```
         IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
                      AT WHEELING
```

* * * * * * * * * * * * * * * * * * * * * * * *

TRANS ENERGY, INC., a
Nevada Corporation,
REPUBLIC PARTNERS VI,
LP, a Texas limited partnership,
REPUBLIC ENERGY VENTURES,
LLC, a Delaware Limited Liability
Company, and PRIMA OIL COMPANY,
INC., a Delaware Corporation,

          Plaintiffs,

vs.              CIVIL ACTION NO. 1:11-cv-00075

EQT CORPORATION, a
Pennsylvania Corporation,

          Defendant.

* * * * * * * * * * * * * * * * * * * * * * * *

        Deposition of ARNOLD SCHULBERG taken by the Plaintiff under the Rules of Civil Procedure in the above-entitled action, pursuant to notice, before Kristen S. Craddock, a court reporter, at the offices of Lewis, Glasser, Casey & Rollins, 300 Summers Street, Charleston, West Virginia, on the 22nd day of August, 2012.

           REALTIME REPORTERS, LLC
           KRISTEN S. CRADDOCK, CR
             118 Capitol Street
            Charleston, WV 25271
             (304) 344-8463

1      A.   I don't have any information on it.
2      Q.   What information would you need to even make that
3  opinion?
4      A.   I mean, all I can tell you is that when I worked
5  at CNG Development Company in the mid '80s, it seemed
6  that everybody was aware of that and although I wasn't
7  part of the -- any attempt to resolve it, it was out
8  there.  Now, whether it ever got concluded and the
9  parties all brought -- came to the table and said, "You
10 know, this is stupid to have this hanging out here," I
11 don't have any idea.
12     Q.   Now, there are several documents we looked at
13 including the indentures that were not recorded?
14     A.   Yes.
15     Q.   Is that any significance to you, the fact that
16 these documents were not recorded?
17     A.   Can I ask you to restate what you mean by
18 significance?
19     Q.   Well, does it mean anything to you whether or not
20 a document conveying property is recorded versus not
21 recorded?
22     A.   Yes.
23     Q.   And tell me -- explain that to me.
24     A.   Well, a recorded document is noticed to the

1  world.  An unrecorded document is not.
2      Q.  And is that the purpose of our recording statute
3  here in West Virginia?
4      A.  Yes.
5      Q.  Would you agree that the proper recording of an
6  instrument is a preferred means to place --
7          MS. LYONS:  Object --
8      Q.  -- on notice?
9          MS. LYONS:  -- to form.
10     A.  Yes.
11 MR. MCMILLAN:
12     Q.  Have you written any papers about the importance
13 of recording documents?
14     A.  Not that I can recall.  No.
15     Q.  Have you given any lectures or anything in that
16 regard about recording?
17     A.  No.
18     Q.  Okay.  Did you -- were you able to look at the
19 recorded documents and give any opinion as to record
20 title in this case?
21     A.  No.  I was tasked with reviewing documents that
22 were supplied to me, some of which were recorded, some
23 of which were unrecorded.  And I think that my title
24 report indicates that limitation.

1   Q. Correct?
2   A. Yes.
3   Q. You're looking at the language that deals with
4   the conveyance itself?
5   A. Yes.
6   Q. Do you refer that to a term, like the conveying
7   language in a document or what?
8   A. The granting language, the assignment language.
9   Q. Is it located somewhere?
10  A. Yeah. It's usually in the granting clause.
11  Q. So you look at the granting clause?
12  A. Yes.
13  Q. Is that something in your vernacular as a title
14  lawyer what you would call that?
15  A. Yes.
16  Q. Is that typically in the beginning of the
17  document?
18  A. Close to the top. Yes.
19  Q. The ones that I've reviewed, I've always seen it
20  kind of in the beginning.
21  A. Right.
22  Q. Is that a fair place for it to be located?
23  A. Yes.
24  Q. And what exactly does the granting language do or

```
 1   mean?
 2       A.   It explains what's being conveyed.
 3       Q.   Okay.  Now, Deposition Exhibit 7 in front of you,
 4   tell me what -- tell me what the granting or conveying
 5   language is.
 6               MS. LYONS:  Show my objection.
 7                           Go ahead.
 8       A.   It says -- this is a memorandum, so it's
 9   describing what the underlying document did.  And it
10   says, "Did bargain, sell, transfer, assign and convey
11   unto assignee all right, title and interest it may have
12   in and to certain oil and gas leases and 88 - which is
13   interlineated - wells more particularly described on
14   Exhibit A and Exhibit B attached hereto and made a part
15   hereof".
16       Q.   Okay.  And would that be the, quote, granting or
17   conveyance language that you're referring to?
18       A.   Yes.
19       Q.   Okay.  Now, attached to this document are
20   exhibits, correct?
21       A.   Yes.
22       Q.   Now, in reviewing your document, does yours have
23   an Exhibit B labeled on it at the bottom?
24       A.   On Page 2 of 3?
```

1    Q.   Page 1 of 3, Page 2 of 3.
2    A.   Yeah.  That must refer to -- I don't know where
3  that is.  But, yes.
4    Q.   Do you have an Exhibit A or is Exhibit A --
5    A.   Yeah.  Exhibit A, at the top.
6    Q.   I just wanted to make sure because I got confused
7  already.
8    A.   Right.
9    Q.   So when we're talking Exhibit A, we're talking
10 about the top portion of the document?
11   A.   The reference at the top.  Yes.
12   Q.   Okay.  What is Exhibit A?
13   A.   Exhibit A is a list of -- I don't know how many
14 -- a group of leases.
15   Q.   Okay.  So it's a listing of leases?
16   A.   Yes.
17   Q.   And it indicates who the lessor/grantor is and
18 who the lessee/grantee is?
19   A.   Yes.
20   Q.   And it gives the date?
21   A.   Yes.
22   Q.   Book and page?
23   A.   Yes.
24   Q.   Is that reflecting that these deeds or these

```
 1   leases are actually recorded?
 2       A.   Yes.  They're references to where you can find
 3   the lease.
 4       Q.   Okay.  And what's the remarks?
 5       A.   I don't know.  There aren't any.
 6       Q.   Look on Page 1 of 3.
 7       A.   Okay.
 8       Q.   Do you have a section or I guess a column that
 9   starts with the word "remarks"?
10       A.   Yes.
11       Q.   What does that mean?
12       A.   It would be some description that the parties
13   felt was necessary to explain what they were doing.
14       Q.   Okay.  And what does it mean based on your
15   review?
16       A.   Well, it appears that these first eight leases
17   were actually not leases, they were fee property and
18   that's what they say - "Fee property, Pennzoil, to
19   retain its interest and grant purchaser an oil and gas
20   lease".
21       Q.   Okay.
22       A.   So they were including these properties, but
23   attempting to explain that there, in fact, was no lease,
24   that the reference is to the page, I assume, where
```

1   Pennzoil got the fee ownership of the oil and gas. And
2   they're trying to explain that we're not conveying these
3   properties to you, we're just going to grant you a lease
4   on those properties.
5       Q.  And then there are blanks and other portions of
6   the remarks; is that correct?
7       A.  Yes; yes.
8       Q.  And do you have any information as to why they're
9   blank?
10      A.  No, I don't.
11      Q.  Is the Blackshere listed as one of the leases?
12      A.  The Blackshere is on here seven times with
13  different lease numbers and I cannot account for that.
14      Q.  So I guess to answer my question, it is listed?
15      A.  Yes.
16      Q.  Not once, but seven times?
17      A.  Yes.
18      Q.  Okay.  As a lease that was conveyed to Cobham
19  from Pennzoil?
20              MS. LYONS:  Show my objection to the form.
21      A.  It is an assignment of that lease.
22  BY MR. MCMILLAN:
23      Q.  Okay.  And Exhibit B, what is Exhibit B?
24      A.  Exhibit B appears to be a list of the leases.

1          I'm sorry.  A list of the wells.
2     Q.  Okay.  Are these the wells on a particular lease
3  or, do you know?
4     A.  Well, two of them appear to be on the John
5  Stevens lease and 17 of them to be on the Blackshere
6  Wells and company lease.
7     Q.  Now, there's nothing out by the remarks.  Do you
8  see that?
9          Is yours blank?
10    A.  Yes.
11    Q.  Does that mean anything to you other than it's
12 blank?
13    A.  No.
14    Q.  Okay.  And the remarks on the Exhibit A, they're
15 blank after it looks -- appears to be the lessor/grantor
16 B.W. Peterson.
17         Do you see that?
18    A.  I do.
19    Q.  Do you have any understanding of why those are
20 blank other than they're just blank?
21    A.  I don't have any understanding on that.
22    Q.  Do you know anything about Cobham?
23    A.  I do not.
24    Q.  Do you know what it operated on the Blackshere

1  lease?

2  A.  I do not.

3  Q.  And my understanding is you did not look at any
4  records from the DEP in regard to what it was producing
5  on the Blackshere lease?

6  A.  That's correct.

7  Q.  And we were talking about what the record chain
8  of title shows regarding ownership of the Blackshere
9  lease and we were dealing with -- I think we got up to
10 Cobham; is that correct?

11 A.  Yes.

12 Q.  And what was your understanding after the Cobham?

13 A.  We have an assignment from Cobham Gas Industries,
14 Inc., to Prima Oil Company, Inc.

15 Q.  And do you know the date of that?

16 A.  It's, apparently, November 5th, 2004.

17 Q.  And have you reviewed that --

18 A.  Yes.

19 Q.  -- document?

20         Okay.  And what is after that?

21 A.  Confirmatory Assignment and Bill of Sale from
22 Cobham Gas Industries, Inc., and Belmont Energy, Inc.,
23 to Prima Oil Company, Inc.

24 Q.  Okay.  Is it fair to say that based on just the

1  record title, that there is a chain directly from the
2  original lessor to Prima Oil?
3      A.  Yes.  There's a chain.
4      Q.  Based on the record?
5      A.  Yes.
6      Q.  Now, we talked a little bit about the recording
7  statute, correct?
8      A.  Yes.
9      Q.  And what it means.
10             And as I lawyer who practices and does
11 title opinions, you're very familiar with the recording
12 statute, are you not?
13     A.  Yes.
14     Q.  Do you know how long that recording statute has
15 been around?
16     A.  I don't.
17     Q.  Were you involved with its creation or enactment
18 or anything like that?
19     A.  No; no.
20     Q.  Now, do you know whether or not, as we sit here
21 today, some of the recorded -- of the unrecorded working
22 agreements and indentures between Hope and South Penn --
23 whether or not they've actually been recorded as we sit
24 here today?

```
 1      A.   I don't know.
 2      Q.   Okay.  Would --
 3           Could those documents be recorded today?
 4      MS. LYONS:  Which specific documents are you
 5  referring to?
 6      MR. MCMILLAN:  I'm trying to be as -- kind
 7  of -- maybe I'll be more specific.  I'm trying to kind
 8  of shortcut this, but the 1902 indenture that was
 9  between Hope Gas and South Penn.
10      MS. LYONS:  Well, let's mark it, so we're
11  very clear.
12      THE WITNESS:  Would that be Exhibit 4?
13      MR. MCMILLAN:  Yeah.  It has already been
14  marked.  Let me just be clear.
15           Exhibit 4 is the working -- what
16  I've characterized as the working agreement.  I
17  believe --
18      MS. LYONS:  And I would show my objection to
19  that characterization.
20      MR. MCMILLAN:  Okay.
21      A.   I believe if an original could be found with --
22  given the fact that it had been notarized, it could be
23  recorded.
24  BY MR. MCMILLAN:
```

1  Q.  Okay.  Okay.  You rendered an opinion in this
2  case, correct?
3  A.  Yes.
4  Q.  And you have rendered an amended opinion in this
5  case, correct?
6  A.  Yes.
7  Q.  All right.  What is your opinion in this case as
8  to who owns the rights and the type of rights under the
9  subject Blackshere lease?
10 A.  Based upon my review of the instruments listed in
11 Exhibit 1 as well as my experience and expertise in the
12 field of real property under West Virginia law, it is my
13 opinion that EQT is the rightful, exclusive and lawful
14 holder of the subject gas leasehold with the exception
15 of formations above the base of the Injun sand and a
16 certain 671-acre tract within the 3,800-acre tract
17 included in the Blackshere lease and a certain 250-acre
18 tract within the 3,800-acre tract included in the
19 Blackshere lease.
20 Q.  What's your basis?
21 A.  My basis is the review of the documents that I
22 was asked to review and my experience.
23 Q.  What particular documents are you referring to
24 that you rely on that provide you with this opinion that

1  the title rests with EQT as the lawful and exclusive
2  owner of gas rights?
3      A.  The -- I place great weight on the language in
4  the assignment from Pennzoil Products Company to Cobham
5  Gas Industries where the wells were assigned and
6  indicated that the rights assigned were oil rights.
7      Q.  Okay.  Any other documents that you place great
8  emphasis or weight that assists you with the opinion
9  that you've provided me today?
10     A.  That is the strongest document in there to
11 support that opinion.  But based on the review, again,
12 of the scope that I was asked to review.
13     Q.  What's the weakest document?
14          MS. LYONS:  Show my objection.
15     A.  The fact that the 1902 working agreement was not
16 recorded.
17 BY MR. MCMILLAN:
18     Q.  Okay.  So you're basing your opinion more on the
19 1996 Memorandum of Assignment between Pennzoil to Cobham
20 Gas; is that correct?
21     A.  Not exclusively.  But as I indicated, I think
22 that's the strongest indicator.
23     Q.  Okay.  And the weakest indicator is the actual
24 unrecorded document?

1  Q. So looking at this document, you're unable to
2  determine what rights, if any, Prima Oil would have on
3  or with respect to the Blackshere lease?
4  A. It looks like it's attempting to assign all
5  right, title and interest, but, like I said, with the
6  reference to the Middle Island Construction, I don't
7  know how that impacts it.
8  Q. Okay. Let's -- how about if we modify it subject
9  to that. What would be your --
10 A. All rights, title and interest.
11 Q. To Prima Oil?
12 A. That's what it --
13         The document says that Cobham and
14 Belmont who are called collectively the assignor, hereby
15 sell, sign, transfer and set over to assignee all of
16 assignor's right, title and interest in and to the wells
17 described in Exhibit A, which is attached hereto and
18 incorporated herein for all purposes and all equipment,
19 contracts, rights, waive bonds, leases and leasehold
20 estates related to the wells.
21         So looks to me like it's everything.
22 Q. That Prima owns everything as it relates to the
23 Blackshere lease?
24         MR. GOTTLIEB: Your question, I take it,

```
 1   includes the oil and the gas?
 2       A.   Well, I mean, it conveyed whatever Cobham and
 3   Belmont together have.
 4   BY MR. MCMILLAN:
 5       Q.   Okay.  And it's your understanding that with that
 6   caveat it would convey everything to Prima Oil, based on
 7   your review of that assignment --
 8       A.   Right, right, right.
 9       Q.   -- in front of you?
10       A.   Right.
11       Q.   Okay.  Did you -- and did you come to any kind of
12   conclusion specifically relating to Prima Oil of what it
13   owned as it pertains to the Blackshere lease?
14       A.   I did not.
15       Q.   But if I understand this, if Cobham owned or had
16   rights to the oil and gas leases, then Prima Oil would
17   have ownership to the oil and gas leases as it relates
18   specifically to the Blackshere lease, correct?
19       A.   Only to the -- to whatever extent and whatever
20   interest Cobham owned, then they would -- those rights
21   would have been assigned to Prima.
22       Q.   Right; right.
23            And my question was if, in fact, that
24   were assigned to Cobham - the oil and gas leases - it's
```

1   A.   No.

2   Q.   Your assignment or your expertise relates to
3   looking at the documents and providing a title opinion,
4   correct?

5   A.   Right.

6   Q.   Okay.  Have you ever heard of the term wild deed?

7   A.   Wild deed?

8        No.  Not really.

9   Q.   Well, based on that answer, what have you heard
10  maybe similar to a wild deed as you understand it?

11  A.   Well, I believe it would be a deed that appears
12  in the record without a tie back to -- or appears
13  outside of the chain of title, but appears to affect the
14  properties.

15  Q.   Okay.  Have you ever dealt with that concept of a
16  wild deed as you defined it?

17  A.   I have had -- in titles that I've done, I have
18  had assignments that have come out of a party and back
19  into somebody who we were tracking and we have no idea
20  where they received their interest.  That's -- but not a
21  wild deed per se.  I have not encountered that.

22  Q.   And is it fair to say that the Hope conveyance to
23  Consolidated Gas Supply had no record of where Hope
24  received its interest to Blackshere?

1    A.    There's no recital in it.
2    Q.    What do you mean by that - "no recital in it"?
3    A.    There's no recital as to Hope stating any
4    assignment whereby it took its interest.
5    Q.    Right.
6    A.    Yeah.
7    Q.    Is there -- so there's no information that you
8    can see in the record about where Hope received its
9    interest?
10   A.    Not in the record.
11   Q.    Would that be construed as a wild deed in your
12   view?
13   A.    Well, my understanding by your definition is that
14   it would be.
15   Q.    Okay.  I'm not sure I gave it a definition.
16         MR. GOTTLIEB:  Yeah.  And you need to give
17   -- define your own terms and not accept his definition
18   then answer according to yours.
19         MR. MCMILLAN:  And I'll say it again, I
20   didn't give a definition.
21         THE WITNESS:  Okay.
22         MR. GOTTLIEB:  Yeah.  So --
23         MR. MCMILLAN:  But I agree with your
24   definition that it is.

1      A.   It -- I mean, it does not reference a prior
2  vesting instrument other than the lease.  And if you go
3  to the lease, the lease is in South Penn.
4  BY MR. MCMILLAN:
5      Q.   Right; right.
6           There's nothing to tell you on the
7  record of where it got its interest?
8      A.   Not on the record.
9      Q.   And that's the chain on which Eastern States Oil
10 and Gas received its interest in the Blackshere lease,
11 is it not?
12     A.   Yes.
13     Q.   Do you know what the term inquiry notice means?
14     A.   Yes.
15     Q.   What does that mean?
16     A.   It means an item that appears in a chain of title
17 or a document that would require the party obtaining
18 that information to make further inquiry.
19     Q.   Okay.  Do you have an idea of what would be --
20 constitute sufficient information to trigger this
21 inquiry notice?  Or is that something that would be
22 relegated to a question of fact?
23     A.   I believe it depends on each particular fact
24 question.