**In the case of:**

*TRANS ENERGY, INC., et al.  v.*

*EQT PRODUCTION COMPANY*

*Richard L. Starkey*

*August 24, 2012*



"Because your time matters"

118 Capitol Street
Charleston, WV 25301

(304) 344-8463
ScheduleRealtime@gmail.com

Realtimereporters.net

*Min-U-Script® with Word Index*

EXHIBIT C

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2       FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

 3   * * * * * * * * * * * * * * * * * * * * * * *

 4   TRANS ENERGY, INC., a
     Nevada Corporation,
 5   REPUBLIC PARTNERS VI,
     LP, a Texas limited
 6   partnership, REPUBLIC
     ENERGY VENTURES, LLC,
 7   a Delaware Limited
     Liability Company, and
 8   PRIMA OIL COMPANY, INC.,
     a Delaware Corporation
 9
             Plaintiffs,
10
     vs.                        CIVIL ACTION
11                              NO. 1:11CV75
     EQT PRODUCTION COMPANY, a
12   Pennsylvania Corporation,

13
             Defendant.
14
     * * * * * * * * * * * * * * * * * * * * * * *
15
         Deposition of Richard L. Starkey taken by the
16   Defendant under the Federal Rules of Civil
     Procedure in the above-entitled action, pursuant
17   to notice, before Jennifer Vail-Kirkbride, a
     Registered Merit Reporter and West Virginia
18   Commissioner and Notary Public, at the law offices
     of Bowles Rice McDavid Graff & Love LLP, 7000
19   Hampton Center, Morgantown, West Virginia on the
     24th day of August, 2012, commencing at 11:06 a.m.
20
             REALTIME REPORTERS, LLC
21           JENNIFER VAIL-KIRKBRIDE
             Certified Realtime Reporter
22           RMR, CRR, FCRR, RPR, WV-CCR
             118 Capitol Street
23           Charleston, WV  25301
             (304) 344-8463
24           realtimereporters.net
```

Page 2

```
 1                APPEARANCES:

 2   APPEARING FOR THE PLAINTIFFS:

 3       Dylan C. Lewis, Esquire
         dlewis@bowlesrice.com
 4       Kimberly S. Croyle, Esquire
         kcroyle@bowlesrice.com
 5       Bowles Rice McDavid Graff & Love
         7000 Hampton Center
 6       Morgantown, WV  26505
         304.285.2500
 7

 8   APPEARING FOR THE DEFENDANT:

 9       Ramonda C. Lyons, Esquire
         rlyons@lgcr.com
10       Lewis Glasser Casey & Rollins, PLLC
         300 Summers Street, Suite 700
11       Post Office Box 1746
         Charleston, WV  25326-1746
12       304.345.2000

13   ALSO PRESENT:  Mark Woodburn, representative on
     behalf of the plaintiffs generally.
14

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
 1                EXAMINATION INDEX

 2

 3   8-24-2012

 4   Deponent:

 5   Richard L. Starkey
         BY MS. LYONS . . . . . . . . .    5
 6       BY MR. LEWIS . . . . . . . . .   56

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

```
 1                  INDEX

 2                                             MAR
     Starkey Deposition Exhibit Number
 3       1                                      14

 4       2                                      36

 5       3                                      58

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 5

1   P R O C E E D I N G S
2   (8-24-2012, 11:06 p.m.)
3   RICHARD L. STARKEY,
4  being first duly sworn, was examined and deposed
5  as follows:
6   EXAMINATION
7   BY MS. LYONS:
8  Q.   Please state your full name for the
9   record.
10  A.   Richard L. Starkey.
11  Q.   Mr. Starkey, my name is Ramonda Lyons.  I
12   believe we introduced ourselves to each other
13   before the deposition began.  Just so that you
14   understand my role in this case, I am with the law
15   firm of Lewis Glasser Casey & Rollins and we
16   represent EQT in this matter.  You understand that
17   you are here today as a fact witness to give your
18   discovery deposition in a matter involving Prima
19   Oil, Trans Energy and others versus EQT regarding
20   the Blackshere lease in Wetzel County, West
21   Virginia, do you understand that, sir?
22  A.   Yes.
23  Q.   What is your understanding about the
24   underlying lawsuit?

Page 6

1  A.   It is a quiet title action, a dec.
2   action.
3  Q.   Have you actually reviewed any of the
4   pleadings in that case?
5  A.   I have read the complaint and the answer.
6  Q.   I understand from Mr. Mark Woodburn's
7   deposition that you have been associated with the
8   plaintiffs for sometime.  Is that correct?
9  A.   Correct.
10  Q.   Could you just give me an overview of
11   your involvement with the plaintiffs beginning
12   with the year that you first began to provide
13   professional services, the scope of those services
14   and things of that nature, please.
15  A.   I have worked with the--with the
16   ownership of Trans Energy before they were Trans
17   Energy.  I don't know exactly when they became
18   Trans Energy, but my relationship with the
19   management goes back into the early '80's or even
20   late '70's and I provided legal services,
21   consultation, document preparation, title
22   examination.  I couldn't tell you exactly when
23   Trans Energy--Trans Energy existed prior.  I think
24   it was purchased, actually, by the current

Page 7

1   management, the current ownership, but I couldn't
2   tell you exactly when that was.
3  Q.   Do you have a personal friendship with
4   some of the owners of Trans Energy?
5  A.   It is more of a business friendship, but,
6   yes, we know each other well and are
7   acquaintances.
8  Q.   And you say you have been providing
9   professional services to the plaintiff since
10   approximately the late 1970's, did I understand
11   you correctly?
12  A.   Right.
13  Q.   Have you ever served as in-house counsel
14   for any of the plaintiffs in this matter?
15  A.   No.
16  Q.   And you are licensed to practice law in
17   which states?
18  A.   West Virginia and Ohio.
19  Q.   Do you currently have an ownership
20   interest in any of the plaintiffs' business
21   entities?
22  A.   Yes, Trans Energy, I own stock.  It is a
23   public company.
24  Q.   And when did you acquire that stock?

Page 8

1  A.   Last year.
2  Q.   Have you held an ownership interest in
3   any of the other plaintiffs in the past which you
4   may no longer hold now?
5  A.   No.
6  Q.   How many shares of Trans Energy do you
7   hold?
8  A.   I think I am actually vested with 10,000,
9   but I have additional rights.  I think the total
10   is around 60,000, but I couldn't tell you for
11   sure.  It's--it vests over a period of time.
12  Q.   Vests under what type of arrangement?  An
13   employee relationship?
14  A.   I am a director.
15  Q.   You are a director, so as a part of your
16   compensation package?
17  A.   Correct.
18  Q.   As a director, you have become vested in
19   10,000 shares?
20  A.   I think it is 10,000 and I think there is
21   an additional 50,000 that will vest over time.
22  Q.   Over time, okay.  And when did you become
23   a director of Trans Energy?
24  A.   June of 2011, I believe it was June, but

Page 9

1   it was around that time, may have been May.
2   Q.   Spring or early summer of last year?
3   A.   Right.
4   Q.   Other than your current directorship for
5   Trans Energy and serving as outside counsel, have
6   you had any other roles, responsibilities, with
7   regard to any of the plaintiffs in this matter?
8   A.   No.
9   Q.   In the 1970's when you began providing
10  legal services, which entity would that have been
11  for?  I guess the ownership--
12  A.   Probably Sancho, it's a privately owned
13  oil and gas company.  It is owned by the same
14  people as Trans Energy, some of the same people.
15  Q.   Some of the same people, okay.
16  At that time--for the record, how do you spell
17  Sancho?
18  A.   S A N C H O, it is like Sancho, but it is
19  the Tyler County pronunciation.
20  Q.   Tyler County pronunciation?
21  A.   It is, there is a creek called Sancho
22  Creek and it is called Sancho.
23  Q.   At that time where were you practicing
24  law?  Were you a firm, a solo practitioner?

Page 10

1   A.   The late 1970's I was a sole practitioner
2   and also later on I was working for a larger firm
3   that I did some work for.
4   Q.   And you brought your client base with
5   you?
6   A.   Some, yeah.  I didn't do a whole lot of
7   work at that time, but, yeah.
8   Q.   And what was the name of the firm?
9   A.   It was initially Davis, Davis, Hall and
10  Clovis.  And later on it became Davis, Bailey
11  Pfalzgraf, Hall and Clovis and it individually
12  merged into Bowles, but I had left before that.
13  Q.   When did you leave the firm?
14  A.   1985.
15  Q.   What was the name of your solo
16  practitioner office?  The offices of Mr. Starkey?
17  A.   It was Friend--actually, Friend &
18  Starkey.  It was a guy by the name of Bob Friend,
19  I had a branch office and he wasn't around, but it
20  was called Friend & Starkey.
21  Q.   There in name only, apparently?
22  A.   Right.  I was in Tyler County and he was
23  in Wood County.
24  Q.   Okay.  And what type of work did you do

Page 11

1   when you basically had your solo practitionership?
2   A.   Well, at the same time I was an assistant
3   prosecuting attorney, but that was part time.
4   Q.   For Tyler County?
5   A.   Wetzel County.
6   Q.   Wetzel County.
7   A.   And it was mostly real estate and a
8   little bit of oil and gas.
9   Q.   When you say "real estate," was that
10  residential, title opinions?
11  A.   Mostly residential real estate.
12  Q.   And you said some oil and gas in terms of
13  oil and gas titles?
14  A.   Exactly.
15  Q.   And how did you come to have--was it
16  Sancho, the Tyler County?
17  A.   Sancho.
18  Q.   As a client?
19  A.   I couldn't tell you exactly how.  Loren
20  knew me.
21  Q.   Loren Bagley?
22  A.   Loren Bagley, and he asked me to do some
23  work for them.  Well, that was probably--that was
24  probably before Sancho.  That was probably L & B.,

Page 12

1   Loren and Bernard, they had an oil and gas
2   production in the early '80's and most of my work
3   was actually for L & B.  I think Sancho was a
4   later company.
5   Q.   And where would you have been practicing
6   law in between the 2002 time frame and 2004 time
7   frame?
8   A.   2002 to 2004, my office was in
9   Parkersburg.
10  Q.   And were you a solo practitioner, were
11  you with Davis, Davis, Hall?
12  A.   I was still a sole practitioner.
13  Q.   You were still a sole practitioner?
14  And you were providing legal services to--
15  A.   Residential real estate, commercial real
16  estate and oil and gas to BB&T and Advantage Bank,
17  WesBanco, Union Bank, HG--those were the banks.
18  Oil and gas companies, HG, Sancho, Jaybee, that is
19  mostly it.  Jaybee is J A Y B E E.  HG is just HG,
20  East Resources during that time, too, which East
21  Resources is now HG in part.
22  Q.   In part.
23  A.   Right.
24  Q.   It is my understanding that in 2004,

Page 13

1  Prima Oil actually acquired a lease from Cobham,
2  were you involved in that transaction?
3  A.   Yes.
4  Q.   At that time were you providing services
5  on an hourly basis or were you, basically, on
6  retainer?
7  A.   Hourly.
8  Q.   Hourly.  To the best of your
9  recollection, when did Prima begin negotiations to
10  acquire that leasehold?
11  A.   Around 2004; I wasn't involved at all in
12  the negotiations.
13  Q.   So you weren't involved in the
14  negotiation process.  Do you know who was on
15  behalf of Prima Oil?
16  A.   I couldn't say.  I mean, the management
17  of Trans Energy, which would have been Loren
18  Bagley and Bill Woodburn.
19  Q.   Does Trans Energy exist at this point?
20  A.   Yeah, Trans Energy existed at that point.
21  Q.   When did you become involved in that
22  particular acquisition or purchase?
23  A.   Around 2004.
24  Q.   Well, was it before or after the sale had

Page 14

1  actually been effectuated?
2  A.   It was before the documents were
3  recorded.
4  Q.   Was it before the documents were
5  executed?
6  A.   Probably.
7  (Starkey Deposition Exhibit 1 was marked)
8  Q.   I will hand you what has been marked
9  Exhibit 1.  This is an assignment and bill of
10  sale.  I'll let you take a moment to review it.  I
11  believe this is an assignment from Cobham and to
12  Prima Oil dated November 5th, 2004.  Let me know
13  when you have completed your review of the
14  document.  I have some questions on it.
15  A.   Okay, I have read the first page.  Do you
16  want me to look through the whole story?
17  Q.   That will not be necessary.  My first
18  question is, did you draft this?
19  A.   I don't think I drafted the
20  assignment.  I think I did draft the Exhibit A.  I
21  didn't draft the master well list.
22  Q.   I'm sorry, you did or did not?
23  A.   I did not draft the well list.  I did
24  draft the Exhibit A.  I don't think I drafted the

Page 15

1  assignment.
2  Q.   So you have a clear recollection of
3  drafting Exhibit A?
4  A.   Well, it just looks like the form I use
5  and I am pretty sure I did.  But if you would look
6  at an Exhibit A that I prepared today, it would
7  look very similar.
8  Q.   Yes, the fonts changed throughout as you
9  look at the entire document, not that you--
10  Do you know who prepared the actual
11  assignment?
12  A.   No.
13  Q.   Do you know who prepared the master well
14  list?
15  A.   No.
16  Q.   Did you review the assignment and master
17  well list as counsel for Prima?
18  A.   I would have reviewed the assignment.  I
19  doubt if I reviewed the master well list.  I mean,
20  I probably looked at it, but I wouldn't have had
21  any comments on it.
22  Q.   During Mr. Woodburn's deposition in this
23  case, he indicated that at some point in time you
24  were involved in a conversation and advised that

Page 16

1  there was legend and lore, to use his words, which
2  I believe he was trying to quote you as best he
3  could recall, of the division of certain leases in
4  terms of the natural gas estate from the oil
5  estate.  Do you recall that same conversation?
6  MR. LEWIS:  Mr. Starkey, before you
7  answer this, I just want to remind you that the
8  client hasn't given you permission to disclose any
9  type of attorney/client-related communications and
10  if there is a discrepancy, if you are doing this
11  outside of the attorney/client--outside of the
12  relationship, when you are not representing them
13  in connection with this deal, you have to make
14  that distinction.  You have to distinguish that on
15  the record.
16  A.   I'm sure the discussion about that would
17  have been in my representation as an attorney.
18  MS. LYONS:  It would be my position since
19  Mr. Woodburn has already disclosed that
20  conversation, that he has waived attorney/client
21  privilege as to that conversation.  And I am
22  entitled to explore that further.  It has already
23  been waived.
24  MR. LEWIS:  My position is that he hasn't

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

Richard L. Starkey
August 24, 2012

Page 17

1  waived any type of opinion that Mr. Starkey has
2  given him about the conversation. He has merely
3  expressed a fact that the conversation was based
4  on.
5      MS. LYONS: Then I can explore the facts.
6      MR. LEWIS: I am just reminding him as to
7  his opinion. It has not been waived.
8  Q. Do you recall the conversation?
9  A. I don't know that I recall the
10  conversation with Bill, no.
11  Q. Do you recall having that conversation
12  with any representatives of Prima Oil?
13  A. I think I had that conversation with
14  Mark.
15  Q. With Mark, and actually--did I say Bill?
16  It was Mark who testified. You believe you had
17  that conversation with Mark Woodburn.
18  A. Right.
19  Q. When did you first hear about the
20  division of the natural gas estates and certain
21  leases in northern West Virginia?
22  A. Probably the '80's.
23  Q. And tell me exactly what you heard.
24  A. That there was a very inconsistently

Page 18

1  applied agreement which gave gas rights in
2  subleases somewhere to Hope, and oil rights to
3  South Penn, but that--I didn't know exactly--I
4  have never seen the agreement, so I don't know
5  anything about it, really.
6  Q. That was going to be my next
7  question. Have you ever seen any written
8  documents pertaining to that division, the two
9  estates?
10  A. No, it is secret.
11  Q. Do you recall who would have made you
12  aware of this potential division?
13  A. Probably Dave Clovis, would be my
14  guess. He was at Davis, Bailey, Pfalzgraf, Hall
15  and Clovis and we represented Pennzoil in the five
16  or six counties around Wood County.
17  That's--that's probably who would have told me
18  about it because he had represented Pennzoil for
19  many years.
20  Q. Did you work with Mr. Clovis or anyone
21  else on title opinions in which this potential
22  division of the natural gas estates--I'm sorry,
23  the natural gas estate from the oil estate had
24  been divided?

Page 19

1  A. I have been thinking about that and for
2  30 years I have worked for Pennzoil and then East
3  Resources and now HG, and never once has it
4  applied to anything I have worked on. I have
5  worked on the Sistersville field, Wileyville
6  field, Stringtown, these are big fields, you know,
7  hundreds of leases, Mannington field; it doesn't
8  apply to any of them.
9  Q. Did Mr. Clovis indicate that this
10  particular division of the oil from the natural
11  gas estate had applied to any title opinions that
12  he had actually drafted?
13  A. I couldn't tell you. I can't remember
14  that.
15  Q. Can you give me any more context to that
16  conversation with Mr. Clovis?
17  A. No, this has been 30 years ago. I
18  haven't seen Mr. Clovis in probably 25 years.
19  Q. Okay. And have you ever heard of this
20  division between the oil and natural gas estates
21  from any other sources other than Mr. Clovis?
22  A. The complaint, obviously, it has it in
23  it. I was involved in a lawsuit, Saint Lukes,
24  that was, apparently, one of the leases that was

Page 20

1  subject to the agreement, but there was actually
2  an assignment there. At some point, I can't
3  remember who took the original lease, Hope or
4  South Penn. They assigned their rights so that
5  South Penn owned the oil and Hope owned the gas,
6  but there was actually an assignment of record;
7  but I think it probably was because of that
8  treatment. It was in Ritchie County. It was an
9  800-acre lease and Jaybee actually owned the oil
10  rights. They were the successor to South Penn.
11  Q. South Penn.
12  A. And Dominion owned the gas rights; but
13  they actually recorded an assignment. It wasn't
14  just based on the secret agreement.
15  Q. Why do you keep referring to it as a
16  secret agreement?
17  A. Because it was a secret agreement.
18  Q. How do know that? Who told you that?
19  A. It wasn't recorded. It was kept--it
20  was--no one could look at it.
21  Q. Did Mr. Clovis tell you that it was
22  secret?
23  A. A Pennzoil land man told me that they
24  didn't show it to anyone.

Page 21

1  Q.   So a Pennzoil land man, so you have now
2  spoken to Mr. Clovis, someone at Pennzoil and then
3  this involvement in the Ritchie County lawsuit.
4  And give me the caption for that case again.
5  A.   Saint Lukes is what I always called it,
6  Saint Lukes versus CNG, I think, and it eventually
7  became Dominion.
8  Q.   And was that a quiet title action?
9  A.   Failure to develop.
10  Q.   Failure to develop.  And did that go
11  beyond the Circuit Court level?
12  A.   Made it to the Supreme Court.
13  Q.   Okay, who was the land man at Pennzoil
14  that discussed the agreement with you?
15  A.   Mike Kirsch.
16  Q.   Can you spell his last name, please?
17  A.   K I R S C H.
18  Q.   And approximately when were you speaking
19  with Mr. Kirsch regarding the agreement?
20  A.   This would have been within the last ten
21  years.  I asked him about it one time and he said
22  that he couldn't--he couldn't show it to me.
23  Q.   Do you know if Mr. Kirsch is still alive?
24  A.   Yes, he still works there.

Page 22

1  Q.   Do you have his contact information?
2  A.   Yes.
3  Q.   Okay.  Is it in your cell phone or do you
4  have it with you today?
5  A.   Yes.
6  Q.   Can you tell me what that is?
7  A.   Do you want his cell phone number?
8  Q.   I don't know if you feel comfortable
9  giving his cell phone number out, maybe his work
10  number.
11  A.   I don't know what his work number is.
12  Q.   But he is still with Pennzoil?
13  A.   Uh-huh.
14  Q.   And you say this conversation was within
15  the last ten years.  Were you actually working for
16  Pennzoil yourself when this conversation took
17  place?  I'm sorry, you have to answer.
18  A.   Yes.
19  Q.   And what prompted you to ask Mr. Kirsch
20  about the agreement?
21  A.   I couldn't tell you.  We were just
22  discussing oil and gas title issues and that came
23  up.
24  Q.   Okay.  And you affirmatively asked him if

Page 23

1  you could see the agreement?  Yes?
2  A.   Yes.
3  Q.   Okay.  And he would not let you see the
4  agreement?
5  A.   He said, no, they didn't want it out.
6  Q.   Did he say why?
7  A.   He said they liked the ambiguity.
8     MR. LEWIS:  Excuse me, who is "they?"  I
9  don't understand who you are referring to.
10     MS. LYONS:  Pennzoil.
11  A.   East Resources at that time.
12  I'm sorry, I thought you said he was with
13  Pennzoil.
14  A.   It became East Resources in 2000.  They
15  changed their name.  Well, East Resources bought
16  Pennzoil's production in West Virginia and
17  Pennsylvania but Mike stayed through the years.
18  Q.   And were you actually an employee, then,
19  of East Resources at this time?
20  A.   Outside counsel.
21  Q.   Outside counsel for East Resources?
22  Okay, back to where we were before.  So at the
23  time of this conversation, Mr. Kirsch is an
24  employee of East Resources, which was--

Page 24

1  A.   It is now HG.
2  Q.   Now HG.  And you were outside counsel for
3  East Resources.  Did this particular agreement
4  have some relevance to a matter that you had been
5  retained on?
6  A.   No.
7  Q.   No, okay.  And I believe I was asking you
8  if he indicated why you could not see the
9  document.  And his response was?
10  A.   They--East Resources preferred the
11  ambiguity.
12  Q.   Did he expand upon that?
13  A.   No, it would have been easy enough to
14  record if they wanted to make it clear to
15  everyone.
16  Q.   So we have--help me to understand.  Your
17  conversation with Mr. Clovis regarding the
18  agreement occurred in the 1980's, correct?
19  (Nodding affirmatively)
20  Can you give me any more information as to
21  when the Ritchie County lawsuit occurred?
22  A.   I think it was filed in late 2002, early
23  2003.
24  Q.   And then you said this conversation with

Page 25

1  Mr. Kirsch occurred--you said within the last ten
2  years?
3  A.  Right.
4  Q.  Would it have occurred--
5  A.  It may have been as a result of the Saint
6  Lukes case, it could have been what prompted me to
7  ask him about it.
8  Q.  Would it have been before 2004?
9  A.  Maybe, I couldn't tell you for sure.
10  Q.  Can you tell me whether it was the
11  contemplated transaction between Cobham and Prima
12  Oil that prompted you to speak with Mr. Kirsch?
13  A.  No.
14  Q.  No, it was not?
15  A.  No, it was not.
16  Q.  Did your conversation with Mr. Kirsch
17  occur before that transaction--
18     MR. LEWIS: One moment.
19     MS. LYONS: Off the record.
20  (Recess at 11:40 a.m. until 12:05)
21     MS. LYONS: Let's go back on the
22  record. Madam Court Reporter, could you read the
23  last question to the witness.
24  (The following question was read by the court

Page 26

1  reporter: "Can you tell me whether it was the
2  contemplated transaction between Cobham and Prima
3  Oil that prompted you to speak with Mr. Kirsch?")
4  A.  I couldn't tell you for sure. It wasn't
5  related at all.
6  Q.  It is not related. You couldn't tell
7  whether it occurred before or after?
8  A.  No.
9  Q.  We have discussed that with regard
10  to--any time I say "the transaction," if we could
11  just understand that that is the transaction in
12  which Cobham assigned rights to the Blackshere
13  lease to Prima Oil on November 5th, 2004, just for
14  shorthand purposes, okay?
15  A.  Okay.
16  Q.  With regard to the transaction, you had
17  told me that you drafted Exhibit A and that you
18  would have reviewed the assignment and bill of
19  sale on behalf of Prima Oil?
20  A.  Yes.
21  Q.  Did you have any other involvement in
22  this transaction? Did you provide any other legal
23  services?
24  A.  I went to the courthouses at various

Page 27

1  counties to determine whether Cobham had a good
2  assignment from Pennzoil.
3  Q.  Did you actually go into Marion, Wetzel,
4  Doddridge Counties and obtain copies of the
5  recorded documents referenced on Exhibit A?
6  A.  I don't know that I obtained copies.
7  Q.  Did you actually travel to each of those
8  three counties in terms of your work for Prima on
9  this transaction?
10  A.  Yes.
11  Q.  And you reviewed these documents?
12  A.  Yes.
13  Q.  You simply don't know if you made copies
14  of the documents.
15  A.  No, I may have been given copies. I
16  don't know. It is not unusual.
17  Q.  You would have--if you had been given
18  copies, who would have given them to you?
19  A.  Trans Energy.
20  Q.  Some representative of Trans Energy?
21  A.  Right, but I don't recall that. That is
22  not unusual in a transaction like that that they
23  give you copies of older documents. Usually,
24  every time I do a title opinion, I end up with a

Page 28

1  fist full of documents.
2  Q.  Prior to this transaction actually being
3  effectuated, did you prepare a title opinion?
4  A.  I think I did.
5  Q.  So that would have been in 2004 that you
6  prepared a title opinion?
7  A.  Correct.
8  Q.  And was that a title opinion with
9  reference to each of the leases on Exhibit A?
10  A.  Yes.
11  Q.  Including item number 8, Pennzoil to
12  Cobham?
13  A.  Correct.
14  Q.  And that particular lease pertained--or,
15  I'm sorry, that particular assignment into Cobham
16  would have included reference to the Blackshere
17  lease which is at issue in this case?
18  A.  Correct.
19  Q.  And did your title opinion examine both
20  oil and gas rights?
21  A.  Yes.
22  Q.  With regard to the Blackshere lease?
23  A.  Yes.
24  Q.  Would you consider that a full title

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

Richard L. Starkey
August 24, 2012

---

Page 29

1  opinion?
2  A.   It was not a full title opinion.
3  Q.   How would you characterize it?
4  A.   At the time we--it was a purchase of
5  existing production and usually checked either the
6  most recent assignment or maybe a few assignments
7  back, but I didn't search it back until day
8  one.  It would have just been the leasehold side.
9  I didn't examine the mineral ownership.
10 Q.   Can you be more specific in terms of what
11 documents you would have reviewed and how far back
12 you would have gone with regard to the leasehold
13 side, to use your terminology, other than what is
14 reflected here?
15 A.   Yes, I couldn't tell you how far I went
16 back.
17 Q.   Did you review that title opinion in
18 preparation for your testimony today?
19 A.   No.
20 Q.   Do you have a copy of it in your file?
21 A.   I probably have one, sure.
22 Q.   And this title opinion--can we refer to
23 it as an abbreviated title opinion?
24 A.   Okay.

---

Page 30

1  Q.   Fair enough.  I'm sorry, you have to
2  answer.
3  A.   Yes.
4  Q.   This abbreviated title opinion, you would
5  have rendered that in 2004, correct?
6  A.   Correct.
7  Q.   Prior to November 5th of 2004.
8  A.   Correct.
9  Q.   When were you rendering your abbreviated
10 title opinion prior to November 5th of 2004, did
11 you advise anyone with Trans Energy or Prima Oil
12 what you had learned from the Saint Lukes case and
13 Davis Clovis regarding the potential division of
14 the oil and natural gas estates for certain
15 leases?
16 A.   No.
17 Q.   Why not?
18 A.   It was rarely applied.  It didn't seem to
19 apply to this.  There was nothing in the
20 assignments to bring it up.
21 Q.   At some point you did advise
22 representatives of Trans Energy or Prima Oil of
23 this potential division of oil and natural gas
24 estates, correct?

---

Page 31

1       MR. LEWIS: Hold on one second.  I think
2  he hasn't been authorized to tell what he advised
3  them of.
4       MS. LYONS: We have already gone over
5  this.  This is a fact, it is not an opinion.  And
6  Mr.--let me finish.  And Mr. Woodburn has already
7  testified to it and waived any privileges.
8       MR. LEWIS: Could you please read back
9  her question?
10 (The following question was read by the court
11 reporter:  "At some point you did advise
12 representatives of Trans Energy or Prima Oil of
13 this potential division of oil and natural gas
14 estates, correct?")
15      MR. LEWIS: That assumes--that assumes a
16 legal conclusion.  What we talked about before was
17 he discussed lore and legend.  Now you are asking
18 him to say what type of opinion he rendered as to
19 whether or not there was a division.
20      MS. LYONS: I would disagree, but I am
21 happy to rephrase the question.
22      MR. LEWIS: I appreciate that.
23 Q.   At some point in time you advised--I
24 believe you said it was Bill Woodburn; is that

---

Page 32

1  correct?
2  A.   Mark, I think.
3  Q.   I'm sorry, I keep getting that
4  confused.
5  At some point in time you advised Mark
6  Woodburn of a lore and legend that you had heard
7  from Mr. Clovis regarding the potential division
8  of the oil from the natural gas estate under
9  certain leases in which South Penn would have kept
10 the oil rights and Hope Natural Gas would have
11 gotten the gas rights; is that correct?
12 A.   We had that discussion at one time, yes.
13 Q.   And what was the context of that
14 discussion?  I don't want to get into any legal
15 opinions.
16      MR. LEWIS: Could you put in a time
17 frame, too?
18      MS. LYONS: Yes, I can.
19 Q.   Can you give me a time frame for that
20 discussion?
21 A.   It would have been when they were going
22 to drill a Marcellus well.  I think that is when
23 we discussed it.
24 Q.   On the Blackshere lease or another lease?

---

Page 33

1  A.   On the Blackshere.
2  Q.   And was this in your role as an attorney
3  or was it simply a conversation between two
4  gentlemen that knew each other?
5  A.   My role as an attorney.
6  Q.   Your role as an attorney.  How many title
7  opinions have you rendered with regard to the
8  Blackshere lease?
9  A.   Two.
10  Q.   We have discussed the one in 2004, which
11  we have referred to as the abbreviated title
12  opinion, and you have said that only addressed the
13  leasehold side, not the mineral ownership;
14  correct?
15  A.   Correct.
16  Q.   The second title opinion, what was the
17  scope of that opinion?
18  A.   It was the leasehold side, but it was a
19  more complete title opinion.
20  Q.   Did the second title opinion address
21  mineral ownership?
22  A.   No.
23  Q.   So to be clear, the second title opinion
24  did not opine on ownership of the natural gas

Page 34

1  estate?
2  A.   The mineral estate.
3  Q.   Including natural gas.
4  A.   It was the entire leasehold, oil and gas
5  leasehold.
6  Q.   And the second title opinion was rendered
7  in what year?
8  A.   Uh, I don't know, two years, three years
9  ago, it was when they were considering drilling
10  the Marcellus well.
11  Q.   And do you have a copy of that written
12  title opinion--
13  A.   Yes.
14  Q.   --in your files?
15  A.   Yes.
16  Q.   So both title opinions were restricted to
17  the leasehold side, correct?
18  A.   Yes.  I believe they had another attorney
19  do the mineral.
20  Q.   In the second title opinion, did you make
21  reference to the lore and legend in your written
22  title opinion?  It is a fact whether--
23  MR. LEWIS: Okay, now you are talking
24  about not what he is basing some of his inquiries

Page 35

1  on, but what he is actually putting into writing,
2  which is also attorney work product, which he
3  doesn't have to tell you.  That is going into what
4  is in there and that is now being conveyed as an
5  opinion to the client, so we are not going to get
6  into what is actually in his opinion.  You can ask
7  have him what he reviewed.
8  MS. LYONS: You are instructing him not
9  to answer that question.
10  MR. LEWIS: Yes, he will not answer that
11  question.
12  MS. LYONS: We will reserve our right to
13  take that up.
14  MR. LEWIS: That is fine.
15  Q.   Was it in this time frame that you
16  verbally advised Mr. Woodburn of the lore and
17  legend between the oil and natural gas estate
18  between South Penn and Hope Natural Gas?
19  A.   It was around that time.  It was Mark,
20  not Bill.
21  Q.   I'm sorry, I keep doing that, Mark.  And,
22  again, what prompted you to tell him that was the
23  fact that they were contemplating drilling a
24  Marcellus well on the Blackshere lease, correct?

Page 36

1  A.   Correct.
2  (Starkey Deposition Exhibit 2 was marked)
3  MR. LEWIS: Ramonda, for the record I am
4  not instructing him not to answer these
5  questions.  He has not been permitted by the
6  client to answer any questions that are
7  attorney/client privilege.  And if I am making the
8  determination--if I am determining in my capacity
9  as the client's attorney that those questions you
10  asked are going into attorney/client privilege,
11  I'll raise that with the understanding that it is
12  not that I am directing him not to, he does not
13  have the authority to do it.
14  MS. LYONS: I understand the distinction
15  you are making.
16  MR. LEWIS: Okay.
17  Q.   Just let me know once you have completed
18  your review of Exhibit 2.
19  A.   I have read the first page.
20  MR. LEWIS: Can I have a copy, please?
21  MS. LYONS: I'm sorry, I don't think I
22  have another copy, but it is the assignment to
23  Cobham from Pennzoil from yesterday.
24  MR. LEWIS: I know what it says.  That is

TRANS ENERGY, INC., et al.  v.
EQT PRODUCTION COMPANY

Richard L. Starkey
August 24, 2012

Page 37

1  fine.
2      MS. LYONS: I have my copy from
3  yesterday.  Do you want that?
4      MR. LEWIS: No.  I know what it says.
5  Q.  If you could turn to in Exhibit 1,
6  Exhibit A, which I believe you testified you
7  prepared.
8  A.  No, I didn't prepare that.
9  Q.  Exhibit A, the listing, you didn't
10  prepare that?
11  A.  Okay, on this one--
12  A.  Yes, I wanted to go back to Exhibit 1.
13  A.  All right.
14  Q.  And then Exhibit A of Exhibit 1.
15  A.  Right, okay, got it.
16  Q.  And this is the document that you
17  indicated is your form and that you prepared.
18  A.  Yes, I prepared that.
19  Q.  And down on item 8, it references
20  assignor, Pennzoil Products Company, assignee,
21  Cobham, date October 15, 1996, book and page
22  reference is 76A704.
23  First of all, is Exhibit 2 the document that
24  you were referring to as item 8 on your listing

Page 38

1  here?
2  A.  Yes.
3  Q.  And so this is the same document that you
4  reviewed, correct?
5  A.  Correct.
6  Q.  In terms of preparing your abbreviated
7  title opinion?
8  A.  Yes.
9  Q.  Prior to effectuation of the transaction
10  as we have described it?
11  A.  Correct.
12  Q.  And I believe you earlier said that you
13  did not reference the potential division of the
14  oil and natural gas estates between South Penn and
15  Hope Natural Gas because the assignments made no
16  reference to it; is that correct?
17      MR. LEWIS: Hold on a second.
18      MS. LYONS: That is what he has already
19  said.
20      MR. LEWIS: Reference in what?
21      MS. LYONS: The potential division of the
22  natural gas estates from the oil--
23      MR. LEWIS: In what?  In a conversation?
24      MS. LYONS: No, he said that is why he

Page 39

1  didn't tell them in 2004.
2      MR. LEWIS: I want you to read the
3  question back.  It sounds like you are asking him
4  to testify to something that he has referenced in
5  a written document.
6      MS. LYONS: It is actually something he
7  didn't reference.
8      MR. LEWIS: If I don't understand the
9  question, I don't understand the question, so I
10  want it to be clear.
11  (The following question was read by the court
12  reporter:  "And I believe you earlier said that
13  you did not reference the potential division of
14  the oil and natural gas estates between South Penn
15  and Hope Natural Gas because the assignments made
16  no reference to it; is that correct?")
17      MR. LEWIS: Okay, I think it is unclear
18  as to what he is referencing and where, so if you
19  could add that type of information, I would
20  appreciate it.
21  Q.  Mr. Starkey, do you understand the
22  question?
23  A.  I don't think that is what I answered.  I
24  do understand the question.  I think I just said I

Page 40

1  didn't discuss it and I found no evidence of it.
2  Q.  Okay.  Let's look at Exhibit 2.
3  A.  Okay.
4  Q.  Obviously, this document is of record in
5  Wetzel County.  Did you review Exhibit B to
6  Deposition Exhibit 2?
7  A.  The list of leases?
8  Q.  There are some--
9  A.  That is Exhibit A.  Exhibit B, did you
10  say?
11  Q.  Yes, Exhibit B.  Did you review that
12  prior to issuing--
13  A.  I probably looked at it, yeah, it is a
14  list of wells.  I was more concerned with the
15  leases.  I didn't do it, an examination of the
16  wells.  I did an examination of the leases.
17  Q.  I would like to just get the question out
18  and then if you can answer it.
19  A.  Okay.
20  Q.  As a part of your preparation for issuing
21  what we have referred to as the abbreviated title
22  opinion in 2004 prior to the transaction being
23  effectuated on November 5th, 2004, did you review
24  Exhibit B to Deposition Exhibit 2?

Page 41

1  A.   I would have looked at it.
2  Q.   Okay.  Did you note the rights column and
3   that as to Blackshere, it indicates oil only?
4  A.   That is a list of wells, oil wells.
5  Q.   The question was simply, did you make
6   note of that, yes or no?
7  A.   I don't recall.
8  Q.   You don't recall.
9  A.   It is a list of wells.  Some wells are
10  gas wells, some wells are oil wells.
11 Q.   So how do you explain the oil and
12  right--the oil and gas rights as to the Stevens?
13 A.   Some of them are oil and gas wells.
14 Q.   Originally, some wells are contemplated
15  to be both oil and gas wells?  They are not
16  primarily supposed to be an oil or a gas well?
17 A.   It is more of an engineering than a legal
18  question.
19 Q.   I would agree with that, just based on
20  your experience in the industry?
21 A.   Some are called oil, some are called gas,
22  some are called oil and gas.
23 Q.   How did you interpret the word "rights"
24  over that column?

Page 42

1      MR. LEWIS: I think you already answered
2   that one.
3  A.   I think we are discussing wells here.
4  Q.   So it would be the rights in the wells?
5  A.   Exactly.  I mean, they are not
6   referencing leases.  You can see that.
7  Q.   So from that, it would be your opinion
8   that Cobham had no right to the gas that was
9   produced by the wells on the Blackshere lease
10  because it says oil only?
11 A.   I don't know whether that is true or not.
12 Q.   As you sit here--
13 A.   It is an engineering thing, I think, more
14  than a legal question.  Some wells are oil wells.
15  Some wells are gas wells.  Some are oil and gas
16  wells.
17 Q.   Actually, I don't think you understood my
18  question.  As you sit here today as an oil and gas
19  title attorney, that column is entitled
20  "rights."  As to the Blackshere wells it only
21  lists oil.  It is your opinion that that only
22  gives oil rights for those wells?
23 A.   I couldn't tell you for sure what that
24  means, but it is in reference to wells, not

Page 43

1   leases.
2  Q.   Is that ambiguous to you since you can't
3   tell me what it means?
4  A.   I could tell you that it means oil wells.
5  Q.   Do you see the word "rights" above that?
6  A.   I do.
7  Q.   And "rights" denotes what in this
8   document?
9      MR. LEWIS: Ramonda, I would like to--
10     MS. LYONS: I am not asking for what he
11  said to his client.  I am asking his opinion
12  now.
13     MR. LEWIS: I have another thing to tell
14  you.  As you know, he has been designated a fact
15  witness.  Now you are asking for a legal
16  conclusion.  I understand Mr. Starkey is an
17  attorney, but you already had an opportunity to
18  depose our legal expert or our expert.
19     MS. LYONS: And as a fact witness, you
20  can make an objection.
21     MR. LEWIS: That is what I am doing.
22     MS. LYONS: That is your objection.  You
23  may answer.
24 A.   They appear to be oil wells.

Page 44

1  Q.   And my question to you is, what does the
2   word "rights" mean on this document?
3  A.   I couldn't tell you for sure.
4  Q.   And to you, does that make that ambiguous
5   as an attorney?
6  A.   It is a description of wells.  It is not
7   a description of a leasehold.
8  Q.   Can you answer the question, is it
9   ambiguous?
10 A.   I did answer it.  These are wells.  They
11  are oil wells.
12 Q.   Yes or no, is it ambiguous or not?
13 A.   I think it is clear that those are oil
14  wells.
15 Q.   And that the word "rights" has what
16  meaning in that to you?
17 A.   I don't know what the meaning it has in
18  the document.
19 Q.   Were you specifically instructed to only
20  look at the leasehold side?
21 A.   Yes.
22 Q.   For both the abbreviated and the second
23  title opinion?
24 A.   Correct.

Page 45

1  Q.   Can you tell me, you said that the second
2  title opinion was--well, tell me the difference
3  between the two in terms of the scope of your
4  work.
5  A.   I went back to the Blackshere lease
6  itself and came forward from there.
7  Q.   I believe that was 1892, if memory
8  serves.
9  A.   Right.
10 Q.   So you went all of the way back to 1892
11 with regard to the leasehold, correct?
12 A.   Correct.
13 Q.   In 2004, was the acquisition from Cobham
14 made to eventually develop the property?
15     MR. LEWIS: Hold on.
16 A.   Say that again?  Would you repeat that?
17     MR. LEWIS: Excuse me.
18     MS. LYONS: I will repeat it and you can
19 make your objection.
20     MR. LEWIS: You really need to give me
21 time before you answer questions.
22     THE WITNESS: Okay.
23     MR. LEWIS: Because you are speaking way
24 too fast and I need to understand the questions

Page 46

1  Ramonda is asking to preserve the client's rights.
2      THE WITNESS: Okay.
3  Q.   In 2004, do you know whether or not Prima
4  Oil acquired the leases from Cobham to develop
5  those leases further?
6      MR. LEWIS: I am going to object to that
7  as attorney/client privileged information.
8      MS. LYONS: Well, I think he can first
9  say yes or no whether he knew or not, and then
10 whenever I actually ask him--
11     MR. LEWIS: That is fine.
12 Q.   Do you know?
13 A.   I don't know what the intent was at that
14 time.
15 Q.   Have you ever spoken with anyone at
16 Dominion with regard to the division of oil and
17 natural gas estates in West Virginia?
18 A.   No.
19 Q.   Other than your request to Mr. Kirsch,
20 have you ever tried to obtain copies or view those
21 actual, written documents?
22 A.   No.
23 Q.   In terms of what you had heard regarding
24 this lore and legend, did you learn as to which

Page 47

1  potential counties would be effected?
2  A.   No.
3  Q.   Other than Ritchie County based upon how
4  you referred to that case?
5  A.   The Saint Lukes case, there was actually
6  an assignment there.  It was a step beyond the--it
7  was recorded documentation.
8  Q.   Did that recorded documentation make
9  reference to other counties other than Ritchie
10 County?
11 A.   No, it was an assignment of a lease.
12 Q.   A single lease?
13 A.   A single lease.
14 Q.   I didn't mean to raise my voice.  It was
15 because of the sirens.
16 A.   I didn't even notice.
17 Q.   Have you ever been out to the Blackshere
18 property?
19 A.   No.
20 Q.   Have you had discussions with anyone from
21 Trans Energy or any of the other plaintiffs in
22 this case about a physical inspection of the
23 property?  That is a yes or no.
24 A.   Yes.

Page 48

1  Q.   Okay.  And those conversations, were
2  those in the context of preparing your title
3  opinion or opinions plural?
4  A.   It concerned the--
5      MR. LEWIS: Mr. Starkey, before you
6  answer, just remember that your not authorized to
7  disclose any attorney/client-privileged materials
8  or information.
9  Q.   Let's back up.  As to the Blackshere
10 lease, you have been engaged to provide legal
11 services on two separate occasions; is that
12 correct?
13 A.   Yes.
14 Q.   And that was your preliminary or
15 abbreviated title opinion in 2004 and then the
16 second title opinion; is that correct?
17 A.   Correct.
18 Q.   Have you completed those two projects?
19 A.   Yes.
20 Q.   Have you been retained to provide any
21 other legal services pertaining to the Blackshere
22 lease?
23 A.   No.
24 Q.   Okay.  When did you issue your second

Page 49

1  title opinion?
2  A.  It has been whenever they contemplated
3  drilling the Marcellus well, I don't know exactly
4  when that was, two, three years ago.
5  Q.  Okay.  Since you completed that report,
6  have you had conversations with anyone at Trans
7  Energy or Prima regarding the Blackshere lease?
8  A.  Yes.
9  Q.  So, you would agree with me that those
10  conversations have not been within the context of
11  the attorney/client privilege because you have
12  completed your work, correct?
13  A.  No.
14  Q.  No?  What is your other assignment?
15  A.  We were involved in this.
16  Q.  Are you a consulting expert in this case?
17  A.  I think I am acting as an attorney.
18  Q.  In what capacity?
19  A.  Discussing the lawsuit, this lawsuit.
20  Q.  So when you discussed the lawsuit, who
21  are you discussing it with?
22  A.  Mark, usually.
23  Q.  Have you had discussions regarding the
24  lawsuit with attorneys from Bowles Rice?

Page 50

1  A.  Yes.
2  Q.  So you are providing consulting services?
3  A.  Mostly discussion of the deposition.
4  Q.  For today's deposition?
5  A.  Yes.
6  Q.  We were talking about your conversations
7  with representatives of Trans Energy or any of the
8  other plaintiffs regarding a physical inspection
9  of the Blackshere leasehold, correct?
10  A.  Correct.
11  Q.  Have those conversations taken place, you
12  said, within the last--in preparation for this
13  deposition?
14  A.  Mostly, yes.
15  Q.  So within the last two weeks?
16  A.  Oh, longer than that.  It has been fairly
17  recent.
18  Q.  And who was your conversation with?  You
19  said Mark primarily.  Anybody else?
20  A.  Bill Woodburn.
21  Q.  Mark and Bill Woodburn.
22  A.  John Corp, he is the president of Trans
23  Energy.  We have discussed it.
24  Q.  Were there any discussions regarding

Page 51

1  physical inspection of the property when you were
2  rendering your preliminary title opinion in 2004?
3  That is a yes or no.
4  A.  I can't remember.
5  Q.  What about when you did your second title
6  opinion?
7  A.  I can't really recall when the
8  conversations occurred, but it--we have discussed
9  it, that they physically inspected the property.
10  Q.  They have physically inspected the
11  property?
12  A.  Correct.  They operate on the
13  property.  They are out there on a daily basis.
14  Q.  Have you advised any other clients of the
15  potential division of oil and natural gas estates?
16  A.  Other than HG.
17  Q.  On how many leases have you made HG aware
18  of that potential, the potential?
19  A.  It has never been--I have examined
20  hundreds of leases for HG and none of them has
21  ever been subject to the agreement.
22  Q.  But you said you have made them aware of
23  the potential?
24  A.  Well, they made me aware of the

Page 52

1  potential.
2  Q.  They made you aware.
3  A.  Yes, that was the discussion.
4  Q.  Specifically in what counties?
5  A.  Wetzel, Marion, Tyler, but none of them
6  were subject to it, they were for whatever reason
7  outside.  It is very inconsistently applied.  You
8  can't tell--there is nothing consistent about it,
9  it is--it is rare.
10  Q.  Who at HG did you have these
11  conversations with?
12  A.  Mike Kirsch.
13  Q.  The same, I'm sorry.  And it has only
14  been that one conversation?
15  A.  That is the only one I recall.
16  Q.  And he, specifically, referenced Wetzel,
17  Marion, and Tyler?
18  A.  No, that is where I did work for HG, is
19  in Wetzel, Marion, and Tyler.  I don't know that
20  we discussed it separately in those counties or
21  anything like that, but I have worked for HG in
22  those counties and none of their leases in those
23  counties are subject to the agreement.  And,
24  again, it is very inconsistent, even rare, and

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

Richard L. Starkey
August 24, 2012

Page 53

1  there is no way to determine--
2  Q.   Have you personally ever run the chain
3  for Hope Gas to see what might have happened with
4  the leases that were subject to that potential
5  agreement?
6  A.   Yes.
7  Q.   Under what context or in what context?
8  A.   Working for clients.
9  Q.   Did you run the Hope Natural Gas chain
10  for Trans Energy or Prima?  That is a yes or no.
11  A.   I did.
12  Q.   Did you run the Hope Natural Gas chain
13  with regard to the Blackshere lease?
14  A.   Yes, I did.
15      MR. LEWIS: Can you make sure that you
16  understand what time you are talking about,
17  Ramonda, because it is not clear.
18      MS. LYONS: That was going to be my next
19  question.
20      MR. LEWIS: Thank you.
21  Q.   And did you run the Hope Natural Gas
22  chain with regard to the Blackshere lease in 2004?
23  A.   No.
24  Q.   Did you run the Hope Natural Gas chain

Page 54

1  with regard to the Blackshere lease for the second
2  title opinion?
3  A.   Yes.
4  Q.   Were you specifically instructed to do
5  that?
6  A.   No.
7  Q.   And the only difference between what
8  you--in terms of the motivation between the first
9  title opinion and the second one was that you knew
10  they were going to develop a Marcellus on this
11  leasehold?
12  A.   Six million dollars is, basically, the
13  difference.
14  Q.   Six million dollars, okay.  Nothing kept
15  you from doing that in 2004, did it?
16  A.   No, but--
17  Q.   And you had that knowledge in 2004 that
18  there was the potential, correct?
19  A.   Yes.
20      MS. LYONS: I have no further questions.
21      MR. LEWIS: I am going to take a couple
22  minutes and we will see if there is any follow-up.
23      MS. LYONS: All right.
24      (Recess at 12:49 p.m. until  1:23 p.m)

Page 55

1      BY MS. LYONS:
2  Q.   In reviewing the privilege log in this
3  matter, it appears you prepared some documents
4  dated 8-17-2010, would you say that that is the
5  correct time frame for what we have referred to as
6  your second title opinion?
7  A.   That could be, I'm not certain, but that
8  sounds about--
9  Q.   Because that was before or in
10  contemplation of drilling the Marcellus?
11  A.   Correct.
12  Q.   And who actually asked you to run your
13  first title opinion?
14  A.   Mark might have.
15  Q.   Do you recall specifically?
16  A.   No.
17  Q.   Who did you tender that report to?
18  A.   Probably Mark.
19  Q.   Mark Woodburn?
20  A.   Right.
21  Q.   But this is just your supposition?
22  A.   Right.
23  Q.   But you do recall doing the first title
24  opinion in 2004?

Page 56

1  A.   I do recall doing, yes, the title opinion
2  around that time when they purchased it, yes.
3  Q.   Prior to the purchase.
4  A.   Right.
5  Q.   And there was a written document?
6  A.   Correct.
7  Q.   Now, when you ran the Hope Natural Gas
8  chain for the Blackshere lease, did that chain
9  reveal that EQT had a potential claim to the gas
10  estate?
11  A.   I never found EQT.
12  Q.   Who did you find?
13  A.   CNG.
14  Q.   CNG, so that led to CNG.  Okay.  And did
15  you do any follow-up work after the second title
16  opinion?
17  A.   No.
18      MS. LYONS: I have no further questions.
19      MR. LEWIS: Give us just a minute.
20  (Short break)
21      EXAMINATION
22      BY MR. LEWIS:
23  Q.   I just have a few follow-up
24  questions.  Mr. Starkey, you testified earlier

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

Richard L. Starkey
August 24, 2012

Page 57

1  that you have been affiliated with Trans Energy
2  for almost 30 years in some capacity.
3  A.   Trans Energy and the people that managed
4  Trans Energy.
5  Q.   Does that include Bill Woodburn and Mark
6  Woodburn?
7  A.   I--probably it is a shorter period of
8  time for Mark.  He is a younger person.  I'm sure
9  the last 20 years at least I have known them.
10 Q.   Okay.  So you know that Mark Woodburn
11 moved to Texas in 2001 and was not involved with
12 Trans Energy?
13 A.   Correct.
14 Q.   And you know that Mark Woodburn moved
15 back to West Virginia in late 2007 and at that
16 time he then began working for Trans Energy?
17 A.   Yes.
18 Q.   So between 2001 and 2007, Mark Woodburn
19 was not affiliated with Trans Energy?
20 A.   Correct.
21 Q.   Okay, I want to for--have you take a peek
22 at what I am going to Mark as Exhibit Number
23 3.  Take a peek at that.  Take a review of this
24 document and then let me know when you are done.

Page 58

1  (Starkey Deposition Exhibit 3 was marked)
2  A.   Yes, I recall this.
3  Q.   I'm not going to ask you substantively
4  what is going on in the document, but I want you
5  to look at the day, March 3rd, 2008.
6  A.   Correct.
7  Q.   This is addressed to Mark Woodburn,
8  correct?
9  A.   Yes.
10 Q.   Does this refresh your recollection as to
11 what time period you may have had discussions
12 regarding the lore and legend with Mark Woodburn?
13 A.   Yes, it would have been around this date
14 because that discussion prompted Mark to contact
15 Dominion to determine whether they thought that
16 this might apply.
17 Q.   And there is no possibility that such a
18 conversation could have occurred between 2001 and
19 2007.
20 A.   No, it was definitely with Mark.  That is
21 what I recall more than anything else.
22     MR. LEWIS:  Thank you.
23     MS. LYONS:  Is that it?
24     MR. LEWIS:  Yes, we are done.

Page 59

1      MS. LYONS:  I have no further questions.
2      MR. LEWIS:  Mr. Starkey, I am sure you
3  are aware that the deponent has an opportunity to
4  read.  We have all agreed to waive anyway.  There
5  wasn't going to be much to do.
6  (The deposition of Richard Starkey was
7  concluded at 1:36 p.m., 8-24-2012)

Page 60

1
2
3
4  STATE OF WEST VIRGINIA,
5  COUNTY OF MONONGALIA, to wit;
6      I, Jennifer Vail-Kirkbride, a Notary Public
7  and Commissioner within and for the County and
8  State aforesaid, duly commissioned and qualified,
9  do hereby certify that the foregoing deposition of
10 RICHARD L. STARKEY was duly taken by me and before
11 me at the time and place and for the purpose
12 specified in the caption hereof, the said witness
13 having been by me first duly sworn.
14     I do further certify that the said deposition
15 was correctly taken by me in stenotypy notes, and
16 that the same were accurately written out in full
17 and reduced to typewriting and that the witness
18 did not request to read his transcript.
19     I further certify that I am neither attorney
20 or counsel for, nor related to or employed by, any
21 of the parties to the action in which this
22 deposition is taken, and further that I am not a
23 relative or employee of any attorney or counsel
24 employed by the parties or financially interested

Page 61

1  in the action.

2

3  My Notary Public commission expires:  August 26,

4  2018.

5  My West Virginia Commissioner commission expires:

6  February 15, 2022.

7  Given under my hand this 27th day of August, 2012.

8

9                    /s/ Jennifer Vail-Kirkbride

10                   Registered Professional
                     Reporter
11                   RMR, CRR, FCCR, RPR, WV-CCR

12

13

14

15

16

17

18

19

20

21

22

23

24

## A

**abbreviated (8)**
29:23;30:4,9;33:11;
38:6;40:21;44:22;
48:15
**about- (1)**
55:8
**above (1)**
43:5
**acquaintances (1)**
7:7
**acquire (2)**
7:24;13:10
**acquired (2)**
13:1;46:4
**acquisition (2)**
13:22;45:13
**acting (1)**
49:17
**action (3)**
6:1;2;21:8
**actual (2)**
15:10;46:21
**actually (23)**
6:3,24;8:8;12:3;
13:1;14:1;19:12;20:1,
6,9,13;22:15;23:18;
27:3,7;28:2;35:1,6;
39:6;42:17;46:10;47:5;
55:12
**actually-did (1)**
17:15
**add (1)**
39:19
**additional (2)**
8:9,21
**address (1)**
33:20
**addressed (2)**
33:12;58:7
**Advantage (1)**
12:16
**advise (3)**
30:11,21;31:11
**advised (5)**
15:24;31:2;32:5;
35:16;51:14
**advised-I (1)**
31:23
**affiliated (2)**
57:1,19
**affirmatively (2)**
22:24;24:19
**again (3)**
21:4;35:22;45:16;
52:24
**ago (3)**
19:17;34:9;49:4
**agree (2)**
41:19;49:9
**agreed (1)**

59:4
**agreement (16)**
18:1,4;20:1,14,16,
17;21:14,19;22:20;
23:1,4;24:3,18;51:21;
52:23;53:5
**alive (1)**
21:23
**almost (1)**
57:2
**always (1)**
21:5
**ambiguity (2)**
23:7;24:11
**ambiguous (4)**
43:2;44:4,9,12
**answered (2)**
39:23;42:1
**apparently (2)**
10:21;19:24
**appear (1)**
43:24
**appears (1)**
55:3
**applied (5)**
18:1;19:4,11;30:18;
52:7
**apply (3)**
19:8;30:19;58:16
**appreciate (2)**
31:22;39:20
**approximately (2)**
7:10;21:18
**around (9)**
8:10;9:1;10:19;
13:11,23;18:16;35:19;
56:2;58:13
**arrangement (1)**
8:12
**assigned (2)**
20:4;26:12
**assignee (1)**
37:20
**assignment (18)**
14:9,11,20;15:1,11,
16,18;20:2,6,13;26:18;
27:2;28:15;29:6;36:22;
47:6,11;49:14
**assignments (4)**
29:6;30:20;38:15;
39:15
**assignor (1)**
37:20
**assistant (1)**
11:2
**associated (1)**
6:7
**assumes (1)**
31:15
**assumes-that (1)**
31:15
**attorney (12)**
11:3;16:17;33:2,5,6;

34:18;35:2;36:9;42:19;
43:17;44:5;49:17
**attorney/client (5)**
16:20;36:7,10;46:7;
49:11
**attorney/client-outside (1)**
16:11
**attorney/client-privileged (1)**
48:7
**attorney/client-related (1)**
16:9
**attorneys (1)**
49:24
**authority (1)**
36:13
**authorized (2)**
31:2;48:6
**aware (6)**
18:12;51:17,22,24;
52:2;59:3

## B

**back (14)**
6:19;23:22;25:21;
29:7,7,11,16;31:8;
37:12;39:3;45:5,10;
48:9;57:15
**Bagley (3)**
11:21,22;13:18
**Bailey (2)**
10:10;18:14
**Bank (2)**
12:16,17
**banks (1)**
12:17
**base (1)**
10:4
**based (4)**
17:3;20:14;41:19;
47:3
**basically (3)**
11:1;13:5;54:12
**basing (1)**
34:24
**basis (2)**
13:5;51:13
**BB&T (1)**
12:16
**became (4)**
6:17;10:10;21:7;
23:14
**become (3)**
8:18,22;13:21
**been-I (1)**
51:19
**began (4)**
5:13;6:12;9:9;57:16
**begin (1)**
13:9
**beginning (1)**
6:11
**behalf (2)**

13:15;26:19
**Bernard (1)**
12:1
**best (2)**
13:8;16:2
**beyond (2)**
21:11;47:6
**big (1)**
19:6
**Bill (10)**
13:18;14:9;17:10,15;
26:18;31:24;35:20;
50:20,21;57:5
**bit (1)**
11:8
**Blackshere (21)**
5:20;26:12;28:16,22;
32:24;33:1,8;35:24;
41:3;42:9,20;45:5;
47:17;48:9,21;49:7;
50:9;53:13,22;54:1;
56:8
**Bob (1)**
10:18
**book (1)**
37:21
**both (4)**
28:19;34:16;41:15;
44:22
**bought (1)**
23:15
**Bowles (2)**
10:12;49:24
**branch (1)**
10:19
**break (1)**
56:20
**bring (1)**
30:20
**brought (1)**
10:4
**business (2)**
7:5,20
**but- (1)**
54:16

## C

**called (7)**
9:21,22;10:20;21:5;
41:21,21,22
**came (2)**
22:22;45:6
**can (20)**
17:5;19:15;21:16;
22:6,24;26:25;10;26:1;
29:10;32:18,19;35:6;
36:20;40:18;42:6;
43:20;44:8;45:1,18;
46:8;53:15
**capacity (2)**
36:8;49:18;57:2
**caption (1)**

21:4
**case (11)**
5:14;6:4;15:23;21:4;
25:6;28:17;30:12;47:4,
5,22;49:16
**Casey (1)**
5:15
**cell (3)**
22:3,7,9
**certain (5)**
16:3;17:20;30:14;
32:9;55:7
**chain (7)**
53:2,9,12,22,24;56:8,
8
**changed (2)**
15:8;23:15
**characterize (1)**
29:3
**checked (1)**
29:5
**Circuit (1)**
21:11
**claim (1)**
56:9
**clear (6)**
15:2;24:14;33:23;
39:10;44:13;53:17
**client (6)**
10:4;11:18;16:8;
35:5;36:6;43:11
**clients (2)**
51:14;53:8
**client's (2)**
36:9;46:1
**Clovis (14)**
10:10,11;18:13,15,
20;19:9,16,18,21;
20:21;21:2;24:17;
30:13;32:7
**CNG (4)**
21:6;56:13,14,14
**Cobham (13)**
13:1;14:11;25:11;
26:2,12;27:1;28:12,15;
36:23;37:21;42:8;
45:13;46:4
**column (3)**
41:2,24;42:19
**comfortable (1)**
22:8
**comments (1)**
15:21
**commercial (1)**
12:15
**communications (1)**
16:9
**companies (1)**
12:18
**company (4)**
7:23;9:13;12:4;
37:20
**compensation (1)**

8:16
**complaint (2)**
6:5;19:22
**complete (1)**
33:19
**completed (5)**
14:13;36:17;48:18;
49:5,12
**concerned (2)**
40:14;48:4
**concluded (1)**
59:7
**conclusion (2)**
31:16;43:16
**confused (1)**
32:4
**connection (1)**
16:13
**consider (1)**
28:24
**considering (1)**
34:9
**consistent (1)**
52:8
**consultation (1)**
6:21
**consulting (2)**
49:16;50:2
**contact (2)**
22:1;58:14
**contemplated (4)**
25:11;26:2;41:14;
49:2
**contemplating (1)**
35:23
**contemplation (1)**
55:10
**context (6)**
19:15;32:13;48:2;
49:10;53:7,7
**conversation (23)**
15:24;16:5,20,21;
17:2,3,8,10,11,13,17;
19:16;22:14,16;23:23;
24:17,24;25:16;33:3;
38:23;50:18;52:14;
58:18
**conversations (7)**
48:1;49:6,10;50:6,
11;51:8;52:11
**conveyed (1)**
35:4
**copies (7)**
27:4,6,13,15,18,23;
46:20
**copy (5)**
29:20;34:11;36:20,
22;37:2
**Corp (1)**
50:22
**correctly (1)**
7:11
**couldn't-he (1)**

21:22
**counsel (6)**
7:13;9:5;15:17;
23:20,21;24:2
**counties (10)**
18:16;27:1,4,8;47:1,
9;52:4,20,22,23
**County (16)**
5:20;9:19,20;10:22,
23;11:4,5,6,16;18:16;
20:8;21:3;24:21;40:5;
47:3,10
**couple (1)**
54:21
**Court (6)**
21:11,12;25:22,24;
31:10;39:11
**courthouses (1)**
26:24
**creek (2)**
9:21,22
**current (3)**
6:24;7:1;9:4
**currently (1)**
7:19

### D

**daily (1)**
51:13
**date (2)**
37:21;58:13
**dated (2)**
14:12;55:4
**Dave (1)**
18:13
**Davis (7)**
10:9,9,10;12:11,11;
18:14;30:13
**day (2)**
29:7;58:5
**deal (1)**
16:13
**dec (1)**
6:1
**definitely (1)**
58:20
**denotes (1)**
43:7
**deponent (1)**
59:3
**depose (1)**
43:18
**deposed (1)**
5:4
**deposition (13)**
5:13,18;6:7;14:7;
15:22;36:2;40:6,24;
50:3,4,13;58:1;59:6
**described (1)**
38:10
**description (2)**
44:6,7

**designated (1)**
43:14
**determination-if (1)**
36:8
**determine (2)**
27:1;58:15
**determine- (1)**
53:1
**determining (1)**
36:8
**develop (5)**
21:9,10;45:14;46:4;
54:10
**difference (3)**
45:2;54:7,13
**directing (1)**
36:12
**director (4)**
8:14,15,18,23
**directorship (1)**
9:4
**disagree (1)**
31:20
**disclose (2)**
16:8;48:7
**disclosed (1)**
16:19
**discovery (1)**
5:18
**discrepancy (1)**
16:10
**discuss (1)**
40:1
**discussed (9)**
21:14;26:9;31:17;
32:23;33:10;49:20;
50:23;51:8;52:20
**discussing (4)**
22:22;42:3;49:19,21
**discussion (7)**
16:16;32:12,14,20;
50:3;52:3;58:14
**discussions (4)**
47:20;49:23;50:24;
58:11
**distinction (2)**
16:14;36:14
**distinguish (1)**
16:14
**divided (1)**
18:24
**division (17)**
16:3;17:20;18:8,12,
22;19:10,20;30:13,23;
31:13,19;32:7;38:13,
21;39:13;46:16;51:15
**document (15)**
6:21;14:14;15:9;
24:9;37:16,23;38:3;
39:5;40:4;43:8;44:2,
18;56:5;57:24;58:4
**documentation (2)**
47:7,8

**documents (11)**
14:2,4;18:8;27:5,11,
14,23;28:1;29:11;
46:21;55:3
**Doddridge (1)**
27:4
**dollars (2)**
54:12,14
**Dominion (4)**
20:12;21:7;46:16;
58:15
**done (2)**
57:24;58:24
**doubt (1)**
15:19
**down (1)**
37:19
**draft (5)**
14:18,20,21,23,24
**drafted (4)**
14:19,24;19:12;
26:17
**drafting (1)**
15:3
**drill (1)**
32:22
**drilling (4)**
34:9;35:23;49:3;
55:10
**duly (1)**
5:4
**during (2)**
12:20;15:22

### E

**earlier (3)**
38:12;39:12;56:24
**early (4)**
6:19;9:2;12:2;24:22
**East (10)**
12:20,20;19:2;23:11,
14,15,19,21,24;24:3
**easy (1)**
24:13
**effected (1)**
47:1
**effectuated (3)**
14:1;28:3;40:23
**effectuation (1)**
38:9
**either (1)**
29:5
**else (3)**
18:21;50:19;58:21
**employee (3)**
8:13;23:18,24
**end (1)**
27:24
**Energy (30)**
5:19;6:16,17,18,23;
7:4,22;8:6,23;9:5,14;
13:17,19,20;27:19,20;

30:11,22;31:12;47:21;
49:7;50:7,23;53:10;
57:1,3,4,12,16,19
**Energy-Trans (1)**
6:23
**engaged (1)**
48:10
**engineering (2)**
41:17;42:13
**enough (2)**
24:13;30:1
**entire (2)**
15:9;34:4
**entities (1)**
7:21
**entitled (2)**
16:22;42:19
**entity (1)**
9:10
**EQT (4)**
5:16,19;56:9,11
**estate (15)**
11:7,9,11;12:15,16;
16:4,5;18:23,23;19:11;
32:8;34:1,2;35:17;
56:10
**estates (11)**
17:20;18:9;19:20;
30:14,24;31:14;38:14,
22;39:14;46:17;51:15
**estates-I'm (1)**
18:22
**even (3)**
6:19;47:16;52:24
**eventually (2)**
21:6;45:14
**everyone (1)**
24:15
**evidence (1)**
40:1
**exactly (8)**
6:17,22;7:2;11:14,
19;17:23;42:5;49:3
**exactly-I (1)**
18:3
**EXAMINATION (5)**
5:6;6:22;40:15,16;
56:21
**examine (2)**
28:19;29:9
**examined (2)**
5:4;51:19
**Excuse (2)**
23:8;45:17
**executed (1)**
14:5
**Exhibit (28)**
14:7,9,20,24;15:3,6;
26:17;27:5;28:9;36:2,
18;37:5,6,9,12,14,14,
23;40:2,5,6,9,9,11,24,
24;57:22;58:1
**exist (1)**

**TRANS ENERGY, INC., et al. v.**
**EQT PRODUCTION COMPANY**

13:19
existed (2)
    6:23;13:20
existing (1)
    29:5
expand (1)
    24:12
experience (1)
    41:20
expert (3)
    43:18,18;49:16
explain (1)
    41:11
explore (2)
    16:22;17:5
expressed (1)
    17:3

**F**

fact (7)
    5:17;17:3;31:5;
    34:22;35:23;43:14,19
facts (1)
    17:5
Failure (2)
    21:9,10
Fair (1)
    30:1
fairly (1)
    50:16
far (2)
    29:11,15
fast (1)
    45:24
feel (1)
    22:8
few (2)
    29:6;56:23
field (3)
    19:5,6,7
fields (1)
    19:6
file (1)
    29:20
filed (1)
    24:22
files (1)
    34:14
find (1)
    56:12
fine (3)
    35:14;37:1;46:11
finish (1)
    31:6
firm (5)
    5:15;9:24;10:2,8,13
first (11)
    5:4;6:12;14:15,17;
    17:19;36:19;37:23;
    46:8;54:8;55:13,23
fist (1)
    28:1

five (1)
    18:15
following (3)
    25:24;31:10;39:11
follows (1)
    5:5
follow-up (3)
    54:22;56:15,23
fonts (1)
    15:8
for-have (1)
    57:21
form (2)
    15:4;37:17
forward (1)
    45:6
found (2)
    40:1;56:11
frame (6)
    12:6,7;32:17,19;
    35:15;55:5
Friend (3)
    10:17,18,20
Friend-actually (1)
    10:17
friendship (2)
    7:3,5
full (4)
    5:8;28:1,24;29:2
further (5)
    16:22;46:5;54:20;
    56:18;59:1

**G**

gas (54)
    9:13;11:8,12,13;
    12:1,16,18;16:4;17:20;
    18:1,22,23;19:11,20;
    20:5,12,22;22:28;20;
    30:14,23;31:13;32:8,
    10,11;33:24;34:3,4;
    35:17,18;38:14,15,22;
    39:14,15;41:10,12,13,
    15,16,21,22;42:8,15,
    15,18;46:17;51:15;
    53:3,9,12,21,24;56:7,9
gave (1)
    18:1
gentlemen (1)
    33:4
given (5)
    16:8;17:2;27:15,17,
    18
gives (1)
    42:22
giving (1)
    22:9
Glasser (1)
    5:15
goes (1)
    6:19
good (1)

27:1
guess (2)
    9:11;18:14
guy (1)
    10:18

**H**

Hall (4)
    10:9,11;12:11;18:14
hand (1)
    14:8
happened (1)
    53:3
happy (1)
    31:21
have-help (1)
    24:16
have-if (1)
    27:17
have-was (1)
    11:15
hear (1)
    17:19
heard (4)
    17:23;19:19;32:6;
    46:23
held (1)
    8:2
here- (1)
    42:12
HG (13)
    12:18,19,19,21;19:3;
    24:1,2;51:16,17,20;
    52:10,18,21
HG-those (1)
    12:17
him- (1)
    46:10
hold (5)
    8:4,7;31:1;38:17;
    45:15
Hope (13)
    18:2;20:3,5;32:10;
    35:18;38:15;39:15;
    53:3,9,12,21,24;56:7
hourly (3)
    13:5,7,8
hundreds (2)
    19:7;51:20

**I**

include (1)
    57:5
included (1)
    28:16
Including (2)
    28:11;34:3
inconsistent (1)
    52:24
inconsistently (2)
    17:24;52:7

indicate (1)
    19:9
indicated (3)
    15:23;24:8;37:17
indicates (1)
    41:3
individually (1)
    10:11
industry (1)
    41:20
information (5)
    22:1;24:20;39:19;
    46:7;48:8
in-house (1)
    7:13
initially (1)
    10:9
inquiries (1)
    34:24
inspected (2)
    51:9,10
inspection (3)
    47:22;50:8;51:1
instructed (2)
    44:19;54:4
instructing (2)
    35:8;36:4
intent (1)
    46:13
interest (2)
    7:20;8:2
interpret (1)
    41:23
into (9)
    6:19;10:12;27:3;
    28:15;32:14;35:1,3,6;
    36:10
introduced (1)
    5:12
involved (8)
    13:2,11,13,21;15:24;
    19:23;49:15;57:11
involvement (3)
    6:11;21:3;26:21
involving (1)
    5:18
I-probably (1)
    57:7
is-it (1)
    52:9
issue (2)
    28:17;48:24
issues (1)
    22:22
issuing (1)
    40:20
issuing- (1)
    40:12
item (3)
    28:11;37:19,24
It's-it (1)
    8:11
it-we (1)

51:8

**J**

Jaybee (3)
    12:18,19;20:9
John (1)
    50:22
June (2)
    8:24,24

**K**

keep (3)
    20:15;32:3;35:21
kept (2)
    32:9;54:14
kept-it (1)
    20:19
Kirsch (11)
    21:15,19,23;22:19;
    23:23;25:1,12,16;26:3;
    46:19;52:12
knew (4)
    11:20;33:4;46:9;
    54:9
knowledge (1)
    54:17
known (1)
    57:9

**L**

land (3)
    20:23;21:1,13
larger (1)
    10:2
Last (9)
    8:1;9:2;21:16,20;
    22:15;25:1,23;50:15;
    57:9
last-in (1)
    50:12
late (5)
    6:20;7:10;10:1;
    24:22;57:15
later (3)
    10:2,10;12:4
law (3)
    5:14;7:16;9:24;12:6
lawsuit (8)
    5:24;19:23;21:3;
    24:21;49:19,19,20,24
learn (1)
    46:24
learned (1)
    30:12
lease (24)
    5:20;13:1;20:3,9;
    26:13;28:14,17,22;
    32:24,24;33:8;35:24;
    42:9;45:5;47:11,12,13;
    48:10,22;49:7;53:13,

22;54:1;56:8
**leasehold (13)**
13:10;29:8,12;33:13,
18;34:4,5,17;44:7,20;
45:11;50:9;54:11
**leases (18)**
16:3;17:21;19:7,24;
28:9;30:15;32:9;40:7,
15,16;42:6;43:1;46:4,
5;51:17,20;52:22;53:4
**least (1)**
57:9
**leave (1)**
10:13
**led (1)**
56:14
**left (1)**
10:12
**legal (12)**
6:20;9:10;12:14;
26:22;31:16;32:14;
41:17;42:14;43:15,18;
48:10,21
**legend (7)**
16:1;31:17;32:6;
34:21;35:17;46:24;
58:12
**level (1)**
21:11
**Lewis (44)**
5:15;16:6,24;17:6;
23:8;25:18;31:1,8,15,
22;32:16;34:23;35:10,
14;36:3,16,20,24;37:4;
38:17,20,23;39:2,8,17;
42:1;43:9,13,21;45:15,
17,20,23;46:6,11;48:5;
53:15,20;54:21;56:19,
22;58:22,24;59:2
**licensed (1)**
7:16
**liked (1)**
23:7
**list (9)**
14:21,23;15:14,17,
19;40:7,14;41:4,9
**listing (2)**
37:9,24
**lists (1)**
42:21
**little (1)**
11:8
**log (1)**
55:2
**longer (2)**
8:4;50:16
**look (8)**
14:16;15:5,7,9;
20:20;40:2;44:20;58:5
**looked (3)**
15:20;40:13;41:1
**looks (1)**
15:4

**lore (7)**
16:1;31:17;32:6;
34:21;35:16;46:24;
58:12
**Loren (5)**
11:19,21,22;12:1;
13:17
**lot (1)**
10:6
**Lukes (6)**
19:23;21:5,6;25:6;
30:12;47:5
**LYONS (31)**
5:7,11;16:18;17:5;
23:10;25:19,21;31:4,
20;32:18;35:8,12;
36:14,21;37:2;38:18,
21,24;39:6;43:10,19,
22;45:18;46:8;53:18;
54:20,23;55:1;56:18;
58:23;59:1

**M**

**Madam (1)**
25:22
**making (2)**
36:7,15
**man (3)**
20:23;21:1,13
**managed (1)**
57:3
**management (3)**
6:19;7:1;13:16
**Mannington (1)**
19:7
**many (4)**
8:6;18:19;33:6;
51:17
**Marcellus (6)**
32:22;34:10;35:24;
49:3;54:10;55:10
**March (1)**
58:5
**Marion (4)**
27:3;52:5,17,19
**Mark (25)**
6:6;17:14,15,16,17;
32:2,5;35:19,21;49:22;
50:19,21;55:14,18,19;
57:5,8,10,14,18,22;
58:7,12,14,20
**marked (4)**
14:7,8;36:2;58:1
**master (4)**
14:21;15:13,16,19
**materials (1)**
48:7
**matter (6)**
5:16,18;7:14;9:7;
24:4;55:3
**may (7)**
8:4;9:1,1;25:5;

27:15;43:23;58:11
**maybe (3)**
22:9;25:9;29:6
**mean (5)**
13:16;15:19;42:5;
44:2;47:14
**meaning (2)**
44:16,17
**means (3)**
42:24;43:3,4
**memory (1)**
45:7
**merely (1)**
17:2
**merged (1)**
10:12
**might (3)**
53:3;55:14;58:16
**Mike (3)**
21:15;23:17;52:12
**million (2)**
54:12,14
**mineral (5)**
29:9;33:13,21;34:2,
19
**minute (1)**
56:19
**minutes (1)**
54:22
**moment (2)**
14:10;25:18
**more (9)**
7:5;19:15;24:20;
29:10;33:19;40:14;
41:17;42:13;58:21
**most (2)**
12:2;29:6
**mostly (5)**
11:7,11;12:19;50:3,
14
**motivation (1)**
54:8
**moved (2)**
57:11,14
**Mr-let (1)**
31:6
**much (1)**
59:5

**N**

**name (8)**
5:8,11;10:8,15,18,
21;21:16;23:15
**natural (27)**
16:4;17:20;18:22,23;
19:10,20;30:14,23;
31:13;32:8,10;33:24;
34:3;35:17,18;38:14,
15,22;39:14,15;46:17;
51:15;53:9,12,21,24;
56:7
**nature (1)**

6:14
**necessary (1)**
14:17
**need (2)**
45:20,24
**negotiation (1)**
13:14
**negotiations (2)**
13:9,12
**next (2)**
18:6;53:18
**Nodding (1)**
24:19
**none (3)**
51:20;52:5,22
**northern (1)**
17:21
**note (2)**
41:2,6
**notice (1)**
47:16
**November (5)**
14:12;26:13;30:7,10;
40:23
**number (6)**
22:7,9,10,11;28:11;
57:22

**O**

**object (1)**
46:6
**objection (3)**
43:20,22;45:19
**obtain (2)**
27:4;46:20
**obtained (2)**
27:6
**obviously (2)**
19:22;40:4
**occasions (1)**
48:11
**occur (1)**
25:17
**occurred (5)**
24:18,21;26:7;51:8;
58:18
**occurred- (1)**
25:4
**occurred-you (1)**
25:1
**October (1)**
37:21
**Off (1)**
25:19
**office (3)**
10:16,19;12:8
**offices (1)**
10:16
**Ohio (1)**
7:18
**Oil (60)**
5:19;9:13;11:8,12,

13;12:1,16,18;13:1,15;
14:12;16:4;17:12;18:2,
23;19:10,20;20:5,9;
22:22;25:12;26:3,13,
19;28:20;30:11,14,22,
23;31:12,13;32:8,10;
34:4;35:17;38:14;
39:14;41:3,4,10,11,12,
13,15,16,21,22;42:10,
14,15,18,21,22;43:4,
24;44:11,13;46:4,16;
51:15
**oil- (1)**
38:22
**older (1)**
27:23
**once (2)**
19:3;36:17
**one (13)**
19:24;20:20;21:21;
25:18;29:8,21;31:1;
32:12;33:10;42:2;
52:14,15;54:9
**one- (1)**
37:11
**only (10)**
10:21;33:12;41:3;
42:10,20,21;44:19;
52:13,15;54:7
**operate (1)**
51:12
**opine (1)**
33:24
**opinion (46)**
17:1,7;27:24;28:3,6,
8,19;29:1,2,17,23;30:4,
10;31:5,18;33:12,16,
17,19,20,23;34:6,20,
22;35:5,6;38:7;40:22;
42:7,21;43:11;44:23;
45:2;48:3,15,16;49:1;
51:2,6;54:2,9;55:6,13,
24;56:1,16
**opinion- (1)**
34:12
**opinion-can (1)**
29:22
**opinions (7)**
11:10;18:21;19:11;
32:15;33:7;34:16;48:3
**opportunity (2)**
43:17;59:3
**original (1)**
20:3
**Originally (1)**
41:14
**others (1)**
5:19
**ourselves (1)**
5:12
**out (5)**
22:9;23:5;40:17;
47:17;51:13

**outside (6)**
9:5;16:11;23:20,21;
24:2;52:7
**over (5)**
8:11,21,22;31:4;
41:24
**overview (1)**
6:10
**own (1)**
7:22
**owned (6)**
9:12,13;20:5,5,9,12
**owners (1)**
7:4
**ownership (8)**
6:16;7:1,19;8:2;
29:9;33:13,21,24
**ownership- (1)**
9:11

**P**

**package (1)**
8:16
**page (3)**
14:15;36:19;37:21
**Parkersburg (1)**
12:9
**part (5)**
8:15;11:3;12:21,22;
40:20
**particular (5)**
13:22;19:10;24:3;
28:14,15
**past (1)**
8:3
**peek (2)**
57:21,23
**Penn (9)**
18:3;20:4,5,10,11;
32:9;35:18;38:14;
39:14
**Pennsylvania (1)**
23:17
**Pennzoil (15)**
18:15,18;19:2;20:23;
21:1,2,13;22:12,16;
23:10,13;27:2;28:11;
36:23;37:20
**Pennzoil's (1)**
23:16
**people (4)**
9:14,14,15;57:3
**period (3)**
8:11;57:7;58:11
**permission (1)**
16:8
**permitted (1)**
36:5
**person (1)**
57:8
**personal (1)**
7:3

**personally (1)**
53:2
**pertained-or (1)**
28:14
**pertaining (2)**
18:8;48:21
**Pfalzgraf (2)**
10:11;18:14
**phone (3)**
22:3,7,9
**physical (3)**
47:22;50:8;51:1
**physically (2)**
51:9,10
**place (2)**
22:17;50:11
**plaintiff (1)**
7:9
**plaintiffs (7)**
6:8,11;7:14;8:3;9:7;
47:21;50:8
**plaintiffs' (1)**
7:20
**pleadings (1)**
6:4
**Please (5)**
5:8;6:14;21:16;31:8;
36:20
**plural (1)**
48:3
**pm (4)**
5:2;54:24,24;59:7
**point (8)**
13:19,20;15:23;20:2;
30:21;31:11,23;32:5
**position (2)**
16:18,24
**possibility (1)**
58:17
**potential (18)**
18:12,21;30:13,23;
31:13;32:7;38:13,21;
39:13;47:1;51:15,18,
18,23;52:1;53:4;54:18;
56:9
**practice (1)**
7:16
**practicing (2)**
9:23;12:5
**practitioner (6)**
9:24;10:1,16;12:10,
12,13
**practitionership (1)**
11:1
**preferred (1)**
24:10
**preliminary (2)**
48:14;51:2
**preparation (4)**
6:21;29:18;40:20;
50:12
**prepare (3)**
28:3;37:8,10

**prepared (8)**
15:6,10,13;28:6;
37:7,17,18;55:3
**preparing (2)**
38:6;48:2
**preserve (1)**
46:1
**president (1)**
50:22
**pretty (1)**
15:5
**Prima (18)**
5:18;13:1,9,15;
14:12;15:17;17:12;
25:11;26:2,13,19;27:8;
30:11,22;31:12;46:3;
49:7;53:10
**primarily (2)**
41:16;50:19
**prior (8)**
6:23;28:2;30:7,10;
38:9;40:12,22;56:3
**privately (1)**
9:12
**privilege (5)**
16:21;36:7,10;49:11;
55:2
**privileged (1)**
46:7
**privileges (1)**
31:7
**Probably (13)**
9:12;11:24,24;14:6;
15:20;17:22;18:13,17;
19:18;20:7;29:21;
40:13;55:18
**probably-that (1)**
11:23
**process (1)**
13:14
**produced (1)**
42:9
**product (1)**
35:2
**production (3)**
12:2;23:16;29:5
**Products (1)**
37:20
**professional (2)**
6:13;7:9
**projects (1)**
48:18
**prompted (6)**
22:19;25:6,12;26:3;
35:22;58:14
**pronunciation (2)**
9:19,20
**property (7)**
45:14;47:18,23;51:1,
9,11,13
**prosecuting (1)**
11:3
**provide (4)**

6:12;26:22;48:10,20
**provided (1)**
6:20
**providing (5)**
7:8;9:9;12:14;13:4;
50:2
**public (1)**
7:23
**purchase (3)**
13:22;29:4;56:3
**purchased (2)**
6:24;56:2
**purposes (1)**
26:14
**put (1)**
32:16
**putting (1)**
35:1

**Q**

**quiet (2)**
6:1;21:8
**quote (1)**
16:2

**R**

**raise (2)**
36:11;47:14
**Ramonda (5)**
5:11;36:3;43:9;46:1;
53:17
**ran (1)**
56:7
**rare (2)**
52:9,24
**rarely (1)**
30:18
**read (10)**
6:5;14:15;25:22,24;
31:8,10;36:19;39:2,11;
59:4
**real (5)**
11:7,9,11;12:15,15
**really (3)**
18:5;45:20;51:7
**reason (1)**
52:6
**recall (16)**
16:3,5;17:8,9,11;
18:11;27:21;41:7,8;
51:7;52:15;55:15,23;
56:1;58:2,21
**recent (2)**
29:6;50:17
**Recess (2)**
25:20;54:24
**recollection (3)**
13:9;15:2;58:10
**record (9)**
5:9;9:16;16:15;20:6;
24:14;25:19,22;36:3;

40:4
**recorded (6)**
14:3;20:13,19;27:5;
47:7,8
**refer (1)**
29:22
**reference (12)**
28:9,16;34:21;37:22;
38:13,16,20;39:7,13,
16;42:24;47:9
**referenced (3)**
27:5;39:4;52:16
**references (1)**
37:19
**referencing (2)**
39:18;42:6
**referred (4)**
33:11;40:21;47:4;
55:5
**referring (3)**
20:15;23:9;37:24
**reflected (1)**
29:14
**refresh (1)**
58:10
**regard (11)**
9:7;26:9,16;28:22;
29:12;33:7;45:11;
46:16;53:13,22;54:1
**regarding (11)**
5:19;21:19;24:17;
30:13;32:7;46:23;49:7,
23;50:8,24;58:12
**related (2)**
26:5,6
**relationship (3)**
6:18;8:13;16:12
**relevance (1)**
24:4
**remember (4)**
19:13;20:3;48:6;
51:4
**remind (1)**
16:7
**reminding (1)**
17:6
**rendered (4)**
30:5;31:18;33:7;
34:6
**rendering (2)**
30:9;51:2
**repeat (2)**
45:16,18
**rephrase (1)**
31:21
**report (2)**
49:5;55:17
**Reporter (4)**
25:22;26:1;31:11;
39:12
**represent (1)**
5:16
**representation (1)**

16:17
**representative (1)**
27:20
**representatives (4)**
17:12;30:22;31:12;
50:7
**represented (2)**
18:15,18
**representing (1)**
16:12
**request (1)**
46:19
**reserve (1)**
35:12
**residential (3)**
11:10,11;12:15
**Resources (11)**
12:20,21;19:3;23:11,
14,15,19,21,24;24:3,10
**response (1)**
24:9
**responsibilities (1)**
9:6
**restricted (1)**
34:16
**result (1)**
25:5
**retained (2)**
24:5;48:20
**retainer (1)**
13:6
**reveal (1)**
56:9
**review (9)**
14:10,13;15:16;
29:17;36:18;40:5,11,
23;57:23
**reviewed (8)**
6:3;15:18,19;26:18;
27:11;29:11;35:7;38:4
**reviewing (1)**
55:2
**Rice (1)**
49:24
**RICHARD (3)**
5:3,10;59:6
**Right (16)**
7:12;9:3;10:22;
12:23;17:18;25:3;
27:21;35:12;37:13,15;
42:8;45:9;54:23;55:20,
22;56:4
**rights (21)**
8:9;18:1,2;20:4,10,
12;26:12;28:20;32:10,
11;41:2,12,23;42:4,20,
22;43:5,7;44:2,15;46:1
**right-the (1)**
41:12
**Ritchie (5)**
20:8;21:3;24:21;
47:3,9
**role (4)**

5:14;33:2,5,6
**roles (1)**
9:6
**Rollins (1)**
5:15
**run (6)**
53:2,9,12,21,24;
55:12

---

## S

**Saint (6)**
19:23;21:5,6;25:5;
30:12;47:5
**sale (3)**
13:24;14:10;26:19
**same (7)**
9:13,14,15;11:2;
16:5;38:3;52:13
**Sancho (10)**
9:12,17,18,21,22;
11:16,17,24;12:3,18
**scope (3)**
6:13;33:17;45:3
**search (1)**
29:7
**second (16)**
31:1;33:16,20,23;
34:6,20;38:17;44:22;
45:1;48:16,24;51:5;
54:1,9;55:6;56:15
**secret (5)**
18:10;20:14,16,17,
22
**seem (1)**
30:18
**separate (1)**
48:11
**separately (1)**
52:20
**served (1)**
7:13
**serves (1)**
45:8
**services (11)**
6:13,13,20;7:9;9:10;
12:14;13:4;26:23;
48:11,21;50:2
**serving (1)**
9:5
**shares (2)**
8:6,19
**Short (1)**
56:20
**shorter (1)**
57:7
**shorthand (1)**
26:14
**show (2)**
20:24;21:22
**side (6)**
29:8,13;33:13,18;
34:17;44:20

**similar (1)**
15:7
**simply (3)**
27:13;33:3;41:5
**single (2)**
47:12,13
**sirens (1)**
47:15
**Sistersville (1)**
19:5
**sit (2)**
42:12,18
**six (3)**
18:16;54:12,14
**sole (3)**
10:1;12:12,13
**solo (4)**
9:24;10:15;11:1;
12:10
**some- (1)**
40:8
**someone (1)**
21:2
**sometime (1)**
6:8
**somewhere (1)**
18:2
**sorry (10)**
14:22;18:22;22:17;
23:12;28:15;30:1;32:3;
35:21;36:21;52:13
**sounds (2)**
39:3;55:8
**sources (1)**
19:21
**South (9)**
18:3;20:4,5,10,11;
32:9;35:18;38:14;
39:14
**speak (2)**
25:12;26:3
**speaking (2)**
21:18;45:23
**specific (1)**
29:10
**specifically (5)**
44:19;52:4,16;54:4;
55:15
**spell (2)**
9:16;21:16
**spoken (2)**
21:2;46:15
**Spring (1)**
9:2
**STARKEY (17)**
5:3,10,11;10:16,18,
20;14:7;16:6;17:1;
36:2;39:21;43:16;48:5;
56:24;58:1;59:2,6
**state (1)**
5:8
**states (1)**
7:17

**stayed (1)**
23:17
**step (1)**
47:6
**Stevens (1)**
41:12
**still (5)**
12:12,13;21:23,24;
22:12
**stock (2)**
7:22,24
**Stringtown (1)**
19:6
**subject (5)**
20:1;51:21;52:6,23;
53:4
**subleases (1)**
18:2
**substantively (1)**
58:3
**successor (1)**
20:10
**summer (1)**
9:2
**supposed (1)**
41:16
**supposition (1)**
55:21
**Supreme (1)**
21:12
**sure (11)**
8:11;15:5;16:16;
25:9;26:4;29:21;42:23;
44:3;53:15;57:8;59:2
**sworn (1)**
5:4

---

## T

**talked (1)**
31:16
**talking (3)**
34:23;50:6;53:16
**tell-there (1)**
52:8
**ten (3)**
21:20;22:15;25:1
**tender (1)**
55:17
**terminology (1)**
29:13
**terms (8)**
11:12;16:4;27:8;
29:10;38:6;45:3;46:23;
54:8
**testified (4)**
17:16;31:7;37:6;
56:24
**testify (1)**
39:4
**testimony (1)**
29:18
**Texas (1)**

57:11
**that-I (1)**
18:3
**That's-that's (1)**
18:17
**the- (1)**
48:4
**the-it (1)**
47:6
**the-with (1)**
6:15
**They-East (1)**
24:10
**thinking (1)**
19:1
**thought (2)**
23:12;58:15
**three (3)**
27:8;34:8;49:4
**throughout (1)**
15:8
**time-for (1)**
9:16
**title (48)**
6:1,21;11:10;18:21;
19:11;21:8;22:22;
27:24;28:3,6,8,19,24;
29:2,17,22,23;30:4,10;
33:6,11,16,19,20,23;
34:6,12,16,20,22;38:7;
40:21;42:19;44:23;
45:2;48:2,15,16;49:1;
51:2,5;54:2,9;55:6,13,
23;56:1,15
**titles (1)**
11:13
**to- (2)**
12:14;43:9
**to-any (1)**
26:10
**today (5)**
5:17;15:6;22:4;
29:18;42:18
**today's (1)**
50:4
**told (4)**
18:17;20:18,23;
26:17
**took (2)**
20:3;22:16
**total (1)**
8:9
**Trans (30)**
5:19;6:16,16,18,23;
7:4,22;8:6,23;9:5,14;
13:17,19,20;27:19,20;
30:11,22;31:12;47:21;
49:6;50:7,22;53:10;
57:1,3,4,12,16,19
**transaction (12)**
13:2;25:11;26:2,10,
11,16,22;27:9,22;28:2;
38:9;40:22

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

Richard L. Starkey
August 24, 2012

transaction- (1)
25:17
travel (1)
27:7
treatment (1)
20:8
tried (1)
46:20
true (1)
42:11
trying (1)
16:2
turn (1)
37:5
two (9)
18:8;33:3,9;34:8;
45:3;48:11,18;49:4;
50:15
Tyler (8)
9:19,20;10:22;11:4,
16;52:5,17,19
type (6)
8:12;10:24;16:9;
17:1;31:18;39:19

**U**

Uh (1)
34:8
unclear (1)
39:17
under (3)
8:12;32:8;53:7
underlying (1)
5:24
understood (1)
42:17
Union (1)
12:17
unusual (2)
27:16,22
up (5)
22:23;27:24;30:20;
35:13;48:9
upon (2)
24:12;47:3
use (3)
15:4;16:1;29:13
Usually (3)
27:23;29:5;49:22

**V**

various (1)
26:24
verbally (1)
35:16
versus (2)
5:19;21:6
vest (1)
8:21
vested (2)
8:8,18

vests (2)
8:11,12
view (1)
46:20
Virginia (6)
5:21;7:18;17:21;
23:16;46:17;57:15
voice (1)
47:14

**W**

waive (1)
59:4
waived (5)
16:20,23;17:1,7;31:7
was- (1)
23:24
was-no (1)
20:20
was-well (1)
45:2
way (3)
45:10,23;53:1
weeks (1)
50:15
we-it (1)
29:4
wells (29)
40:14,16;41:4,4,9,9,
10,10,10,13,14,15;
42:3,4,9,14,14,15,15,
16,20,22,24;43:4,24;
44:6,10,11,14
weren't (1)
13:13
WesBanco (1)
12:17
West (6)
5:20;7:18;17:21;
23:16;46:17;57:15
Wetzel (8)
5:20;11:5,6;27:3;
40:5;52:5,16,19
whenever (2)
46:10;49:2
whether- (1)
34:22
whole (2)
10:6;14:16
Wileyville (1)
19:5
within (6)
21:20;22:14;25:1;
49:10;50:12,15
witness (6)
5:17;25:23;43:15,19;
45:22;46:2
Wood (2)
10:23;18:16
Woodburn (17)
13:18;16:19;17:17;
31:6,24;32:6;35:16;

50:20,21;55:19;57:5,6,
10,14,18;58:7,12
Woodburn's (2)
6:6;15:22
word (4)
41:23;43:5;44:2,15
words (1)
16:1
work (14)
10:3,7,24;11:23;
12:2;18:20;22:9,11;
27:8;35:2;45:4;49:12;
52:18;56:15
worked (5)
6:15;19:2,4,5;52:21
working (4)
10:2;22:15;53:8;
57:16
works (1)
21:24
writing (1)
35:1
written (6)
18:7;34:11,21;39:5;
46:21;56:5

**Y**

year (4)
6:12;8:1;9:2;34:7
years (13)
18:19;19:2,17,18;
21:21;22:15;23:17;
25:2;34:8,8;49:4;57:2,
9
yesterday (2)
36:23;37:3
you- (1)
15:9
you-in (1)
54:8
younger (1)
57:8

**1**

1 (5)
14:7,9;37:5,12,14
1:23 (1)
54:24
1:36 (1)
59:7
10,000 (3)
8:8,19,20
11:06 (1)
5:2
11:40 (1)
25:20
12:05 (1)
25:20
12:49 (1)
54:24
15 (1)

37:21
1892 (2)
45:7,10
1970's (3)
7:10;9:9;10:1
1980's (1)
24:18
1985 (1)
10:14
1996 (1)
37:21

**2**

2 (6)
36:2,18;37:23;40:2,
6,24
20 (1)
57:9
2000 (1)
23:14
2001 (3)
57:11,18;58:18
2002 (3)
12:6,8;24:22
2003 (1)
24:23
2004 (24)
12:6,8,24;13:11,23;
14:12;25:8;26:13;28:5;
30:5,7,10;33:10;39:1;
40:22,23;45:13;46:3;
48:15;51:2;53:22;
54:15,17;55:24
2007 (3)
57:15,18;58:19
2008 (1)
58:5
2011 (1)
8:24
25 (1)
19:18

**3**

3 (2)
57:23;58:1
30 (3)
19:2,17;57:2
3rd (1)
58:5

**5**

50,000 (1)
8:21
5th (5)
14:12;26:13;30:7,10;
40:23

**6**

60,000 (1)

8:10

**7**

70's (1)
6:20
76A704 (1)
37:22

**8**

8 (3)
28:11;37:19,24
800-acre (1)
20:9
80's (3)
6:19;12:2;17:22
8-17-2010 (1)
55:4
8-24-2012 (2)
5:2;59:7