**In the case of:**

*TRANS ENERGY, INC., et al.  v.*

*EQT PRODUCTION COMPANY*

---

*William F. Woodburn*

*August 24, 2012*

---



118 Capitol Street
Charleston, WV 25301

(304) 344-8463
ScheduleRealtime@gmail.com

Realtimereporters.net

*Min-U-Script® with Word Index*

EXHIBIT G

---

**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

3    * * * * * * * * * * * * * * * * * * * * * * *

4    TRANS ENERGY, INC., a
     Nevada Corporation,
5    REPUBLIC PARTNERS VI,
     LP, a Texas limited
6    partnership, REPUBLIC
     ENERGY VENTURES, LLC,
7    a Delaware Limited
     Liability Company, and
8    PRIMA OIL COMPANY, INC.,
     a Delaware Corporation
9
             Plaintiffs,
10
     vs.                       CIVIL ACTION
11                             NO. 1:11CV75
     EQT PRODUCTION COMPANY, a
12   Pennsylvania Corporation,

13
             Defendant.
14
     * * * * * * * * * * * * * * * * * * * * * * *
15
         Deposition of William F. Woodburn taken by the
16   Defendant under the Federal Rules of Civil
     Procedure in the above-entitled action, pursuant
17   to notice, before Jennifer Vail-Kirkbride, a
     Registered Merit Reporter and West Virginia
18   Commissioner and Notary Public, at the law offices
     of Bowles Rice McDavid Graff & Love LLP, 7000
19   Hampton Center, Morgantown, West Virginia on the
     24th day of August, 2012, commencing at 2:04 p.m.
20
             REALTIME REPORTERS, LLC
21           JENNIFER VAIL-KIRKBRIDE
            Certified Realtime Reporter
22         RMR, CRR, FCRR, RPR, WV-CCR
               118 Capitol Street
23           Charleston, WV  25301
                (304) 344-8463
24            realtimereporters.net
```

---

**Page 2**

```
1                 APPEARANCES:

2    APPEARING FOR THE PLAINTIFFS:

3       Dylan C. Lewis, Esquire
        dlewis@bowlesrice.com
4       Kimberly S. Croyle, Esquire
        kcroyle@bowlesrice.com
5       Bowles Rice McDavid Graff & Love
        7000 Hampton Center
6       Morgantown, WV  26505
        304.285.2500
7

8    APPEARING FOR THE DEFENDANT:

9       Ramonda C. Lyons, Esquire
        rlyons@lgcr.com
10      Lewis Glasser Casey & Rollins, PLLC
        300 Summers Street, Suite 700
11      Post Office Box 1746
        Charleston, WV  25326-1746
12      304.345.2000

13   ALSO PRESENT:  Mark Woodburn, representative on
     behalf of the plaintiffs generally.
14

15

16

17

18

19

20

21

22

23

24
```

---

**Page 3**

```
1              EXAMINATION INDEX

2    8-24-2012

3    Deponent:

4    William F. Woodburn
        BY MS. LYONS . . . . . . . . .    5
5       BY MR. LEWIS . . . . . . . . .   50
        BY MS. LYONS . . . . . . . . .   51
6
```

---

**Page 4**

```
1              EXHIBIT INDEX

2                                          MAR
     Woodburn Deposition Exhibit Number
3       1                                    6

4       2                                   32
```

Page 5

1  P R O C E E D I N G S
2  (8-24-2012, 2:04 p.m.)
3  WILLIAM F. WOODBURN,
4  being first duly sworn, was examined and deposed
5  as follows:
6  EXAMINATION
7  BY MS. LYONS:
8  Q.  Please state your full name for the
9  record.
10  A.  William F. Woodburn.
11  Q.  Mr. Woodburn, prior to going on the
12  record in this matter, I introduced myself as
13  Ramonda Lyons.  I am an attorney representing EQT
14  in this matter.  As you know, we are here today to
15  take your 30(b)(6) deposition in the matter of
16  Trans Energy et al. versus EQT and this matter is
17  pending in the Federal Court for the Northern
18  District of West Virginia and it is specifically
19  involves the Blackshere lease.  Are you aware of
20  that?
21  A.  Yes.
22  Q.  You have agreed to appear here today as
23  the 30(b)(6) designee or corporate designee on
24  behalf of Prima Oil specifically; is that correct?

Page 6

1  A.  Yes.
2  Q.  Will you be speaking on behalf of any of
3  the other plaintiffs during today's deposition?
4  A.  That is a good question.
5  MR. LEWIS: The answer is no.
6  MS. LYONS: I thought the answer is no.
7  MR. LEWIS: The answer is no.
8  A.  I will be speaking, you know, as far as
9  Trans Energy as being the--Prima is a wholly-owned
10  subsidiary of Trans Energy.
11  Q.  And was that the case in 2004?
12  A.  Yes.
13  Q.  At the time that Prima acquired its
14  interest in the Blackshere lease?
15  A.  Yes.
16  Q.  Just so we are clear, I will mark a
17  Deposition Exhibit.
18  (Woodburn Deposition Exhibit 1 was marked)
19  It is my understanding you have been
20  designated to address the first topic on this
21  notice, and that reads, "Due diligence performed
22  by each plaintiff," I understand that is for
23  Prima, "prior to acquisition of an interest in the
24  Blackshere lease."  Do you see that, sir?

Page 7

1  A.  Yes.
2  Q.  Is that your understanding, that you are
3  here today fully prepared to address questions
4  regarding the due diligence efforts conducted on
5  behalf of Prima Oil before acquiring its interest
6  in the Blackshere lease in November, 2004?
7  A.  Yes.
8  Q.  What have you done to prepare yourself to
9  speak on behalf of Prima Oil as to topic number
10  one?
11  A.  Oh, I went back and reviewed some of the
12  acquisition dates and what we paid for it and how
13  we went about it.
14  Q.  What specific documents have you
15  reviewed, sir?
16  A.  Just some hand notes that I had that
17  showed the time frames that we had purchased the
18  Cobham acquisition.
19  Q.  And by the Cobham acquisition, are you
20  referring to, basically, the rights that were
21  conveyed under the memorandum of assignment and
22  bill of sale dated November 4th or November 5th,
23  this is the wrong document, 2004.
24  (The document was handed to the witness)

Page 8

1  A.  Yes, this is the signed bill of sale.
2  Q.  And this is the transaction that you are
3  referring to as the Cobham acquisition?
4  A.  Yes, ma'am.
5  Q.  Just so we are all clear what we are
6  referring to.
7  MR. LEWIS: Are you making that document
8  of record?
9  MS. LYONS: I don't have another copy for
10  his deposition.
11  MR. LEWIS: Do you want to refer to as--
12  MS. LYONS: It was Starkey Exhibit 1 so
13  we are all clear, Starkey Exhibit Number 1.
14  MR. LEWIS: Just so we are clear.
15  Q.  And what was your role in the Cobham
16  acquisition in 2004?
17  A.  To do the due diligence as far as the
18  field operations are concerned and production
19  records.
20  Q.  Okay.  For field operations and
21  production records?
22  A.  Right.
23  Q.  Was that the extent of your role in the
24  Cobham acquisition?

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

William F. Woodburn
August 24, 2012

---

Page 9

1  A.  Basically, yes.
2  Q.  I kind of skipped over, you had said that
3  in preparing for today's deposition, you reviewed
4  some handwritten notes regarding the Cobham
5  acquisition.  What else did you say?  I'm sorry,
6  actually, my pen quit writing.
7  A.  I just looked over some documents that
8  you showed me right there to see what kind of
9  chronological order we went about this in.  It has
10  been a good while.
11  Q.  Did you review anything other than
12  Starkey Exhibit 1?
13  A.  I probably looked at some old production
14  notes that I had, you know, from when we acquired
15  it and what was producing, who the royalty owners
16  are, that sort of thing.
17  Q.  Did you also review Starkey Exhibit 2,
18  which is the memorandum of assignment and bill of
19  sale into Cobham from Pennzoil?  And this document
20  is dated October 15th, 1996.
21  A.  No.
22  Q.  You did not review that in preparation
23  for today's deposition?
24  A.  That is correct.

---

Page 10

1  Q.  Did you speak with anyone other than
2  counsel in preparing for today's deposition as a
3  30(b)(6) designee?
4  A.  No.
5  Q.  Do you understand that you are speaking
6  on behalf of the company today--
7  A.  Yes.
8  Q.  --rather than in your individual
9  capacity?
10  When did Prima first begin considering the
11  Cobham acquisition?
12  A.  Obviously, somewhat prior to when the
13  acquisition was actually accomplished, but I can't
14  tell you the specific date.
15  Q.  Was it effectuated in less than a year
16  from the date that it was first contemplated?
17  A.  I believe that to be true.
18  Q.  Was it effectuated in less than six
19  months from the date it was first contemplated?
20  A.  Probably six months might have been in
21  the range.
22  Q.  In the range.  How did the acquisition
23  come about?  Did someone from Prima contact
24  Cobham, the reverse?  What was the motivation for

---

Page 11

1  the acquisition?
2  A.  The motivation, there was a fellow by the
3  name of Jordan Hillyar that had an option to buy
4  out Cobham and he came to us and asked if we was
5  interested in picking that up and acquiring
6  Cobham.  And we then got interested in it and
7  started doing due diligence.
8  Q.  And his name again, I'm sorry?
9  A.  George Hillyar.
10  Q.  Can you spell his last name?  Is it H I L
11  L A R D?
12  A.  No, H A--H I L L--I can't spell.  I don't
13  know.
14  Q.  Okay.  All right.
15  A.  I don't know.
16  Q.  So Mr. Hillyar approached Prima about
17  potentially exercising his option to buy out
18  Cobham.  Correct?
19  A.  Correct.
20  Q.  Was that to buy out Cobham's interest
21  entirely or simply a portion thereof?
22  A.  100 percent, everything, all Cobham had.
23  Q.  Okay.  How many counties did this
24  involve?

---

Page 12

1  A.  Uh, four.
2  Q.  And what are those counties?
3  A.  Wetzel, Harrison, Doddridge, Marion.
4  Q.  My geography is not the best.  Did
5  anything occur or did it involve anything outside
6  of West Virginia?
7  A.  No.
8  Q.  Were any of these border counties?
9  A.  No.
10  Q.  Had Prima or Trans Energy ever been
11  involved in a complete acquisition about rights--
12  MR. LEWIS:  Ramonda, excuse me, he is
13  here from Prima.  I know he has said Prima and
14  Trans Energy are together.  You have already had
15  the opportunity to depose Trans Energy, and as you
16  know under the rules to do it again you have to
17  get leave of the court, which you have not
18  done.  He is only here with regard to Prima,
19  regardless of what he says.
20  Q.  Do you know if Prima has been involved in
21  the acquisition of 100 percent of another entity's
22  rights at any other time with the exception of the
23  Cobham acquisition?
24  A.  Not to my best recollection.

---

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

William F. Woodburn
August 24, 2012

Page 13

1  Q.   Okay, so not before Cobham or after.
2  A.   Not to my--the best of my recollection,
3  no.
4  Q.   Okay, so this was an isolated incident or
5  an isolated type of transaction?
6  A.   It was a deal.
7  Q.   Did Prima have any prior experience in a
8  100 percent acquisition?  I am gathering the
9  answer is no based upon what you have told me.
10 A.   Yeah, to the best of my knowledge, yes,
11 that is correct.
12 Q.   Did you personally have any experience in
13 a 100 percent acquisition of this type prior to
14 the Prima-Cobham acquisition?
15 A.   Yes.
16 Q.   Which other acquisitions have you
17 personally been involved in?
18 A.   We purchased wells off of different
19 companies over the years.
20 Q.   100 percent of the company's holdings?
21 That is what I am getting to.
22 A.   Yes, okay.  I don't recall right offhand
23 100 percent, let's put it that way.
24 Q.   Was Prima looking at the Cobham

Page 14

1  acquisition for potential future development or
2  simply buying production?  Do you understand the
3  distinction I am making?
4  A.   Both.
5  Q.   Both.  When did Mr. Hillyar approach
6  Prima about the potential buyout?
7  A.   Prior to the acquisition, that is all I
8  can say.
9  Q.   That is all you can say.  Are there any
10 writings between Mr. Hillyar and Prima regarding
11 this buyout and acquisition?
12 A.   Probably.
13 Q.   Did Prima monetarily compensate
14 Mr. Hillyar for the option?
15 A.   I don't recall.
16 Q.   What were the terms of the deal between
17 Prima and Mr. Hillyar regarding the exercising of
18 his option to buy out Cobham?
19 A.   Well, in round numbers, I think he or his
20 company, whatever you want to say, or his
21 associates, they got about a quarter of a million
22 dollars out of it and Cobham got about a quarter
23 of a million and he got about 250,000 shares of
24 Trans Energy stock.

Page 15

1  Q.   Mr. Hillyar as an individual?
2  A.   I don't recall.
3  Q.   And at the time that Prima was looking at
4  this potential Cobham acquisition, was it
5  interested in developing the Marcellus shale
6  formation?
7  A.   No.
8  Q.   Under the leaseholds?
9  A.   No.
10 Q.   But it was interested in additional
11 development of the leaseholds?
12 A.   Yes, our intention, which we did, spent a
13 couple million dollars or so probably fixing up
14 wells and putting wells in production and fixing
15 gathering lines, building roads, doing service
16 work, plus we were, you know, going to drill more
17 wells and did drill some more on certain parts of
18 it.
19 Q.   It is my understanding that Prima has not
20 drilled any additional wells on the Blackshere
21 lease and since acquiring certain rights--that is
22 my term, I realize it is not your term--in 2004;
23 is that correct?
24 A.   Yes; it is.

Page 16

1  Q.   What was your due diligence plan with
2  regard to the Cobham acquisition?
3  A.   I went to their offices in Clarksburg,
4  spent several days going over records and went to
5  the field, spent several days looking over their
6  holdings in Marion, Wetzel Counties, looking at
7  gas gathering systems, visiting sales meters where
8  the gas was being sold to equitable and East
9  Resources, looked at several wells, spent two or
10 three days probably in Wetzel County looking over
11 the Blackshere and related acreage in that area.
12 Q.   Okay.  I'm sorry, how many days did you
13 say you spent?
14 A.   I would say two or three.
15 Q.   Two or three days in Wetzel County?
16 A.   Uh-huh.
17 Q.   What exactly did you do while there in
18 Wetzel County, specifically, with regard to the
19 Blackshere leasehold?
20 A.   I just looked at the wells, looked over
21 the gathering systems.
22 Q.   You looked at the wells that were
23 potentially--
24 A.   That were producing and ones that were

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

William F. Woodburn
August 24, 2012

---

Page 17

1 not producing; and, again, visited all of the
2 sales lines, all of the sales meters at that time
3 in the East and Equitable.
4      MS. LYONS: Do you have an extra copy of
5 Starkey Number 1 that we can look at at the same
6 time?  A is the Cobham acquisition.
7      MR. LEWIS: The November assignment?
8      MS. LYONS: The November 5, 2004.
9      MR. LEWIS: 2004 assignment?  I might
10 actually have one.  Here it is.
11      (The document was handed to the witness)
12 Q.  Sir, are we both looking at the November
13 5th, 2004 assignment and bill of sale from Cobham
14 into Prima Oil?
15 A.  Yes.
16 Q.  Okay.  I would like you to turn to the
17 master well list, please.  Can you specify which
18 wells you actually visited on the Blackshere
19 leasehold specifically by reviewing the master
20 well lease of Starkey?
21 A.  I could tell you some of them.  70, 71,
22 73.
23 Q.  Slow down, sir, please.  When you say 70,
24 71, which page are you looking at?

---

Page 18

1 A.  Page 4.
2 Q.  Page 4, I'm sorry.  I was on page 1.
3 A.  Those are the only ones I can
4 specifically say we visited.  We visited a lot of
5 those on the way to those wells, but I don't
6 recall the numbers, but--
7 Q.  Okay, 70, I'm sorry--
8 A.  70--
9 A.  71--
10 A.  --73.
11 Q.  Any particular reason those three stand
12 out in your mind?
13 A.  They are pretty good producers.
14 Q.  And you would have looked at others on
15 the way to 70?
16 A.  Yes, we would have looked at other wells
17 on the lease while we were out there.
18 Q.  Are those three located in close
19 proximity to each other?
20 A.  On the same ridge.
21 Q.  On the same ridge.  Are they all on the
22 same access road?
23 A.  No, there are dozens of access roads out
24 there.

---

Page 19

1 Q.  Dozens of access roads.  Well, how many
2 access roads would you have traveled to get to
3 wells 70, 71 and 73?  I have never been to the
4 leasehold, so, I am at a disadvantage.
5 A.  You have no conception of how the roads
6 and access to these from the Morgan's Run or the
7 Archie's Fork side.  The average person if they
8 would go out there if they were trying to find
9 these would be lost 100 percent of the time.  It
10 is a 100 percent wooded area and there are roads
11 going every place.
12 Q.  Do you remember visiting any other
13 specific wells?
14 A.  No.
15 Q.  And I wanted to point out that there are
16 Blackshere wells on other pages of the exhibit.
17 A.  Right.
18 Q.  I didn't want you just to look at that
19 page.  And if your answer remains the same, that
20 is fine.  I just wanted to make sure you were
21 looking--
22 A.  Right, I am aware of it.
23 Q.  In 2004, were you aware whether any other
24 producers were operating on this leasehold?

---

Page 20

1 A.  No.
2 Q.  Did you make any effort to determine if
3 other producers were operating on this leasehold?
4 A.  I spent a couple days out there, two or
5 three days looking around, didn't see any.
6 Q.  Was that your only effort to determine if
7 other producers were on the leasehold?  And by
8 producers, I mean gas producers, not oil
9 producers.
10 A.  I don't understand the question.
11 Q.  Okay, let me ask it this way.  What
12 effort did you make on behalf of Prima to
13 determine if other natural gas producers were
14 operating on the Blackshere leasehold?
15 A.  At the time we did the due diligence, it
16 was no one that was associated with that lease
17 that I knew or had operated or was operating on it
18 as far as well tendings and that sort of thing,
19 was aware of any other producing wells on the
20 lease.
21 Q.  And what efforts, if any, did you make to
22 determine if there were others?  That is my
23 question, not what you were generally aware
24 of.  What efforts did you make to investigate the

---

Page 21

1  possibility?
2  A.   The people that were tending, the well
3  tenders that were tending the well was on those
4  leases for Cobham--
5  Q.   Uh-huh.
6  A.   --knew of no other producing wells on the
7  lease other than the ones that they owned.
8  Q.   And did you personally interview these
9  Cobham well tenders?
10  A.   Yes, I did.
11  Q.   Okay, who did you speak with?
12  A.   Beg your pardon?
13  Q.   Who did you speak with?
14  A.   Well, I talked to George Hillyar, was out
15  there.  He spent some time out there and the guy
16  by the name of Spitznogle and a guy by the name of
17  Aaron.
18  Q.   And did you specifically ask that
19  question, "Is anyone else operating?"
20  A.   Probably not.
21  Q.   You did not ask that question.
22  A.   I don't actually remember, but the
23  subject never came up and nobody ever made any
24  notice of any other producing wells on the

Page 22

1  property other than those that belong to Cobham.
2  Q.   Okay.  So and am I to understand that you
3  didn't ask the well tenders or Mr. Hillyar or
4  anyone else if they were aware of other natural
5  gas producers on the Blackshere lease?
6  A.   To the best of my knowledge, I probably
7  did not ask that question.  But, also, in all of
8  the discussions and time I spent with them, nobody
9  ever brought it to light that there were other
10  producing wells on that lease period.
11  Q.   Since it was acquired in 2004, have you
12  ever gone back and asked Mr. Hillyar if he was
13  aware?
14  A.   No.
15  Q.   You have not asked him that?
16  A.   No, ma'am.
17  Q.   Did you make an effort to physically
18  inspect any portion of the Blackshere lease that
19  did not actually have a well that you were
20  potentially acquiring?
21  A.   Repeat that question.
22  Q.   Did you make an effort to explore or
23  inspect any other part of the Blackshere leasehold
24  other than those areas that would have had wells

Page 23

1  that were subject to the acquisition?  Do you
2  understand what I am saying?
3  A.   Yes, probably the producing wells, excuse
4  me, and the wells that we believed that Cobham
5  owned, those are the only ones we inspected.
6  Q.   And so am I to understand, then, and
7  please correct me if I am wrong, that you made no
8  effort to inspect any other area of the leasehold
9  other than those areas with wells that were
10  subject to the acquisition?
11      MR. LEWIS: Ramonda, I think that is a
12  misstatement of what he has already testified to.
13      MS. LYONS: That is why I am asking him.
14      MR. LEWIS: But the way you are phrasing
15  it is he can give you an answer that misstates
16  what he has already said.  He said he went to
17  wells and on his way he saw other wells.
18      MS. LYONS: You can object to the form.
19      MR. LEWIS: I object to the form.
20      MS. LYONS: That is the objection.
21  Q.   My question is--
22      MR. LEWIS: Do you understand the
23  question?  Can you answer it accurately?
24  A.   I can't answer it accurately, but I can

Page 24

1  say that I have been over most of the lease and I
2  did not see or hear mention of any other, other
3  than Cobham wells on that lease, factual.
4  Q.   I want to go back to your due diligence,
5  which was two or three days--
6  A.   Uh-huh.
7  Q.   --in 2004.
8  A.   Uh-huh.
9  Q.   And only those two or three days in 2004,
10  okay?
11  A.   Uh-huh.
12  Q.   Not any time after that.  Is it fair to
13  say that those two or three days were the only
14  days prior to the acquisition that you spent on
15  the leasehold?
16  A.   Probably not.  I was probably there other
17  times, but that is, you know, passing through
18  there to get to other leases.
19  Q.   But for purposes of your due diligence
20  examination, let me ask it that way, were those
21  two or three days that you were in Wetzel County
22  the only days that you would be performing due
23  diligence for this potential acquisition?
24  A.   Probably so.

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

William F. Woodburn
August 24, 2012

Page 25

1  Q.  Okay, during these--and did you actually
2    spend two to three days on the Blackshere lease?
3  A.  Well, probably the majority of that time
4    was spent on the Blackshere; probably some of it
5    drifted over into, maybe the third day, drifted
6    over in the L.G. Robinson and other leases, but
7    the majority of the time was probably spent on the
8    Blackshere.
9  Q.  Let's call those the due diligence days,
10   okay?
11 A.  Okay.
12 Q.  Those two or three days in Wetzel
13   County.  During the due diligence days, did you as
14   a representative of Prima Oil make any effort to
15   inspect or view other portions of the Blackshere
16   leasehold other than those areas that had wells
17   located on them that were subject to the potential
18   acquisition?
19     MR. LEWIS: Objection as to form.
20     MS. LYONS: You may answer, sir.
21 A.  The majority of the time was spent
22   looking at the wells that everyone knew where they
23   were at and there was no reason at that time to
24   look for other wells because there was never any

Page 26

1    mention of other wells being on the lease.
2  Q.  Was any time spent in viewing or
3    inspecting the leasehold for other wells, yes or
4    no?
5  A.  No.  There was time spent looking for
6    other Blackshere wells.
7  Q.  Okay.  Did you find any other Blackshere
8    wells?
9  A.  Yes, there is a lot of them out there.
10   There is some of them that, you know, they just
11   haven't been producing in recent times, so there
12   are some of them that are kind of went back to
13   nature.
14 Q.  When you say other Blackshere wells, what
15   are you referring to, other Cobham wells?
16 A.  Other Cobham wells which were on the
17   Blackshere lease.
18 Q.  And just to be clear to make sure we
19   haven't misunderstood--do you need to take a call,
20   sir?
21 A.  No.
22 Q.  During your due diligence days on the
23   Blackshere lease as a representative of Prima
24   Oil--

Page 27

1  A.  I have answered that question.
2  Q.  Well, but then you threw some in and I
3    want to make sure I am clear.
4    Did you make any effort to view the property
5    for gas wells that were being operated by other
6    producers?  And by "other producers" I mean
7    nonCobham affiliated producers?
8      MR. LEWIS: He has already answered that.
9  A.  I can answer it.  There was no reason
10   to.  There was no reason--there was never any
11   mention of any other wells.  There was no reason
12   to be looking around for anything other than
13   Cobham wells on the Blackshere lease at that point
14   in time.
15 Q.  So you didn't do it?
16 A.  We looked for Blackshere wells.  If we
17   had ran onto someone that was not a Blackshere
18   well, we certainly would have made note of that,
19   but we did not.
20     MS. LYONS: Can I see your screen?
21   Pause.
22 Q.  How many people were involved in the due
23   diligence efforts on behalf of Prima Oil with
24   regard to the potential Cobham acquisition?

Page 28

1  A.  Two.
2  Q.  Yourself and who else?
3  A.  Loren Bagley.
4  Q.  Did Mr. Bagley actually accompany you to
5    visit the Blackshere lease in Wetzel County?
6  A.  No.
7  Q.  So you were the only representative from
8    Prima Oil to actually visit the Blackshere
9    leasehold prior to the Cobham acquisition?
10 A.  That's correct.
11 Q.  Did anyone from Cobham accompany you
12   during your due diligence review of the Blackshere
13   lease?  I mean, the actual, physical lease?
14 A.  George Hillyar was there, whether you
15   want to call him an employee, you couldn't say he
16   was an employee of Cobham, but he was associated
17   with them.
18 Q.  Was he there for your entire visit to the
19   Blackshere lease--
20 A.  No.
21 Q.  --for the two to three days?
22 A.  No.
23 Q.  For what portion was he there?
24 A.  Probably a half a day or so.

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

William F. Woodburn
August 24, 2012

Page 29

1  Q.   Did anyone else from Cobham accompany you
2  at any point?
3  A.   I don't recall, but not to my
4  knowledge.  Well, let's see.  The guy that
5  actually owned Cobham, Pete Battles, he may have
6  been up there with us.  I don't actually recall.
7  Q.   What was his name?
8  A.   Pete Battles.
9  Q.   But you don't recall?
10  A.   I don't recall.
11  Q.   Is it fair to say that at least a portion
12  of the time that you are conducting your actual,
13  physical view of the leasehold, that you were
14  alone?
15  A.   A part of the time I was alone and there
16  might have been somebody else, an employee, you
17  know, associate of mine or somebody with me at
18  some point in time, but most of the time it was
19  either George Hillyar or by myself.
20  Q.   Do you recall actually having an
21  associate with you?  Because I thought you said
22  you were the only representative.
23  A.   That is what I say, I may have had.  I
24  don't actually recall.

Page 30

1  Q.   Did you take any notes of your physical
2  view of the leasehold?
3  A.   I probably--I had maps with me to
4  find--so I would know where I was at.
5  Q.   Where did you obtain those maps?
6  A.   They were just maps, they came from
7  Cobham.
8  Q.   Cobham provided those maps?
9  A.   Some of them yes.
10  Q.   Where would you have gotten the others?
11  A.   Topo. maps that had wells listed on that
12  you can buy anywhere in West Virginia.
13  Q.   Did you buy those maps specifically for
14  your due diligence on this Cobham acquisition?
15  A.   No, we have a complete set of topo. maps
16  for years and I just pulled one out of the drawer
17  in that area and here we go.
18  Q.   Do you still have that map?
19  A.   That specific map?
20  Q.   Uh-huh.
21  A.   I can't answer that question, but we have
22  probably got some similar to it.
23  Q.   That would have the same information that
24  you were looking at in 2004?

Page 31

1  A.   I can't answer that question.  I don't
2  know.
3  Q.   Where--what company would have provided
4  those topo. maps?
5  A.   West Virginia Geological Survey, I think
6  that is where they come from.  They are just the
7  plain topo. map.
8  Q.   Did you visit the courthouse as a part
9  your due diligence review?
10  A.   No.
11  Q.   Did Prima engage anyone to visit the
12  courthouse in Wetzel County to review the
13  documents of record as a part of the due diligence
14  on the Cobham acquisition?
15  A.   We engaged Richard Starkey to do the
16  legal work on the acquisition.
17  Q.   And this is in 2004?
18  A.   Yes.
19  Q.   Did you personally speak with Richard
20  Starkey about his work on the Cobham acquisition?
21  A.   Probably not.
22  Q.   Who would have done that?
23  A.   Oh, probably Loren Bagley.
24  Q.   Did Mr. Starkey produce a written report

Page 32

1  in 2004?
2  A.   No, not to my knowledge.
3  Q.   Was anyone else engaged to actually
4  review the public records?
5  A.   Not to my knowledge.
6  Q.   And any abstractors?
7  A.   No.
8  Q.   Give me that stapler, sir, in that bag.
9  (Woodburn Deposition Exhibit 2 was marked)
10  Mr. Woodburn, can you review Exhibit 2 and let
11  me know when you have completed your review.
12      MS. LYONS: Let's go off the record.
13  (Pause, discussion off the record)
14      MS. LYONS: Back on the record.
15  Q.   Have you reviewed it, sir?
16  A.   Yes.
17  Q.   As you can see, this is a series of
18  interrogatories and requests for admissions that
19  were submitted under the Federal Rules of Civil
20  Procedure to plaintiffs in this matter.
21  Basically, an interrogatory is a question.  Do you
22  agree with the response to Interrogatory Number
23  13?  Is there anything that you would like to add
24  or change about that since you were the individual

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

William F. Woodburn
August 24, 2012

Page 33

1 actually charged with the due diligence efforts on
2 behalf of Prima Oil?
3 A.  You asked me if I agree with all of that
4 or if it needs any changes?
5 Q.  Exactly, sir.
6 A.  The only thing I see right offhand is the
7 on-site visit of all producing oil and gas wells,
8 I probably did not visit all of them.
9 Q.  That was going to be my next question,
10 okay.  Anything else, sir?  I thought you were
11 still looking at the document.
12 A.  No.
13 Q.  I didn't want to interrupt you.
14 A.  I'm sorry.  That is all.
15 Q.  Did you personally undertake to review
16 any of the records in the Wetzel County
17 Courthouse.  I think you may have answered that.
18 A.  Did I?
19 Q.  Did you personally?
20 A.  No.
21 Q.  Who would have done that on behalf of
22 Prima Oil prior to the acquisition?
23 A.  Richard Starkey.
24 Q.  And he is the only individual that would

Page 34

1 have done that?
2 A.  Yes.
3 Q.  Do you know how far back Mr. Starkey's
4 review of the leasehold chain of title went?
5 A.  No.
6 Q.  Request for Admission Number 8 deals with
7 abstractors and it says, "Admit that neither Prima
8 Oil nor Trans Energy contacted an abstractor
9 familiar with West Virginia title matters
10 regarding the Blackshere lease prior to acquiring
11 the leasehold interest," and that is denied.  What
12 abstractor was contacted?
13 A.  We are talking about Number 7?  Or Number
14 8?
15 Q.  I'm sorry, Number 8.  Seven deals with
16 attorneys.
17 A.  Okay.
18 Q.  Eight deals with abstractors.  Were there
19 any abstractors involved in the due diligence
20 efforts?
21 A.  No.
22 Q.  So that should be admitted.  That is a
23 question, sir.  Should that be admitted rather
24 than denied?

Page 35

1 A.  There were no abstractors hired to my
2 knowledge.
3 Q.  And you would be the person charged with
4 doing that, correct?
5 A.  Except for Mr. Bagley, probably
6 Mr. Bagley.
7 Q.  Today you are here as the 30(b)(6)
8 designee on behalf of Prima Oil to speak to--
9 A.  To the best of my knowledge, no
10 abstractors were hired to review the title.
11     MR. LEWIS:  Ramonda, could you clarify
12 that.  He just said no one was hired.  Your
13 question said that was no one was contacted.
14 Q.  Was any abstractor contacted to
15 actually--
16 A.  Not to my knowledge.
17 Q.  Was an abstractor hired?
18 A.  Not to my knowledge.
19 Q.  Was an abstractor in any way, shape or
20 form in the due diligence review on the Blackshere
21 lease?
22 A.  Not to my knowledge.
23 Q.  And the only attorney involved was
24 Mr. Starkey.

Page 36

1 A.  That is correct.
2 Q.  In 2004 when Prima Oil was looking at the
3 potential acquisition of the Cobham interest, you
4 indicated earlier that there was a potential plan
5 for further development; is that correct?
6 A.  Uh-huh.
7 Q.  Was that oil development or natural gas
8 development?
9 A.  Both.
10 Q.  And do you know if Mr. Starkey was asked
11 to look at title matters regarding the leasehold
12 for both oil and natural gas?
13 A.  Well, if the leasehold is a leasehold,
14 generally speaking.  He was just asked to look--to
15 check, do the legal--whatever he needed to do
16 legally to make it a safe and a valid acquisition
17 for Prima Oil.
18 Q.  And have you spoken with Mr. Bagley about
19 exactly what he charged Mr. Starkey to do?
20 A.  No.
21 Q.  I'm sorry?
22 A.  No.
23 Q.  No?  Okay.  So you have no idea exactly
24 what he was charged with or what he actually

Page 37

1  did. Is that fair to say?
2  A.   That is reasonable.
3  Q.   You have no idea as to whether or not he
4  actually went to the Wetzel County Courthouse or
5  if he simply reviewed documents that were provided
6  him by Prima Oil, correct?
7  A.   I don't know the answer to that.
8  Q.   Let's look at Starkey Number 2. Do you
9  have a copy of Starkey 2 in front of you?
10  A.   I have got one here. Is that it?
11  Q.   No. Can you give him Starkey 2? That is
12  the actual--
13      MR. LEWIS: Pennzoil-Cobham?
14      MS. LYONS: Yes. No, Pennzoil-Cobham.
15  Can you give him a copy?
16  (The document was handed to the witness)
17  Q.   Just let me know when you have completed
18  your review of Starkey 2, which is the October 15,
19  1996 memorandum of assignment and bill of sale
20  into Cobham.
21  A.   Beg your pardon?
22  Q.   Let me know when you have finished your
23  review.
24  A.   Oh, I didn't realize I was supposed to.

Page 38

1  Q.   I'm sorry.
2  (Pause)
3  A.   Okay.
4  Q.   Have you seen Starkey 2 prior to today's
5  deposition?
6  A.   No.
7  Q.   So you did not personally review this as
8  a part of the due diligence process on the Cobham
9  acquisition?
10  A.   That's correct.
11  Q.   Do you know if anyone at Prima Oil
12  reviewed this document as a part of the due
13  diligence efforts?
14  A.   To my knowledge, I know of no one.
15  Q.   So as the corporate designee, you cannot
16  identify a single representative of Prima that
17  reviewed Starkey Number 2, which is the memorandum
18  of assignment and bill of sale into Cobham as a
19  part of the due diligence efforts with regard to
20  the Cobham acquisition?
21      MR. LEWIS: Hold on a second,
22  please. Object to form, Ramonda. I think he has
23  testified that he hired counsel to do this.
24      MS. LYONS: Okay, that is what I am

Page 39

1  trying to get to, but thank you for the speaking
2  objection, object to form.
3  Q.   What is your answer, sir?
4  A.   Unless Mr. Starkey was hired to do the
5  legal review, but I did not review it.
6  Q.   And you have no knowledge of anyone other
7  than potentially Mr. Starkey reviewing it.
8  A.   That is correct.
9  Q.   Have you had discussions with anyone
10  regarding this document?
11  A.   No.
12  Q.   At any point in time?
13  A.   No.
14  Q.   You have not discussed this document with
15  Mr. Bagley even subsequent to the acquisition?
16  A.   That is correct.
17  Q.   You have not discussed this document with
18  your son, Mark Woodburn, subsequent to the
19  acquisition.
20  A.   That is correct.
21  Q.   Prior to today, were you aware that--I
22  can turn to the page for you, sir. Under the
23  "rights" column, the word "oil" appears next to
24  the Blackshere entries, and only oil?

Page 40

1  A.   Uh-huh.
2  Q.   How are you aware of that?
3  A.   You just showed it to me.
4  Q.   I said "prior to today," I'm sorry.
5  A.   I wasn't.
6  Q.   This is the first you have heard of
7  that?
8  A.   Yes. Well, I mean at the time of the
9  acquisition, I did not--I had never heard of this.
10  Q.   Since the acquisition and prior to two
11  minutes ago, have you heard of this entry for
12  "oil" under the "rights" column on Exhibit 2 to
13  the Starkey deposition?
14  A.   Pertaining to this document?
15  Q.   Yes.
16  A.   No.
17  Q.   Just generally?
18  A.   Yes.
19  Q.   How did you become aware of that
20  generally?
21  A.   Oh, probably around '08, '09.
22  Q.   I'm sorry.
23  A.   Around '08, '09.
24  Q.   How did you become aware that there was

Page 41

1  this type of entry on a document?
2  A.   I don't know that I was before--I am just
3  saying general rumor, I became aware of it in the
4  '08-'09 time frame, nothing to do with this
5  document.
6  Q.   Okay.
7  A.   I was not aware of this document.  I
8  never saw it until today.
9  Q.   What was the general rumor that you
10  became aware of in the 2008-2009 time frame?
11  A.   There was a separation of oil and gas on
12  certain leases, old Pennzoil leases.
13  Q.   And who made you aware of that rumor?
14  A.   Probably Mark Woodburn.
15  Q.   And did you and he have a discussion
16  about that separation of oil and gas on certain
17  leases and how it may impact Prima?
18  A.   I'm sure between that time and today, we
19  have talked about it a few times.
20  Q.   So, yes?
21  A.   Yes.
22  Q.   And in the context of that conversation,
23  you and he did not look at Starkey Number 2 and
24  make note of the rights column?

Page 42

1  A.   That is correct.
2  Q.   And if he has testified differently?
3       MR. LEWIS: Objection to form.
4  A.   I am just telling you that this is the
5  first time I have ever seen this document and it
6  had been noted that the oil was out here.  But
7  there is two parts to this document, though.  One
8  is the exhibit of the leases, though, and the
9  other is just an exhibit of the wells.
10  Q.   And who told you that?
11  A.   Me.
12  Q.   But today is the first time you have seen
13  it?
14  A.   Yes.
15  Q.   Then how could you know there were two
16  exhibits?
17  A.   You just gave it to me.  There is an
18  Exhibit A and an Exhibit B.
19  Q.   I think you are looking at a different
20  document, sir.  This is a different document.  If
21  you look at those pages there, as you were looking
22  at it today, you made note of that?
23  A.   Well, there is Exhibit A that has leases
24  on it.

Page 43

1  Q.   Has Mark Woodburn ever pointed that out
2  to you before--
3  A.   No.
4  Q.   --in conversation?
5  A.   No, ma'am.
6  Q.   Does Mr. Bagley generally direct legal
7  matters for Prima?
8  A.   At that point in time, yes, he would have
9  had more involvement than I would, yes.
10  Q.   And by that point in time you are
11  referring to 2004 when the due diligence for the
12  Blackshere--I'm sorry, the Cobham acquisition was
13  taking place?
14  A.   Yes.
15       MS. LYONS: Let's go off the record just
16  a minute.
17  (Pause, short break)
18       BY MS. LYONS:
19  Q.   Did you speak with Mr. Bagley in
20  preparation for your 30(b)(6) deposition testimony
21  today?
22  A.   No.
23  Q.   Can you definitively state without
24  reservation that Mr. Bagley engaged legal counsel

Page 44

1  to review the documents of record in Wetzel County
2  regarding the Blackshere lease prior to the Cobham
3  acquisition?
4  A.   Repeat the question again.
5       MS. LYONS: Read it back, please.
6  (The following question was read by the court
7  reporter:  "Can you definitively state without
8  reservation that Mr. Bagley engaged legal counsel
9  to review the documents of record in Wetzel County
10  regarding the Blackshere lease prior to the Cobham
11  acquisition?")
12  A.   I can say that he asked Mr. Starkey to do
13  the legal work in preparation for this
14  acquisition.
15  Q.   And how do you know that?
16  A.   I was there.  I mean, I was involved in
17  the deal and he would have done that and
18  Mr. Starkey did what he did.
19  Q.   You haven't seen Starkey's report.
20  A.   No.
21       MR. LEWIS: Objection to form.  It is an
22  assumption there is a written report.
23       MS. LYONS: There has been testimony that
24  there is, but we will proceed.

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

William F. Woodburn
August 24, 2012

---

Page 45

1  Q.   You weren't present when Mr. Bagley asked
2   Mr. Starkey to do that review, correct?
3  A.   I don't recall.
4  Q.   In preparation for your testimony today
5   as a corporate representative, you didn't ask
6   Mr. Bagley if he asked Mr. Starkey to do that,
7   correct?
8  A.   That's correct.
9  Q.   Would anyone other than Mr. Bagley have
10   engaged legal counsel to do a review of the
11   leasehold based upon the public records in Wetzel
12   County on behalf of Prima Oil?
13  A.   No.  I mean, it would have been either he
14   or I.
15  Q.   And you know it wasn't you.
16  A.   Yes, he would have handled that part of
17   the deal.
18  Q.   For the Cobham acquisition?
19  A.   Yes.
20  Q.   As a part of your due diligence efforts
21   and your physical inspection of the property, did
22   you walk the perimeter of the leasehold?
23  A.   No.
24  Q.   As a part of your due diligence efforts

---

Page 46

1   and physical review of the leasehold, did you go
2   down a single access road or trail that you did
3   not believe led to a Cobham well?  For example,
4   did you go down a single well--or a single road
5   that is on this leasehold that you didn't believe
6   was going to lead to a Cobham well?
7  A.   I went down lots of lease roads that led
8   to other leases in that area.
9  Q.   My question was, on this leasehold, did
10   you go down any access roads that you did not
11   believe would ultimately lead to a Cobham well?
12  A.   I went down a lot of access roads that I
13   knew was ultimately going to lead to another
14   lease.
15  Q.   And why did you go down those?
16  A.   If you are looking over--if your doing
17   due diligence, you need not only look over the
18   Blackshere, the Robinson, the Smith, there were a
19   lot of other properties involved in this
20   acquisition, so you would been going through this
21   to other areas.
22  Q.   Oh, other leases that were subject to the
23   Cobham acquisition?
24  A.   Yes, yes.

---

Page 47

1  Q.   Let me ask it this way.  Did you go down
2   a single access road that did not in your mind
3   lead to another lease that was subject to the
4   acquisition and that would not lead to a Cobham
5   well on the Blackshere lease?
6  A.   I probably went down access roads that
7   took me to leases that we did not own or were not
8   a part of this acquisition.  You just--you have
9   never been there, so you just can't understand the
10   massiveness of this piece of property and all of
11   the acreage, no development, all trees, all
12   wooded, all steep, no access, no houses, no
13   phones, no nothing.  You are four or five miles
14   from anyplace and if you don't know where you are
15   at, you are lost.
16  Q.   So were you lost when you were going down
17   these other roads?
18  A.   No.
19  Q.   Okay.
20  A.   But if you don't have a map with you, a
21   topo. map or something to tell where you are
22   really at, and it is very difficult to define what
23   lease you are on and where you're at, very
24   difficult.

---

Page 48

1  Q.   How many acres do you think you actually
2   walked of the 300--I'm sorry, 3,800 acres?
3  A.   The walking of it, not very much, but as
4   far as riding four-wheelers or driving a pickup on
5   the existing roads.
6  Q.   Travel.
7  A.   Travel.
8  Q.   Travel.
9  A.   It is in miles.
10  Q.   Five miles, ten miles?
11  A.   Looking over, probably five miles.
12  Q.   So you would estimate that you inspected
13   five miles of the leasehold?  Is that fair?
14  A.   Yes, that is fair.
15  Q.   Did you contact anyone at the DEP to
16   determine if other natural gas operators were on
17   this leasehold, the Blackshere leasehold?
18  A.   No.
19  Q.   And that would include a review of the
20   DEP web site to determine if there were other
21   operators on this leasehold?
22  A.   We did not.
23  Q.   Did you even consider how you might
24   potentially learn if there were other operators on

---

Page 49

1  this leasehold or did you simply assume that there
2  were not other operators?
3  A.  Well, I've been in the well business for
4  30 some years and I don't know how it is possible
5  for two people to own the same lease.  In our
6  minds, the Blackshere lease was a part of the
7  acquisition.  There is no reason to even be
8  thinking about anybody else being there.
9  Q.  Back to my question.
10  A.  Uh-huh.
11    MS. LYONS: Can you read it back?
12  (The following question was read by the court
13  reporter:  "Did you even consider how you might
14  potentially learn if there were other operators on
15  this leasehold or did you simply assume that there
16  were not other operators?")
17    MR. LEWIS: Ramonda, I believe he has
18  already--you asked this and he answered it several
19  times.
20  Q.  Can you answer the question, sir?
21  A.  Read it back one more time, please.
22  (The following question was read by the court
23  reporter:  "Did you even consider how you might
24  potentially learn if there were other operators on

Page 50

1  this leasehold or did you simply assume that there
2  were not other operators?")
3  A.  There was no reason to assume that there
4  were any other operators on there.  So, therefore,
5  the answer to that, we did not.
6    MS. LYONS: I have no further
7  questions.  Do you guys need to confer?
8    EXAMINATION
9    BY MR. LEWIS:
10  Q.  Just a few follow-up questions.
11  Mr. Woodburn, you gave some testimony
12  regarding your inspection of the Blackshere lease
13  and among some other leases, too.  While you were
14  traveling on foot or four-wheeler or pickup from
15  well to well or whatever you were inspecting on
16  that lease, did you see any other leases or did
17  you see any other wells that were not Cobham
18  wells?
19  A.  No, sir.
20  Q.  Okay.  I want to represent to you
21  that--well, first of all, before I do that, can
22  you get in front of you the Starkey Exhibit
23  2.  Here, it is this document right here.
24  Mr. Woodburn--in Mark's testimony in his

Page 51

1  deposition, he testified that he actually reviewed
2  that document with you.  Is there any reason to
3  believe that that didn't happen?
4  A.  Not--I mean, I didn't remember it, let's
5  put it that way.
6  Q.  So it is fair to say that he may have
7  gone over that with you.
8  A.  That is a possibility, yes.
9  Q.  And sitting here today, that--you
10  actually can't recall it.
11  A.  I can't--if it happened, I don't recall
12  it.
13  Q.  So your previous testimony that you
14  hadn't seen it until today could possibly have
15  been inaccurate?
16  A.  Taking the facts, that is possible,
17  always a possibility.
18    MR. LEWIS: Okay.  I think that is all we
19  have.
20    MS. LYONS: Just one follow up.
21    EXAMINATION
22    BY MS. LYONS:
23  Q.  The wells that you did see on the
24  Blackshere leasehold--

Page 52

1  A.  Uh-huh.
2  Q.  --how did you verify that they were
3  Cobham wells?
4  A.  I generally got an API number on it some
5  place, there is a tag hanging on the API number on
6  it.
7  Q.  So on every well that you saw on the
8  Blackshere leasehold, you inspected the API number
9  and made sure that it was a Cobham well?
10  A.  Some of them you look out at the map,
11  here, there, they are in the right place, they are
12  a Blackshere well, I didn't look at every one of
13  them, no.
14  Q.  You didn't cross-reference every one.
15  A.  No.
16    MS. LYONS: I have no further questions.
17    MR. LEWIS: Mr. Wood, you have the right
18  to read.  However we, have already decided
19  everyone is waiving, so--
20    THE WITNESS: That solves that problem,
21  doesn't it?
22    MS. LYONS: That solves that problem,
23  makes your job easier.
24    THE WITNESS: There you go.

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

William F. Woodburn
August 24, 2012

Page 53

1    MS. LYONS: We are off the record.
2    (The deposition of William Woodburn was
3    concluded at 3:20 p.m. 8-24-2012)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 54

1
2
3
4
5
6    STATE OF WEST VIRGINIA
7    COUNTY OF MONONGALIA, to wit;
8        I, Jennifer Vail-Kirkbride, a Notary Public
9    and Commissioner within and for the County and
10   State aforesaid, duly commissioned and qualified,
11   do hereby certify that the foregoing deposition of
12   WILLIAM WOODBURN was duly taken by me and before
13   me at the time and place and for the purpose
14   specified in the caption hereof, the said witness
15   having been by me first duly sworn.
16       I do further certify that the said deposition
17   was correctly taken by me in stenotypy notes, and
18   that the same were accurately written out in full
19   and reduced to typewriting and that the witness
20   did not request to read his transcript.
21       I further certify that I am neither attorney
22   or counsel for, nor related to or employed by, any
23   of the parties to the action in which this
24   deposition is taken, and further that I am not a

Page 55

1    relative or employee of any attorney or counsel
2    employed by the parties or financially interested
3    in the action.
4
5    My Notary Public commission expires:  August 26,
6    2018.
7    My West Virginia Commissioner commission expires:
8    February 15, 2022.
9    Given under my
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
Jennifer Vail-Kirkbride
P.O. Box 42
Wheeling, WV 26003
My Commission Exp. Aug. 26, 2018

Jennifer Vail-Kirkbride

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

William F. Woodburn
August 24, 2012

## A

**Aaron (1)**
   21:17
**abstractor (5)**
   34:8;12;35:14,17,19
**abstractors (6)**
   32:6;34:7,18,19;
   35:1,10
**access (11)**
   18:22,23;19:1,2,6;
   46:2,10,12;47:2,6,12
**accompany (3)**
   28:4,11;29:1
**accomplished (1)**
   10:13
**accurately (2)**
   23:23,24
**acquired (3)**
   6:13;9:14;22:11
**acquiring (5)**
   7:5;11:5;15:21;
   22:20;34:10
**acquisition (54)**
   6:23;7:12,18,19;8:3,
   16,24;9:5;10:11,13,22;
   11:1;12:11,21,23;13:8,
   13,14;14:1,7,11;15:4;
   16:2;17:6;23:1,10;
   24:14,23;25:18;27:24;
   28:9;30:14;31:14,16,
   20;33:22;36:3,16;38:9,
   20;39:15,19;40:9,10;
   43:12;44:3,11,14;
   45:18;46:20,23;47:4,8;
   49:7
**acquisitions (1)**
   13:16
**acreage (2)**
   16:11;47:11
**acres (2)**
   48:1,2
**actual (2)**
   28:13;29:12
**actual- (1)**
   37:12
**actually (20)**
   9:6;10:13;17:10,18;
   21:22;22:19;25:1;28:4,
   8;29:5,6,20,24;32:3;
   33:1;36:24;37:4;48:1;
   51:1,10
**actually- (1)**
   35:15
**add (1)**
   32:23
**additional (2)**
   15:10,20
**address (2)**
   6:20;7:3
**Admission (1)**
   34:6

**admissions (1)**
   32:18
**Admit (1)**
   34:7
**admitted (2)**
   34:22,23
**affiliated (1)**
   27:7
**again (4)**
   11:8;12:16;17:1;
   44:4
**ago (1)**
   40:11
**agree (2)**
   32:22;33:3
**agreed (1)**
   5:22
**A-H (1)**
   11:12
**al (1)**
   5:16
**alone (2)**
   29:14,15
**already-you (1)**
   49:18
**always (1)**
   51:17
**among (1)**
   50:13
**answered (4)**
   27:1,8;33:17;49:18
**anyplace (1)**
   47:14
**API (3)**
   52:4,5,8
**appear (1)**
   5:22
**appears (1)**
   39:23
**approach (1)**
   14:5
**approached (1)**
   11:16
**Archie's (1)**
   19:7
**area (5)**
   16:11;19:10;23:8;
   30:17;46:8
**areas (4)**
   22:24;23:9;25:16;
   46:21
**around (4)**
   20:5;27:12;40:21,23
**as- (1)**
   8:11
**assignment (7)**
   7:21;9:18;17:7,9,13;
   37:19;38:18
**associate (2)**
   29:17,21
**associated (2)**
   20:16;28:16
**associates (1)**

   14:21
**assume (4)**
   49:1,15;50:1,3
**assumption (1)**
   44:22
**attorney (2)**
   5:13;35:23
**attorneys (1)**
   34:16
**average (1)**
   19:7
**aware (15)**
   5:19;19:22,23;20:19,
   23;22:4,13;39:21;40:2,
   19,24;41:3,7,10,13

## B

**back (10)**
   7:11;22:12;24:4;
   26:12;32:14;34:3;44:5;
   49:9,11,21
**bag (1)**
   32:8
**Bagley (14)**
   28:3,4;31:23;35:5,6;
   36:18;39:15;43:6,19,
   24;44:8;45:1,6,9
**based (2)**
   13:9;45:11
**basically (3)**
   7:20;9:1;32:21
**Battles (2)**
   29:5,8
**became (2)**
   41:3,10
**become (2)**
   40:19,24
**before- (1)**
   43:2
**before-I (1)**
   41:2
**Beg (2)**
   21:12;37:21
**begin (1)**
   10:10
**behalf (11)**
   5:24;6:2;7:5,9;10:6;
   20:12;27:23;33:2,21;
   35:8;45:12
**belong (1)**
   22:1
**best (6)**
   12:4,24;13:2,10;
   22:6;35:9
**bill (6)**
   7:22;8:1;9:18;17:13;
   37:19;38:18
**Blackshere (42)**
   5:19;6:14,24;7:6;
   15:20;16:11,19;17:18;
   19:16;20:14;22:5,18,
   23;25:2,4,8,15;26:6,7,

   14,17,23;27:13,16,17;
   28:5,8,12,19;34:10;
   35:20;39:24;44:2,10;
   46:18;47:5;48:17;49:6;
   50:12;51:24;52:8,12
**Blackshere-I'm (1)**
   43:12
**border (1)**
   12:8
**Both (5)**
   14:4,5;17:12;36:9,12
**break (1)**
   43:17
**brought (1)**
   22:9
**building (1)**
   15:15
**business (1)**
   49:3
**but- (1)**
   18:6
**buy (6)**
   11:3,17,20;14:18;
   30:12,13
**buying (1)**
   14:2
**buyout (2)**
   14:6,11

## C

**call (3)**
   25:9;26:19;28:15
**came (3)**
   11:4;21:23;30:6
**Can (24)**
   11:10;14:8,9;17:5,
   17;18:3;23:15,18,23,
   24;27:9,20;30:12;
   32:10,17;37:11,15;
   39:22;43:23;44:7,12;
   49:11,20;50:21
**can't-if (1)**
   51:11
**capacity (1)**
   10:9
**case (1)**
   6:11
**certain (4)**
   15:17,21;41:12,16
**certainly (1)**
   27:18
**chain (1)**
   34:4
**change (1)**
   32:24
**changes (1)**
   33:4
**charged (4)**
   33:1;35:3;36:19,24
**check (1)**
   36:15
**chronological (1)**

   9:9
**Civil (1)**
   32:19
**clarify (1)**
   35:11
**Clarksburg (1)**
   16:3
**clear (6)**
   6:16;8:5,13,14;
   26:18;27:3
**close (1)**
   18:18
**Cobham (57)**
   7:18,19;8:3,15,24;
   9:4,19;10:11,24;11:4,6,
   18,22;12:23;13:1,24;
   14:18,22;15:4;16:2;
   17:6,13;21:9;22:1;
   23:4;24:3;26:15,16;
   27:13,24;28:9,11,16;
   29:1,5;30:7,8,14;31:14,
   20;36:3;37:20;38:8,18,
   20;43:12;44:2,10;
   45:18;46:3,6,11,23;
   47:4;50:17;52:3,9
**Cobham- (1)**
   21:4
**Cobham's (1)**
   11:20
**column (3)**
   39:23;40:12;41:24
**companies (1)**
   13:19
**company (3)**
   10:6;14:20;31:3
**company's (1)**
   13:20
**compensate (1)**
   14:13
**complete (2)**
   12:11;30:15
**completed (2)**
   32:11;37:17
**conception (1)**
   19:5
**concerned (1)**
   8:18
**concluded (1)**
   53:3
**conducted (1)**
   7:4
**conducting (1)**
   29:12
**confer (1)**
   50:7
**consider (3)**
   48:23;49:13,23
**considering (1)**
   10:10
**contact (2)**
   10:23;48:15
**contacted (4)**
   34:8;12;35:13,14

**contemplated (2)**
10:16,19
**context (1)**
41:22
**conversation (2)**
41:22;43:4
**conveyed (1)**
7:21
**copy (4)**
8:9;17:4;37:9,15
**corporate (3)**
5:23;38:15;45:5
**counsel (5)**
10:2;38:23;43:24;
44:8;45:10
**counties (4)**
11:23;12:2,8;16:6
**County (12)**
16:10,15,18;24:21;
25:13;28:5;31:12;
33:16;37:4;44:1,9;
45:12
**couple (2)**
15:13;20:4
**Court (5)**
5:17;12:17;44:6;
49:12,22
**courthouse (4)**
31:8,12;33:17;37:4
**cross-reference (1)**
52:14

**D**

**date (3)**
10:14,16,19
**dated (2)**
7:22;9:20
**dates (1)**
7:12
**day (2)**
25:5;28:24
**days (18)**
16:4,5,10,12,15;20:4,
5;24:9,13,14,21,22;
25:2,9,12,13;26:22;
28:21
**days- (1)**
24:5
**deal (4)**
13:6;14:16;44:17;
45:17
**deals (3)**
34:6,15,18
**decided (1)**
52:18
**define (1)**
47:22
**definitively (2)**
43:23;44:7
**denied (2)**
34:11,24
**DEP (2)**

**depose (1)**
12:15
**deposed (1)**
5:4
**deposition (14)**
5:15;6:3,17,18;8:10;
9:3,23;10:2;32:9;38:5;
40:13;43:20;51:1;53:2
**designated (1)**
6:20
**designee (5)**
5:23,23;10:3;35:8;
38:15
**determine (6)**
20:2,6,13,22;48:16,
20
**developing (1)**
15:5
**development (6)**
14:1;15:11;36:5,7,8;
47:11
**different (3)**
13:18;42:19,20
**differently (1)**
42:2
**difficult (2)**
47:22,24
**diligence (27)**
6:21;7:4;8:17;11:7;
16:1;20:15;24:4,19,23;
25:9,13;26:22;27:23;
28:12;30:14;31:9,13;
33:1;34:19;35:20;38:8,
13,19;43:11;45:20,24;
46:17
**direct (1)**
43:6
**disadvantage (1)**
19:4
**discussed (2)**
39:14,17
**discussion (2)**
32:13;41:15
**discussions (2)**
22:8;39:9
**distinction (1)**
14:3
**District (1)**
5:18
**document (21)**
7:23,24;8:7;9:9,19;
17:11;33:11;37:16;
38:12;39:10,14,17;
40:14;41:1,5,7;42:5,7,
20,20;50:23;51:2
**documents (6)**
7:14;9:7;31:13;37:5;
44:1,9
**Doddridge (1)**
12:3
**dollars (2)**
14:22;15:13

**done (6)**
7:8;12:18;31:22;
33:21;34:1;44:17
**down (10)**
17:23;46:2,4,7,10,12,
15;47:1,6,16
**dozens (2)**
18:23;19:1
**drawer (1)**
30:16
**drifted (2)**
25:5,5
**drill (2)**
15:16,17
**drilled (1)**
15:20
**driving (1)**
48:4
**Due (27)**
6:21;7:4;8:17;11:7;
16:1;20:15;24:4,19,23;
25:9,13;26:22;27:22;
28:12;30:14;31:9,13;
33:1;34:19;35:20;38:8,
12,19;43:11;45:20,24;
46:17
**duly (1)**
5:4
**during (5)**
6:3;25:1,13;26:22;
28:12

**E**

**earlier (1)**
36:4
**easier (1)**
52:23
**East (2)**
16:8;17:3
**effectuated (2)**
10:15,18
**effort (8)**
20:2,6,12;22:17,22;
23:8;25:14;27:4
**efforts (10)**
7:4;20:21,24;27:23;
33:1;34:20;38:13,19;
45:20,24
**Eight (1)**
34:18
**either (2)**
29:19;45:13
**else (9)**
9:5;21:19;22:4;28:2;
29:1,16;32:3;33:10;
49:8
**employee (3)**
28:15,16;29:16
**Energy (8)**
5:16;6:9,10;12:10,
14,15;14:24;34:8
**engage (1)**

31:11
**engaged (5)**
31:15;32:3;43:24;
44:8;45:10
**entire (1)**
28:18
**entirely (1)**
11:21
**entity's (1)**
12:21
**entries (1)**
39:24
**entry (2)**
40:11;41:1
**EQT (2)**
5:13,16
**equitable (2)**
16:8;17:3
**estimate (1)**
48:12
**et (1)**
5:16
**even (5)**
39:15;48:23;49:7,13,
23
**everyone (1)**
25:22;52:19
**exactly (4)**
16:17;33:5;36:19,23
**EXAMINATION (4)**
5:6;24:20;50:8;
51:21
**examined (1)**
5:4
**example (1)**
46:3
**Except (1)**
35:5
**exception (1)**
12:22
**excuse (2)**
12:12;23:3
**exercising (2)**
11:17;14:17
**Exhibit (16)**
6:17,18;8:12,13;
9:12,17;19:16;32:9,10;
40:12;42:8,9,18,18,23;
50:22
**exhibits (1)**
42:16
**existing (1)**
48:5
**experience (2)**
13:7,12
**explore (1)**
22:22
**extent (1)**
8:23
**extra (1)**
17:4

**F**

**facts (1)**
51:16
**factual (1)**
24:3
**fair (6)**
24:12;29:11;37:1;
48:13,14;51:6
**familiar (1)**
34:9
**far (5)**
6:8;8:17;20:18;34:3;
48:4
**Federal (2)**
5:17;32:19
**fellow (1)**
11:2
**few (2)**
41:19;50:10
**field (3)**
8:18,20;16:5
**find (2)**
19:8;26:7
**find-so (1)**
30:4
**fine (1)**
19:20
**finished (1)**
37:22
**first (9)**
5:4;6:20;10:10,16,
19;40:6;42:5,12;50:21
**five (4)**
47:13;48:10,11,13
**fixing (2)**
15:13,14
**follow (1)**
51:20
**following (3)**
44:6;49:12,22
**follows (1)**
5:5
**follow-up (1)**
50:10
**foot (1)**
50:14
**Fork (1)**
19:7
**form (2)**
23:18,19;25:19;
35:20;38:22;39:2;42:3;
44:21
**formation (1)**
15:6
**four (2)**
12:1;47:13
**four-wheeler (1)**
50:14
**four-wheelers (1)**
48:4
**frame (2)**

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

William F. Woodburn
August 24, 2012

41:4,10
frames (1)
7:17
front (2)
37:9;50:22
full (1)
5:8
fully (1)
7:3
further (3)
36:5;50:6;52:16
future (1)
14:1

**G**

gas (12)
16:7,8;20:8,13;22:5;
27:5;33:7;36:7,12;
41:11,16;48:16
gathering (4)
13:8;15:15;16:7,21
gave (2)
42:17;50:11
general (2)
41:3,9
generally (6)
20:23;36:14;40:17,
20;43:6;52:4
geography (1)
12:4
Geological (1)
31:5
George (4)
11:9;21:14;28:14;
29:19
good (3)
6:4;9:10;18:13
guy (3)
21:15,16;29:4
guys (1)
50:7

**H**

half (1)
28:24
hand (1)
7:16
handed (3)
7:24;17:11;37:16
handled (1)
45:16
handwritten (1)
9:4
hanging (1)
52:5
happen (1)
51:3
happened (1)
51:11
Harrison (1)
12:3

hear (1)
24:2
heard (3)
40:6,9,11
Hillyar (13)
11:3,9,16;14:5,10,14,
17;15:1;21:14;22:3,12;
28:14;29:19
hired (6)
35:1,10,12,17;38:23;
39:4
Hold (1)
38:21
holdings (2)
13:20;16:6
houses (1)
47:12

**I**

idea (2)
36:23;37:3
identify (1)
38:16
impact (1)
41:17
inaccurate (1)
51:15
incident (1)
13:4
include (1)
48:19
indicated (1)
36:4
individual (4)
10:8;15:1;32:24;
33:24
information (1)
30:23
inspect (4)
22:18,23;23:8;25:15
inspected (3)
23:5;48:12;52:8
inspecting (2)
26:3;50:15
inspection (2)
45:21;50:12
intention (1)
15:12
interest (6)
6:14,23;7:5;11:20;
34:11;36:3
interested (4)
11:5,6;15:5,10
interrogatories (1)
32:18
interrogatory (2)
32:21,22
interrupt (1)
33:13
interview (1)
21:8
into (5)

9:19;17:14;25:5;
37:20;38:18
introduced (1)
5:12
investigate (1)
20:24
involve (2)
11:24;12:5
involved (8)
12:11,20;13:17;
27:22;34:19;35:23;
44:16;46:19
involvement (1)
43:9
involves (1)
5:19
is- (1)
23:21
isolated (2)
13:4,5

**J**

job (1)
52:23
Jordan (1)
11:3
just-you (1)
47:8

**K**

kind (3)
9:2,8;26:12
knew (4)
20:17;21:6;25:22;
46:13
knowledge (12)
13:10;22:6;29:4;
32:2,5;35:2,9,16,18,22;
38:14;39:6

**L**

last (1)
11:10
lead (5)
46:6,11,13;47:3,4
learn (3)
48:24;49:14,24
lease (36)
5:19;6:14,24;7:6;
15:21;17:20;18:17;
20:16,20;21:7;22:5,10,
18;24:1,3;25:2;26:1,
17,23;27:13;28:5,13,
13;34:10;35:21;44:2,
10;46:7,14;47:3,5,23;
49:5,6;50:12,16
lease- (1)
28:19
leasehold (33)
16:19;17:19;19:4,24;

20:3,7,14;22:23;23:8;
24:15;25:16;26:3;28:9;
29:13;30:2;34:4,11;
36:11,13,13;45:11,22;
46:1,5,9;48:13,17,17,
21;49:1,15;50:1;52:8
leasehold- (1)
51:24
leaseholds (2)
15:8,11
leases (13)
21:4;24:18;25:6;
41:12,12,17;42:8,23;
46:8,22;47:7;50:13,16
least (1)
29:11
leave (1)
12:17
led (2)
46:3,7
legal (7)
31:16;39:5;43:6,24;
44:8,13;45:10
legally (1)
36:16
legal-whatever (1)
36:15
less (2)
10:15,18
LEWIS (23)
6:5,7;8:7,11,14;
12:12;17:7,9;23:11,14,
19,22;25:19;27:8;
35:11;37:13;38:21;
42:3;44:21;49:17;50:9;
51:18;52:17
LG (1)
25:6
L-I (1)
11:12
light (1)
22:9
lines (2)
15:15;17:2
list (1)
17:17
listed (1)
30:11
located (2)
18:18;25:17
look (10)
17:5;19:18;25:24;
36:11;37:8;41:23;
42:21;46:17;52:10,12
looked (9)
9:7,13;16:9,20,20,
22;18:14,16;27:16
looking (18)
13:24;15:3;16:5,6,
10;17:12,24;20:5;
25:22;26:5;27:12;
30:24;33:11;36:2;
42:19,21;46:16;48:11

looking- (1)
19:21
look-to (1)
36:14
Loren (2)
28:3;31:23
lost (3)
19:9;47:15,16
lot (4)
18:4;26:9;46:12,19
lots (1)
46:7
LYONS (27)
5:7;13:6;6:6;8:9,12;
17:4,8;23:13,18,20;
25:20;27:20;32:12,14;
37:14;38:24;43:15,18;
44:5,23;49:11;50:6;
51:20,22;52:16,22;
53:1

**M**

ma'am (3)
8:4;22:16;43:5
majority (3)
25:3,7,21
makes (1)
52:23
making (2)
8:7;14:3
many (5)
11:23;16:12;19:1;
27:22;48:1
map (6)
30:18,19;31:7;47:20,
21;52:10
maps (8)
30:3,5,6,8,11,13,15;
31:4
Marcellus (1)
15:5
Marion (2)
12:3;16:6
mark (4)
6:16;39:18;41:14;
43:1
marked (2)
6:18;32:9
Mark's (1)
50:24
massiveness (1)
47:10
master (2)
17:17,19
matter (5)
5:12,14,15,16;32:20
matters (3)
34:9;36:11;43:7
may (6)
25:20;29:5,23;33:17;
41:17;51:6
maybe (1)

25:5
mean (7)
20:8;27:6;28:13;
40:8;44:16;45:13;51:4
memorandum (4)
7:21;9:18;37:19;
38:17
mention (3)
24:2;26:1;27:11
meters (2)
16:7;17:2
might (6)
10:20;17:9;29:16;
48:23;49:13,23
miles (6)
47:13;48:9,10,10,11,
13
million (3)
14:21,23;15:13
mind (2)
18:12;47:2
minds (1)
49:6
mine (1)
29:17
minute (1)
43:16
minutes (1)
40:11
misstatement (1)
23:12
misstates (1)
23:15
misunderstood-do (1)
26:19
monetarily (1)
14:13
months (2)
10:19,20
more (4)
15:16,17;43:9;49:21
Morgan's (1)
19:6
most (2)
24:1;29:18
motivation (2)
10:24;11:2
much (1)
48:3
myself (2)
5:12;29:19
my-the (1)
13:2

N

name (7)
5:8;11:3,8,10;21:16,
16;29:7
natural (5)
20:13;22:4;36:7,12;
48:16
nature (1)

26:13
need (3)
26:19;46:17;50:7
needed (1)
36:15
needs (1)
33:4
neither (1)
34:7
next (2)
33:9;39:23
nobody (2)
21:23;22:8
nonCobham (1)
27:7
nor (1)
34:8
Northern (1)
5:17
note (3)
27:18;41:24;42:22
noted (1)
42:6
notes (4)
7:16;9:4,14;30:1
not-I (2)
40:9;51:4
notice (2)
6:21;21:24
November (6)
7:6,22,22;17:7,8,12
number (14)
7:9;8:13;17:5;32:22;
34:6,13,13,15;37:8;
38:17;41:23;52:4,5,8
numbers (2)
14:19;18:6

O

object (4)
23:18,19;38:22;39:2
objection (5)
23:20;25:19;39:2;
42:3;44:21
obtain (1)
30:5
Obviously (1)
10:12
occur (1)
12:5
October (2)
9:20;37:18
off (5)
13:18;32:12,13;
43:15;53:1
offhand (2)
13:22;33:6
offices (1)
16:3
Oil (26)
5:24;7:5,9;17:14;
20:8;25:14;27:23;28:8;

33:2,7,22;34:8;35:8;
36:2,7,12,17;37:6;
38:11;39:23,24;40:12;
41:11,16;42:6;45:12
Oil- (1)
26:24
old (2)
9:13;41:12
one (13)
7:10;17:10;20:16;
30:16;35:12,13;37:10;
38:14;42:7;49:21;
51:20;52:12,14
ones (5)
16:24;18:3;21:7;
23:5
only (14)
12:18;18:3;20:6;
23:5;24:9,13,22;28:7;
29:22;33:6,24;35:23;
39:24;46:17
on-site (1)
33:7
onto (1)
27:17
operated (2)
20:17;27:5
operating (5)
19:24;20:3,14,17;
21:19
operations (2)
8:18,20
operators (9)
48:16,21,24;49:2,14,
16,24;50:2,4
opportunity (1)
12:15
option (4)
11:3,17;14:14,18
order (1)
9:9
others (3)
18:14;20:22;30:10
out (18)
11:4,17,20;14:18,22;
18:12,17,23;19:8,15;
20:4;21:14,15;26:9;
30:16;42:6;43:1;52:10
outside (1)
12:5
over (13)
9:2,7;13:19;16:4,5,
10,20;24:1;25:5,6;
46:17;48:11;51:7
over-if (1)
46:16
own (2)
47:7;49:5
owned (3)
21:7;23:5;29:5
owners (1)
9:15

P

page (6)
17:24;18:1,2,2;
19:19;39:22
pages (2)
19:16;42:21
paid (1)
7:12
pardon (2)
21:12;37:21
part (12)
22:23;29:15;31:8,13;
38:8,12,19;45:16,20,
24;47:8;49:6
particular (1)
18:11
parts (2)
15:17;42:7
passing (1)
24:17
Pause (4)
27:21;32:13;38:2;
43:17
pen (1)
9:6
pending (1)
5:17
Pennzoil (2)
9:19;41:12
Pennzoil-Cobham (2)
37:13,14
people (3)
21:2;27:22;49:5
percent (8)
11:22;12:21;13:8,13,
20,23;19:9,10
performed (1)
6:21
performing (1)
24:22
perimeter (1)
45:22
period (1)
22:10
person (2)
19:7;35:3
personally (7)
13:12,17;21:8;31:19;
33:15,19;38:7
Pertaining (1)
40:14
Pete (2)
29:5,8
phones (1)
47:13
phrasing (1)
23:14
physical (5)
28:13;29:13;30:1;
45:21;46:1
physically (1)

22:17
picking (1)
11:5
pickup (2)
48:4;50:14
piece (1)
47:10
place (3)
19:11;43:13;52:5,11
plain (1)
31:7
plaintiff (1)
6:22
plaintiffs (2)
6:3;32:20
plan (2)
16:1;36:4
Please (7)
5:8;17:17,23;23:7;
38:22;44:5;49:21
plus (1)
15:16
pm (2)
5:2;53:3
point (7)
19:15;27:13;29:2,18;
39:12;43:8,10
pointed (1)
43:1
portion (4)
11:21;22:18;28:23;
29:11
portions (1)
25:15
possibility (3)
21:1;51:8,17
possible (2)
49:4;51:16
possibly (1)
51:14
potential (8)
14:1,6;15:4;24:23;
25:17;27:24;36:3,4
potentially (6)
11:17;22:20;39:7;
48:24;49:14,24
potentially- (1)
16:23
preparation (4)
9:22;43:20;44:13;
45:4
prepare (1)
7:8
prepared (1)
7:3
preparing (2)
9:3;10:2
present (1)
45:1
pretty (1)
18:13
previous (1)
51:13

TRANS ENERGY, INC., et al. v.
EQT PRODUCTION COMPANY

William F. Woodburn
August 24, 2012

**Prima (40)**
5:24;6:13,23;7:5,9;
10:10,23;11:16;12:10,
13,13,18,20;13:7,24;
14:6,10,13,17;15:3,19;
17:14;20:12;25:14;
26:23;27:23;28:8;
31:11;33:2,22;34:7;
35:8;36:2,17;37:6;
38:11,16;41:17;43:7;
45:12
**Prima-Cobham (1)**
13:14
**prior (16)**
5:11;6:23;10:12;
13:7,13;14:7;24:14;
28:9;33:22;34:10;38:4;
39:21;40:4,10;44:2,10
**probably (24)**
9:13;10:20;14:12;
15:13;16:10;21:20;
22:6;23:3;24:16,16,24;
25:3,4,7;28:24;30:22;
31:21,23;33:8;35:5;
40:21;41:14;47:6;
48:11
**probably-I (1)**
30:3
**problem (2)**
52:20,22
**Procedure (1)**
32:20
**proceed (1)**
44:24
**process (1)**
38:8
**produce (1)**
31:24
**producers (12)**
18:13;19:24;20:3,7,
8,8,9,13;22:5;27:6,6,7
**producing (10)**
9:15;16:24;17:1;
20:19;21:6,24;22:10;
23:3;26:11;33:7
**production (5)**
8:18,21;9:13;14:2;
15:14
**properties (1)**
46:19
**property (4)**
22:1;27:4;45:21;
47:10
**provided (3)**
30:8;31:3;37:5
**proximity (1)**
18:19
**public (2)**
32:4;45:11
**pulled (1)**
30:16
**purchased (2)**
7:17;13:18

**purposes (1)**
24:19
**put (2)**
13:23;51:5
**putting (1)**
15:14

**Q**

**quarter (2)**
14:21,22
**quit (1)**
9:6

**R**

**Ramonda (6)**
5:13;12:12;23:11;
35:11;38:22;49:17
**ran (1)**
27:17
**range (2)**
10:21,22
**rather (2)**
10:8;34:23
**Read (7)**
44:5,6;49:11,12,21,
22;52:18
**reads (1)**
6:21
**realize (2)**
15:22;37:24
**really (1)**
47:22
**reason (7)**
18:11;25:23;27:9,11;
49:7;50:3;51:2
**reasonable (1)**
37:2
**reason-there (1)**
27:10
**recall (13)**
13:22;14:15;15:2;
18:6;29:3,6,9,10,20,24;
45:3;51:10,11
**recent (1)**
26:11
**recollection (2)**
12:24;13:2
**record (11)**
5:9,12;8:8;31:13;
32:12,13,14;43:15;
44:1,9;53:1
**records (6)**
8:19,21;16:4;32:4;
33:16;45:11
**refer (1)**
8:11
**referring (5)**
7:20;8:3,6;26:15;
43:11
**regard (5)**
12:18;16:2,18;27:24;

38:19
**regarding (10)**
7:4;9:4;14:10,17;
34:10;36:11;39:10;
44:2,10;50:12
**regardless (1)**
12:19
**related (1)**
16:11
**remains (1)**
19:19
**remember (3)**
19:12;21:22;51:4
**Repeat (2)**
22:21;44:4
**report (3)**
31:24;44:19,22
**reporter (3)**
44:7;49:13,23
**represent (1)**
50:20
**representative (6)**
25:14;26:23;28:7;
29:22;38:16;45:5
**representing (1)**
5:13
**Request (1)**
34:6
**requests (1)**
32:18
**reservation (2)**
43:24;44:8
**Resources (1)**
16:9
**response (1)**
32:22
**reverse (1)**
10:24
**review (24)**
9:11,17,22;28:12;
31:9,12;32:4,10,11;
33:15;34:4;35:10,20;
37:18,23;38:7;39:5,5;
44:1,9;45:2,10;46:1;
48:19
**reviewed (8)**
7:11,15;9:3;32:15;
37:5;38:12,17;51:1
**reviewing (2)**
17:19;39:7
**Richard (3)**
31:15,19;33:23
**ridge (2)**
18:20,21
**riding (1)**
48:4
**Right (10)**
8:22;9:8;11:14;
13:22;19:17,22;33:6;
50:23;52:11,17
**rights (5)**
7:20;12:22;39:23;
40:12;41:24

**rights- (1)**
12:11
**rights-that (1)**
15:21
**road (4)**
18:22;46:2,4;47:2
**roads (12)**
15:15;18:23;19:1,2,
5,10;46:7,10,12;47:6,
17;48:5
**Robinson (2)**
25:6;46:18
**role (2)**
8:15,23
**round (1)**
14:19
**royalty (1)**
9:15
**rules (2)**
12:16;32:19
**rumor (3)**
41:3,9,13
**Run (1)**
19:6

**S**

**safe (1)**
36:16
**sale (6)**
7:22;8:1;9:19;17:13;
37:19;38:18
**sales (3)**
16:7;17:2,2
**same (7)**
17:5;18:20,21,22;
19:19;30:23;49:5
**saw (3)**
23:17;41:8;52:7
**saying (2)**
23:2;41:3
**screen (1)**
27:20
**second (1)**
38:21
**separation (2)**
41:11,16
**series (1)**
32:17
**service (1)**
15:15
**set (1)**
30:15
**Seven (1)**
34:15
**several (4)**
16:4,5,9;49:18
**shale (1)**
15:5
**shape (1)**
35:19
**shares (1)**
14:23

**short (1)**
43:17
**showed (3)**
7:17;9:8;40:3
**side (1)**
19:7
**signed (1)**
8:1
**similar (1)**
30:22
**simply (6)**
11:21;14:2;37:5;
49:1,15;50:1
**single (5)**
38:16;46:2,4,4;47:2
**site (1)**
48:20
**sitting (1)**
51:9
**six (2)**
10:18,20
**skipped (1)**
9:2
**Slow (1)**
17:23
**Smith (1)**
46:18
**so- (1)**
52:19
**sold (1)**
16:8
**solves (2)**
52:20,22
**somebody (2)**
29:16,17
**someone (2)**
10:23;27:17
**somewhat (1)**
10:12
**son (1)**
39:18
**sorry (12)**
9:5;11:8;16:12;18:2;
33:14;34:15;36:21;
38:1;40:4,22;43:12;
48:2
**sorry- (1)**
18:7
**sort (2)**
9:16;20:18
**speak (7)**
7:9;10:1;21:11,13;
31:19;35:8;43:19
**speaking (5)**
6:2,8;10:5;36:14;
39:1
**specific (4)**
7:14;10:14;19:13;
30:19
**specifically (7)**
5:18,24;16:18;17:19;
18:4;21:18;30:13
**specify (1)**

17:17
**spell (2)**
  11:10,12
**spend (1)**
  25:2
**spent (14)**
  15:12;16:4,5,9,13;
  20:4;21:15;22:8;24:14;
  25:4,7,21;26:2,5
**Spitznogle (1)**
  21:16
**spoken (1)**
  36:18
**stand (1)**
  18:11
**stapler (1)**
  32:8
**Starkey (28)**
  8:12,13;9:12,17;
  17:5,20;31:15,20,24;
  33:23;35:24;36:10,19;
  37:8,9,11,18;38:4,17;
  39:4,7;40:13;41:23;
  44:12,18;45:2,6;50:22
**Starkey's (2)**
  34:3;44:19
**started (1)**
  11:7
**state (3)**
  5:8;43:23;44:7
**steep (1)**
  47:12
**still (2)**
  30:18;33:11
**stock (1)**
  14:24
**subject (6)**
  21:23;23:1,10;25:17;
  46:22;47:3
**submitted (1)**
  32:19
**subsequent (2)**
  39:15,18
**subsidiary (1)**
  6:10
**supposed (1)**
  37:24
**sure (5)**
  19:20;26:18;27:3;
  41:18;52:9
**Survey (1)**
  31:5
**sworn (1)**
  5:4
**systems (2)**
  16:7,21

### T

**tag (1)**
  52:5
**talked (2)**
  21:14;41:19

**talking (1)**
  34:13
**telling (1)**
  42:4
**ten (1)**
  48:10
**tenders (3)**
  21:3,9;22:3
**tending (2)**
  21:2,3
**tendings (1)**
  20:18
**term (1)**
  15:22
**term-in (1)**
  15:22
**terms (1)**
  14:16
**testified (4)**
  23:12;38:23;42:2;
  51:1
**testimony (6)**
  43:20;44:23;45:4;
  50:11,24;51:13
**that-I (1)**
  39:21
**that-well (1)**
  50:21
**that-you (1)**
  51:9
**the-Prima (1)**
  6:9
**therefore (1)**
  50:4
**thereof (1)**
  11:21
**these-and (1)**
  25:1
**thinking (1)**
  49:8
**third (1)**
  25:5
**though (2)**
  42:7,8
**thought (3)**
  6:6;29:21;33:10
**three (13)**
  16:10,14,15;18:11,
  18;20:5;24:5,9,13,21;
  25:2,12;28:21
**threw (1)**
  27:2
**times (4)**
  24:17;26:11;41:19;
  49:19
**title (4)**
  34:4,9;35:10;36:11
**to- (1)**
  35:8
**today (14)**
  5:14,22;7:3;35:7;
  39:21;40:4;41:8,18;
  42:12,22;43:21;45:4;

51:9,14
**today- (1)**
  10:6
**today's (5)**
  6:3;9:3,23;10:2;38:4
**together (1)**
  12:14
**told (2)**
  13:9;42:10
**took (1)**
  47:7
**topic (2)**
  6:20;7:9
**Topo (5)**
  30:11,15;31:4,7;
  47:21
**trail (1)**
  46:2
**Trans (8)**
  5:16;6:9,10;12:10,
  14,15;14:24;34:8
**transaction (2)**
  8:2;13:5
**Travel (3)**
  48:6,7,8
**traveled (1)**
  19:2
**traveling (1)**
  50:14
**trees (1)**
  47:11
**true (1)**
  10:17
**trying (2)**
  19:8;39:1
**turn (2)**
  17:16;39:22
**two (16)**
  16:9,14,15;20:4;
  24:5,9,13,21;25:2,12;
  28:1,21;40:10;42:7,15;
  49:5
**type (3)**
  13:5,13;41:1

### U

**Uh (1)**
  12:1
**ultimately (2)**
  46:11,13
**under (6)**
  7:21;12:16;15:8;
  32:19;39:22;40:12
**undertake (1)**
  33:15
**Unless (1)**
  39:4
**up (5)**
  11:5;15:13;21:23;
  29:6;51:20
**upon (2)**
  13:9;45:11

### V

**valid (1)**
  36:16
**verify (1)**
  52:2
**versus (1)**
  5:16
**view (4)**
  25:15;27:4;29:13;
  30:2
**viewing (1)**
  26:2
**Virginia (5)**
  5:18;12:6;30:12;
  31:5;34:9
**visit (7)**
  28:5,8,18;31:8,11;
  33:7,8
**visited (4)**
  17:1,18;18:4,4
**visiting (2)**
  16:7;19:12

### W

**waiving (1)**
  52:19
**walk (1)**
  45:22
**walked (1)**
  48:2
**walking (1)**
  48:3
**way (10)**
  13:23;18:5,15;20:11;
  23:14,17;24:20;35:19;
  47:1;51:5
**web (1)**
  48:20
**well-or (1)**
  46:4
**wells (46)**
  13:18;15:14,14,17,
  20;16:9,20,22;17:18;
  18:5,16;19:3,13,16;
  20:19;21:6,24;22:10,
  24;23:3,4,9,17,17;24:3;
  25:16,22,24;26:1,3,6,8,
  14,15,16;27:5,11,13,
  16;30:11;33:7;42:9;
  50:17,18;51:23;52:3
**weren't (1)**
  45:1
**West (5)**
  5:18;12:6;30:12;
  31:5;34:9
**Wetzel (14)**
  12:3;16:6,10,15,18;
  24:21;25:12;28:5;
  31:12;33:16;37:4;44:1,
  9;45:11

**Where-what (1)**
  31:3
**wholly-owned (1)**
  6:9
**WILLIAM (3)**
  5:3,10;53:2
**without (2)**
  43:23;44:7
**witness (5)**
  7:24;17:11;37:16;
  52:20,24
**Wood (1)**
  52:17
**WOODBURN (11)**
  5:3,10,11;6:18;32:9,
  10;39:18;41:14;43:1;
  50:11;53:2
**Woodburn-in (1)**
  50:24
**wooded (2)**
  19:10;47:12
**word (1)**
  39:23
**work (4)**
  15:16;31:16,20;
  44:13
**writing (1)**
  9:6
**writings (1)**
  14:10
**written (2)**
  31:24;44:22
**wrong (2)**
  7:23;23:7

### Y

**year (1)**
  10:15
**years (3)**
  13:19;30:16;49:4

### 0

**08 (2)**
  40:21,23
**08-'09 (1)**
  41:4
**09 (2)**
  40:21,23

### 1

**1 (6)**
  6:18;8:12,13;9:12;
  17:5;18:2
**100 (8)**
  11:22;12:21;13:8,13,
  20,23;19:9,10
**13 (1)**
  32:23
**15 (1)**
  37:18

**15th (1)**
  9:20
**1996 (2)**
  9:20;37:19

---

**2**

**2 (12)**
  9:17;32:9,10;37:8,9,
  11,18;38:4,17;40:12;
  41:23;50:23
**2:04 (1)**
  5:2
**2004 (17)**
  6:11;7:6,23;8:16;
  15:22;17:8,9,13;19:23;
  22:11;24:7,9;30:24;
  31:17;32:1;36:2;43:11
**2008-2009 (1)**
  41:10
**250,000 (1)**
  14:23

---

**3**

**3,800 (1)**
  48:2
**3:20 (1)**
  53:3
**30 (1)**
  49:4
**300-I'm (1)**
  48:2
**30b6 (5)**
  5:15,23;10:3;35:7;
  43:20

---

**4**

**4 (2)**
  18:1,2
**4th (1)**
  7:22

---

**5**

**5 (1)**
  17:8
**5th (2)**
  7:22;17:13

---

**7**

**7 (1)**
  34:13
**70 (5)**
  17:21,23;18:7,15;
  19:3
**70- (1)**
  18:8
**71 (3)**
  17:21,24;19:3
**71- (1)**

---

  18:9
**73 (3)**
  17:22;18:10;19:3

---

**8**

**8 (3)**
  34:6,14,15
**8-24-2012 (2)**
  5:2;53:3