# In the case of:

*TRANS ENERGY, INC., et al. v.*
*EQT CORPORATION*

*ARNOLD SCHULBERG*
*August 22, 2012*



**Realtime Reporters**
*"Because your time matters"*

118 Capitol Street
Charleston, WV 25301

(304) 344-8463
ScheduleRealtime@gmail.com

Realtimereporters.net

*Min-U-Script® with Word Index*

ARNOLD SCHULBERG - August 22, 2012                                              68

```
 1      Q.  Okay.  Okay.  You rendered an opinion in this
 2   case, correct?
 3      A.  Yes.
 4      Q.  And you have rendered an amended opinion in this
 5   case, correct?
 6      A.  Yes.
 7      Q.  All right.  What is your opinion in this case as
 8   to who owns the rights and the type of rights under the
 9   subject Blackshere lease?
10      A.  Based upon my review of the instruments listed in
11   Exhibit 1 as well as my experience and expertise in the
12   field of real property under West Virginia law, it is my
13   opinion that EQT is the rightful, exclusive and lawful
14   holder of the subject gas leasehold with the exception
15   of formations above the base of the Injun sand and a
16   certain 671-acre tract within the 3,800-acre tract
17   included in the Blackshere lease and a certain 250-acre
18   tract within the 3,800-acre tract included in the
19   Blackshere lease.
20      Q.  What's your basis?
21      A.  My basis is the review of the documents that I
22   was asked to review and my experience.
23      Q.  What particular documents are you referring to
24   that you rely on that provide you with this opinion that
```

1   the title rests with EQT as the lawful and exclusive
2   owner of gas rights?
3       A.  The -- I place great weight on the language in
4   the assignment from Pennzoil Products Company to Cobham
5   Gas Industries where the wells were assigned and
6   indicated that the rights assigned were oil rights.
7       Q.  Okay.  Any other documents that you place great
8   emphasis or weight that assists you with the opinion
9   that you've provided me today?
10      A.  That is the strongest document in there to
11  support that opinion.  But based on the review, again,
12  of the scope that I was asked to review.
13      Q.  What's the weakest document?
14              MS. LYONS:  Show my objection.
15      A.  The fact that the 1902 working agreement was not
16  recorded.
17  BY MR. MCMILLAN:
18      Q.  Okay.  So you're basing your opinion more on the
19  1996 Memorandum of Assignment between Pennzoil to Cobham
20  Gas; is that correct?
21      A.  Not exclusively.  But as I indicated, I think
22  that's the strongest indicator.
23      Q.  Okay.  And the weakest indicator is the actual
24  unrecorded document?

1    MS. LYONS: And, again, show my objection.
2    A. Yes.
3    BY MR. MCMILLAN:
4    Q. Okay. Now, this assignment by Pennzoil to
5    Cobham, what is your understanding of what that
6    assignment does?
7    A. My assignment is that -- or my understanding is
8    that the assignment assigns a lease with regard to
9    certain fee properties, assigns certain leases and wells
10   and subject to the limitations contained on Exhibits A
11   and B.
12   Q. Now, you had an opportunity to review this
13   document several different times; is that correct?
14   A. Yes.
15   Q. You've written a draft title opinion and gave
16   some interpretations as to what this document means,
17   correct?
18   A. Yes.
19   Q. And then you issued a report -- an expert report
20   pursuant to our Rules of Federal Procedures 26(b)(2),
21   correct?
22   A. Yes.
23   Q. And then you did an amended 26(b)(2) report,
24   correct?

1    A.   No.

2    Q.   Your assignment or your expertise relates to
3 looking at the documents and providing a title opinion,
4 correct?

5    A.   Right.

6    Q.   Okay.  Have you ever heard of the term wild deed?

7    A.   Wild deed?

8              No.  Not really.

9    Q.   Well, based on that answer, what have you heard
10 maybe similar to a wild deed as you understand it?

11   A.   Well, I believe it would be a deed that appears
12 in the record without a tie back to -- or appears
13 outside of the chain of title, but appears to affect the
14 properties.

15   Q.   Okay.  Have you ever dealt with that concept of a
16 wild deed as you defined it?

17   A.   I have had -- in titles that I've done, I have
18 had assignments that have come out of a party and back
19 into somebody who we were tracking and we have no idea
20 where they received their interest.  That's -- but not a
21 wild deed per se.  I have not encountered that.

22   Q.   And is it fair to say that the Hope conveyance to
23 Consolidated Gas Supply had no record of where Hope
24 received its interest to Blackshere?

ARNOLD SCHULBERG - August 22, 2012                                88

```
 1    A.    There's no recital in it.
 2    Q.    What do you mean by that - "no recital in it"?
 3    A.    There's no recital as to Hope stating any
 4  assignment whereby it took its interest.
 5    Q.    Right.
 6    A.    Yeah.
 7    Q.    Is there -- so there's no information that you
 8  can see in the record about where Hope received its
 9  interest?
10    A.    Not in the record.
11    Q.    Would that be construed as a wild deed in your
12  view?
13    A.    Well, my understanding by your definition is that
14  it would be.
15    Q.    Okay.  I'm not sure I gave it a definition.
16          MR. GOTTLIEB:  Yeah.  And you need to give
17  -- define your own terms and not accept his definition
18  then answer according to yours.
19          MR. MCMILLAN:  And I'll say it again, I
20  didn't give a definition.
21          THE WITNESS:  Okay.
22          MR. GOTTLIEB:  Yeah.  So --
23          MR. MCMILLAN:  But I agree with your
24  definition that it is.
```

1    A.   It -- I mean, it does not reference a prior
2  vesting instrument other than the lease.  And if you go
3  to the lease, the lease is in South Penn.
4  BY MR. MCMILLAN:
5    Q.   Right; right.
6         There's nothing to tell you on the
7  record of where it got its interest?
8    A.   Not on the record.
9    Q.   And that's the chain on which Eastern States Oil
10 and Gas received its interest in the Blackshere lease,
11 is it not?
12   A.   Yes.
13   Q.   Do you know what the term inquiry notice means?
14   A.   Yes.
15   Q.   What does that mean?
16   A.   It means an item that appears in a chain of title
17 or a document that would require the party obtaining
18 that information to make further inquiry.
19   Q.   Okay.  Do you have an idea of what would be --
20 constitute sufficient information to trigger this
21 inquiry notice?  Or is that something that would be
22 relegated to a question of fact?
23   A.   I believe it depends on each particular fact
24 question.

1  Q.  Okay.  What's constructive notice?
2  A.  It's reference to a document that may not be
3  recorded, but --
4          Well, no.  That's not right.  I'm not
5  sure how to define it.
6  Q.  What's actual notice?
7  A.  Actual notice is you get the document and you
8  have it in your possession and so, therefore, you go out
9  and -- or you're charged with notice of everything
10 that's there.
11 Q.  Okay.  Do you have an opinion as to whether or
12 not the acquisition by Eastern States Oil and Gas of
13 assets including leases from CNG Transmission including
14 the Blackshere lease would put them on inquiry notice?
15          MR. GOTTLIEB:  Would put who on inquiry
16 notice?
17          MR. MCMILLAN:  Would put Eastern States on
18 inquiry notice.
19 A.  I believe they have actual notice.  They're the
20 owners of the lease.
21 BY MR. MCMILLAN:
22 Q.  Okay.  Let me rephrase the question --
23 A.  Okay.
24 Q.  -- to make sure it makes sense.

```
 1      A.   Okay.
 2      Q.   If Eastern States and Oil (sic) is acquiring
 3 leases from CNG Corporation and the ownership of those
 4 leases from Hope Gas, would there be anything based on
 5 the fact that Hope Gas doesn't appear to have any record
 6 title to the interest, would that trigger some sort of
 7 inquiry notice to Eastern States in your view?
 8      A.   I don't know what kind of search EQT would have
 9 made upon acquiring the assets.  It's --
10           MR. GOTTLIEB:  His question was about
11 Eastern States, not --
12      A.   All right.  Eastern States.
13           Well, I mean, they're -- by acquiring
14 those leases, I think that the question -- it's a
15 business decision as to whether you're going to do title
16 on everything that you acquire.
17 BY MR. MCMILLAN:
18      Q.   Correct.
19      A.   And I don't -- apparently, that was not done
20 here.
21      Q.   Right.  My question is -- let me ask it this way.
22           If you were in the shoes of Eastern
23 States and you saw the Hope interest and how it was
24 conveyed, would it put you on inquiry notice to look
```

```
 1  further as to where it got its interest?
 2      A.  I think that's a business risk decision and not
 3  necessarily one that I'm equipped to make on behalf or
 4  assert on behalf of a corporation.
 5          MR. MCMILLAN:  Okay.  Let me take a short
 6  break.  We're almost at the end of the rainbow.
 7          (There was a break in the proceedings.)
 8  BY MR. MCMILLAN:
 9      Q.  All right.  We've taken a break.
10          Mr. Schulberg, I'm going to finish up
11  with you with some basic questions.
12          You were retained in this case to
13  provide opinions, correct, from the Lewis, Glasser --
14          MR. GOTTLIEB:  Casey, Rollins --
15      Q.  -- Casey, Rollins Firm, right?
16      A.  Yes.
17      Q.  Have you been hired by this law firm before?
18      A.  No.
19      Q.  Okay.  Do you know any of the lawyers in this law
20  firm?
21      A.  I do.
22      Q.  Have you had professional relationships with
23  anyone in this law firm?
24      A.  I have.
```