**In the case of:**

*TRANS ENERGY, INC., et al. v.*
*EQT PRODUCTION COMPANY*

*William F. Woodburn*
*August 24, 2012*



**Realtime Reporters**
*"Because your time matters"*

118 Capitol Street
Charleston, WV 25301

(304) 344-8463
ScheduleRealtime@gmail.com

Realtimereporters.net

**EXHIBIT A**

Page 9

1  A.  Basically, yes.
2  Q.  I kind of skipped over, you had said that
3  in preparing for today's deposition, you reviewed
4  some handwritten notes regarding the Cobham
5  acquisition. What else did you say? I'm sorry,
6  actually, my pen quit writing.
7  A.  I just looked over some documents that
8  you showed me right there to see what kind of
9  chronological order we went about this in. It has
10 been a good while.
11 Q.  Did you review anything other than
12 Starkey Exhibit 1?
13 A.  I probably looked at some old production
14 notes that I had, you know, from when we acquired
15 it and what was producing, who the royalty owners
16 are, that sort of thing.
17 Q.  Did you also review Starkey Exhibit 2,
18 which is the memorandum of assignment and bill of
19 sale into Cobham from Pennzoil? And this document
20 is dated October 15th, 1996.
21 A.  No.
22 Q.  You did not review that in preparation
23 for today's deposition?
24 A.  That is correct.

Page 10

1  Q.  Did you speak with anyone other than
2  counsel in preparing for today's deposition as a
3  30(b)(6) designee?
4  A.  No.
5  Q.  Do you understand that you are speaking
6  on behalf of the company today--
7  A.  Yes.
8  Q.  --rather than in your individual
9  capacity?
10 When did Prima first begin considering the
11 Cobham acquisition?
12 A.  Obviously, somewhat prior to when the
13 acquisition was actually accomplished, but I can't
14 tell you the specific date.
15 Q.  Was it effectuated in less than a year
16 from the date that it was first contemplated?
17 A.  I believe that to be true.
18 Q.  Was it effectuated in less than six
19 months from the date it was first contemplated?
20 A.  Probably six months might have been in
21 the range.
22 Q.  In the range. How did the acquisition
23 come about? Did someone from Prima contact
24 Cobham, the reverse? What was the motivation for

Page 11

1  the acquisition?
2  A.  The motivation, there was a fellow by the
3  name of Jordan Hillyar that had an option to buy
4  out Cobham and he came to us and asked if we was
5  interested in picking that up and acquiring
6  Cobham. And we then got interested in it and
7  started doing due diligence.
8  Q.  And his name again, I'm sorry?
9  A.  George Hillyar.
10 Q.  Can you spell his last name? Is it H I L
11 L A R D?
12 A.  No, H A--H I L L--I can't spell. I don't
13 know.
14 Q.  Okay. All right.
15 A.  I don't know.
16 Q.  So Mr. Hillyar approached Prima about
17 potentially exercising his option to buy out
18 Cobham. Correct?
19 A.  Correct.
20 Q.  Was that to buy out Cobham's interest
21 entirely or simply a portion thereof?
22 A.  100 percent, everything, all Cobham had.
23 Q.  Okay. How many counties did this
24 involve?

Page 12

1  A.  Uh, four.
2  Q.  And what are those counties?
3  A.  Wetzel, Harrison, Doddridge, Marion.
4  Q.  My geography is not the best. Did
5  anything occur or did it involve anything outside
6  of West Virginia?
7  A.  No.
8  Q.  Were any of these border counties?
9  A.  No.
10 Q.  Had Prima or Trans Energy ever been
11 involved in a complete acquisition about rights--
12     MR. LEWIS: Ramonda, excuse me, he is
13 here from Prima. I know he has said Prima and
14 Trans Energy are together. You have already had
15 the opportunity to depose Trans Energy, and as you
16 know under the rules to do it again you have to
17 get leave of the court, which you have not
18 done. He is only here with regard to Prima,
19 regardless of what he says.
20 Q.  Do you know if Prima has been involved in
21 the acquisition of 100 percent of another entity's
22 rights at any other time with the exception of the
23 Cobham acquisition?
24 A.  Not to my best recollection.

Page 13

1  Q.  Okay, so not before Cobham or after.
2  A.  Not to my--the best of my recollection,
3  no.
4  Q.  Okay, so this was an isolated incident or
5  an isolated type of transaction?
6  A.  It was a deal.
7  Q.  Did Prima have any prior experience in a
8  100 percent acquisition? I am gathering the
9  answer is no based upon what you have told me.
10 A.  Yeah, to the best of my knowledge, yes,
11 that is correct.
12 Q.  Did you personally have any experience in
13 a 100 percent acquisition of this type prior to
14 the Prima-Cobham acquisition?
15 A.  Yes.
16 Q.  Which other acquisitions have you
17 personally been involved in?
18 A.  We purchased wells off of different
19 companies over the years.
20 Q.  100 percent of the company's holdings?
21 That is what I am getting to.
22 A.  Yes, okay. I don't recall right offhand
23 100 percent, let's put it that way.
24 Q.  Was Prima looking at the Cobham

Page 14

1  acquisition for potential future development or
2  simply buying production? Do you understand the
3  distinction I am making?
4  A.  Both.
5  Q.  Both. When did Mr. Hillyar approach
6  Prima about the potential buyout?
7  A.  Prior to the acquisition, that is all I
8  can say.
9  Q.  That is all you can say. Are there any
10 writings between Mr. Hillyar and Prima regarding
11 this buyout and acquisition?
12 A.  Probably.
13 Q.  Did Prima monetarily compensate
14 Mr. Hillyar for the option?
15 A.  I don't recall.
16 Q.  What were the terms of the deal between
17 Prima and Mr. Hillyar regarding the exercising of
18 his option to buy out Cobham?
19 A.  Well, in round numbers, I think he or his
20 company, whatever you want to say, or his
21 associates, they got about a quarter of a million
22 dollars out of it and Cobham got about a quarter
23 of a million and he got about 250,000 shares of
24 Trans Energy stock.

Page 15

1  Q.  Mr. Hillyar as an individual?
2  A.  I don't recall.
3  Q.  And at the time that Prima was looking at
4  this potential Cobham acquisition, was it
5  interested in developing the Marcellus shale
6  formation?
7  A.  No.
8  Q.  Under the leaseholds?
9  A.  No.
10 Q.  But it was interested in additional
11 development of the leaseholds?
12 A.  Yes, our intention, which we did, spent a
13 couple million dollars or so probably fixing up
14 wells and putting wells in production and fixing
15 gathering lines, building roads, doing service
16 work, plus we were, you know, going to drill more
17 wells and did drill some more on certain parts of
18 it.
19 Q.  It is my understanding that Prima has not
20 drilled any additional wells on the Blackshere
21 lease and since acquiring certain rights--that is
22 my term, I realize it is not your term--in 2004;
23 is that correct?
24 A.  Yes; it is.

Page 16

1  Q.  What was your due diligence plan with
2  regard to the Cobham acquisition?
3  A.  I went to their offices in Clarksburg,
4  spent several days going over records and went to
5  the field, spent several days looking over their
6  holdings in Marion, Wetzel Counties, looking at
7  gas gathering systems, visiting sales meters where
8  the gas was being sold to equitable and East
9  Resources, looked at several wells, spent two or
10 three days probably in Wetzel County looking over
11 the Blackshere and related acreage in that area.
12 Q.  Okay. I'm sorry, how many days did you
13 say you spent?
14 A.  I would say two or three.
15 Q.  Two or three days in Wetzel County?
16 A.  Uh-huh.
17 Q.  What exactly did you do while there in
18 Wetzel County, specifically, with regard to the
19 Blackshere leasehold?
20 A.  I just looked at the wells, looked over
21 the gathering systems.
22 Q.  You looked at the wells that were
23 potentially--
24 A.  That were producing and ones that were

Page 17

1  not producing; and, again, visited all of the
2  sales lines, all of the sales meters at that time
3  in the East and Equitable.
4      MS. LYONS: Do you have an extra copy of
5  Starkey Number 1 that we can look at at the same
6  time? A is the Cobham acquisition.
7      MR. LEWIS: The November assignment?
8      MS. LYONS: The November 5, 2004.
9      MR. LEWIS: 2004 assignment? I might
10  actually have one. Here it is.
11  (The document was handed to the witness)
12  Q. Sir, are we both looking at the November
13  5th, 2004 assignment and bill of sale from Cobham
14  into Prima Oil?
15  A. Yes.
16  Q. Okay. I would like you to turn to the
17  master well list, please. Can you specify which
18  wells you actually visited on the Blackshere
19  leasehold specifically by reviewing the master
20  well lease of Starkey?
21  A. I could tell you some of them. 70, 71,
22  73.
23  Q. Slow down, sir, please. When you say 70,
24  71, which page are you looking at?

Page 18

1  A. Page 4.
2  Q. Page 4, I'm sorry. I was on page 1.
3  A. Those are the only ones I can
4  specifically say we visited. We visited a lot of
5  those on the way to those wells, but I don't
6  recall the numbers, but--
7  Q. Okay, 70, I'm sorry--
8  A. 70--
9  Q. 71--
10  A. --73.
11  Q. Any particular reason those three stand
12  out in your mind?
13  A. They are pretty good producers.
14  Q. And you would have looked at others on
15  the way to 70?
16  A. Yes, we would have looked at other wells
17  on the lease while we were out there.
18  Q. Are those three located in close
19  proximity to each other?
20  A. On the same ridge.
21  Q. On the same ridge. Are they all on the
22  same access road?
23  A. No, there are dozens of access roads out
24  there.

Page 19

1  Q. Dozens of access roads. Well, how many
2  access roads would you have traveled to get to
3  wells 70, 71 and 73? I have never been to the
4  leasehold, so, I am at a disadvantage.
5  A. You have no conception of how the roads
6  and access to these from the Morgan's Run or the
7  Archie's Fork side. The average person if they
8  would go out there if they were trying to find
9  these would be lost 100 percent of the time. It
10  is a 100 percent wooded area and there are roads
11  going every place.
12  Q. Do you remember visiting any other
13  specific wells?
14  A. No.
15  Q. And I wanted to point out that there are
16  Blackshere wells on other pages of the exhibit.
17  A. Right.
18  Q. I didn't want you just to look at that
19  page. And if your answer remains the same, that
20  is fine. I just wanted to make sure you were
21  looking--
22  A. Right, I am aware of it.
23  Q. In 2004, were you aware whether any other
24  producers were operating on this leasehold?

Page 20

1  A. No.
2  Q. Did you make any effort to determine if
3  other producers were operating on this leasehold?
4  A. I spent a couple days out there, two or
5  three days looking around, didn't see any.
6  Q. Was that your only effort to determine if
7  other producers were on the leasehold? And by
8  producers, I mean gas producers, not oil
9  producers.
10  A. I don't understand the question.
11  Q. Okay, let me ask it this way. What
12  effort did you make on behalf of Prima to
13  determine if other natural gas producers were
14  operating on the Blackshere leasehold?
15  A. At the time we did the due diligence, it
16  was no one that was associated with that lease
17  that I knew or had operated or was operating on it
18  as far as well tendings and that sort of thing,
19  was aware of any other producing wells on the
20  lease.
21  Q. And what efforts, if any, did you make to
22  determine if there were others? That is my
23  question, not what you were generally aware
24  of. What efforts did you make to investigate the

Page 45

1  Q.  You weren't present when Mr. Bagley asked
2  Mr. Starkey to do that review, correct?
3  A.  I don't recall.
4  Q.  In preparation for your testimony today
5  as a corporate representative, you didn't ask
6  Mr. Bagley if he asked Mr. Starkey to do that,
7  correct?
8  A.  That's correct.
9  Q.  Would anyone other than Mr. Bagley have
10 engaged legal counsel to do a review of the
11 leasehold based upon the public records in Wetzel
12 County on behalf of Prima Oil?
13 A.  No.  I mean, it would have been either he
14 or I.
15 Q.  And you know it wasn't you.
16 A.  Yes, he would have handled that part of
17 the deal.
18 Q.  For the Cobham acquisition?
19 A.  Yes.
20 Q.  As a part of your due diligence efforts
21 and your physical inspection of the property, did
22 you walk the perimeter of the leasehold?
23 A.  No.
24 Q.  As a part of your due diligence efforts

Page 46

1  and physical review of the leasehold, did you go
2  down a single access road or trail that you did
3  not believe led to a Cobham well?  For example,
4  did you go down a single well--or a single road
5  that is on this leasehold that you didn't believe
6  was going to lead to a Cobham well?
7  A.  I went down lots of lease roads that led
8  to other leases in that area.
9  Q.  My question was, on this leasehold, did
10 you go down any access roads that you did not
11 believe would ultimately lead to a Cobham well?
12 A.  I went down a lot of access roads that I
13 knew was ultimately going to lead to another
14 lease.
15 Q.  And why did you go down those?
16 A.  If you are looking over--if your doing
17 due diligence, you need not only look over the
18 Blackshere, the Robinson, the Smith, there were a
19 lot of other properties involved in this
20 acquisition, so you would been going through this
21 to other areas.
22 Q.  Oh, other leases that were subject to the
23 Cobham acquisition?
24 A.  Yes, yes.

Page 47

1  Q.  Let me ask it this way.  Did you go down
2  a single access road that did not in your mind
3  lead to another lease that was subject to the
4  acquisition and that would not lead to a Cobham
5  well on the Blackshere lease?
6  A.  I probably went down access roads that
7  took me to leases that we did not own or were not
8  a part of this acquisition.  You just--you have
9  never been there, so you just can't understand the
10 massiveness of this piece of property and all of
11 the acreage, no development, all trees, all
12 wooded, all steep, no access, no houses, no
13 phones, no nothing.  You are four or five miles
14 from anyplace and if you don't know where you are
15 at, you are lost.
16 Q.  So were you lost when you were going down
17 these other roads?
18 A.  No.
19 Q.  Okay.
20 A.  But if you don't have a map with you, a
21 topo. map or something to tell where you are
22 really at, and it is very difficult to define what
23 lease you are on and where you're at, very
24 difficult.

Page 48

1  Q.  How many acres do you think you actually
2  walked of the 300--I'm sorry, 3,800 acres?
3  A.  The walking of it, not very much, but as
4  far as riding four-wheelers or driving a pickup on
5  the existing roads.
6  Q.  Travel.
7  A.  Travel.
8  Q.  Travel.
9  A.  It is in miles.
10 Q.  Five miles, ten miles?
11 A.  Looking over, probably five miles.
12 Q.  So you would estimate that you inspected
13 five miles of the leasehold?  Is that fair?
14 A.  Yes, that is fair.
15 Q.  Did you contact anyone at the DEP to
16 determine if other natural gas operators were on
17 this leasehold, the Blackshere leasehold?
18 A.  No.
19 Q.  And that would include a review of the
20 DEP web site to determine if there were other
21 operators on this leasehold?
22 A.  We did not.
23 Q.  Did you even consider how you might
24 potentially learn if there were other operators on

In the case of:

*TRANS ENERGY, INC., et al. v.*
*EQT PRODUCTION COMPANY*

*Robert Louis Shuman*
*August 23, 2012*



Realtime Reporters
*"Because your time matters"*

118 Capitol Street
Charleston, WV 25301

(304) 344-8463
ScheduleRealtime@gmail.com

Realtimereporters.net

EXHIBIT B

Page 69

1  MS. CROYLE: Do you want to take a
2  minute?
3  MR. LEWIS: I do. I don't have much else
4  to review.
5  MS. LYONS: We will go off the
6  record. Let me know when you are ready.
7  (Recess at 2:52 p.m. until 3:07 p.m.)
8  MS. LYONS: Back on the record.
9  EXAMINATION
10  BY MR. LEWIS:
11  Q. Mr. Shuman, if you could please pick up
12  Exhibit 2. It is the October 15, 1996 memorandum
13  assignable of sale between Pennzoil and Cobham
14  Gas.
15  A. Yes.
16  Q. Is this document clear and unambiguous on
17  its face?
18  A. Yes.
19  Q. Ms. Lyons asked you a series of questions
20  regarding the inspection of property and the
21  notice. Can you please elaborate on what may be a
22  reasonable inspection or reasonable for the
23  property's use?
24  A. Ask that again?

Page 70

1  Q. Maybe I will split it into two
2  questions. If you are on inquiry notice and you
3  go out to a property, what would be--is the
4  standard that you have to look at every, single
5  inch of the property or is there a reasonable
6  standard involved in the duty for inquiry notice?
7  MS. LYONS: I would just object to
8  form. I believe he has already answered that when
9  I asked it.
10  A. I don't think that particular question
11  was asked. And it is--you are not on inquiry
12  notice until you actually discover something that
13  is adverse or possibly adverse--what was that?
14  MS. CROYLE: That was my phone. I'm
15  sorry.
16  A. Possibly adverse. It is the fact that
17  you find something that is hostile or adverse that
18  then under the four syllabus points of Pocahontas
19  Tanning and all of its progeny, it kicks you into
20  an inquiry mode. If you go out and you find
21  nothing, you have done your due diligence, by my
22  reading of those cases is that doesn't--the fact
23  that you are doing your due diligence, you have to
24  find something adverse or hostile to put you on an

Page 71

1  inquiry to go do further investigation.
2  Q. And then once you are on that inquiry to
3  go do further investigation, is that inspection or
4  investigation--would the standard be a reasonable
5  inspection or investigation and is that fact
6  sensitive?
7  A. Based on the cases, its appears to be a
8  fact--let me say it this way. The way the
9  different inquiry notice cases come down, they are
10  fact specific upon their decision or their
11  determination. An example would be the Hupp case
12  where you had a 500-acre tract, give or take,
13  unrecorded deed for 121 acres, I think. The
14  possession of the party under the unrecorded deed
15  was entirely consistent with the possession and
16  title of the party of the original 500. And the
17  Court came down and said that the two occupancies
18  or possession were not so hostile or adverse with
19  each other, they were actually consistent with
20  each other that the buyer--actually, it was a
21  bank, it was a foreclosure. But the creditor as
22  to the 500 acres that didn't have knowledge of the
23  unrecorded deed as to the 121 acres wouldn't have
24  been put on inquiry notice that there was a

Page 72

1  hostile or adverse claim because the two
2  possessions were so consistent with each other.
3  That--that becomes different. If you are
4  talking about, are there two gas wells on a
5  3800-acre lease, leasehold site, two gas wells are
6  consistent with what Prima envisioned that they
7  were buying.
8  Q. Is there anything in the documents of
9  record that you reviewed that would create in
10  Prima a duty to inquire?
11  A. Not in any of the documents of record,
12  no, not in my opinion. As a matter of fact, the
13  documents of record are consistent with the
14  opinion that Prima holds record title to the oil
15  and gas leasehold estate. Actually, they are
16  inconsistent with the purported assignment to Hope
17  or a bifurcation of those rights.
18  Q. Are you referring to Exhibit 3 when you
19  say that, that they are inconsistent?
20  A. Exhibit 3, which is an unrecorded
21  document, which we have no knowledge of whether it
22  was actually executed by the proper parties,
23  whether it was actually delivered and whether it
24  was actually accepted upon delivery and it was

# In the case of:
# *TRANS ENERGY, INC. v. EQT CORPORATION*

## *ARNOLD SCHULBERG*
## *August 22, 2012*



# Realtime Reporters
*"Because your time matters"*

118 Capitol Street
Charleston, WV 25301

(304) 344-8463
ScheduleRealtime@gmail.com

Realtimereporters.net

Min-U-Script® with Word Index

**EXHIBIT C**

Page 61

1  leases are actually recorded?
2  A. Yes. They're references to where you can find
3  the lease.
4  Q. Okay. And what's the remarks?
5  A. I don't know. There aren't any.
6  Q. Look on Page 1 of 3.
7  A. Okay.
8  Q. Do you have a section or I guess a column that
9  starts with the word "remarks"?
10 A. Yes.
11 Q. What does that mean?
12 A. It would be some description that the parties
13 felt was necessary to explain what they were doing.
14 Q. Okay. And what does it mean based on your
15 review?
16 A. Well, it appears that these first eight leases
17 were actually not leases, they were fee property and
18 that's what they say - "Fee property, Pennzoil, to
19 retain its interest and grant purchaser an oil and gas
20 lease".
21 Q. Okay.
22 A. So they were including these properties, but
23 attempting to explain that there, in fact, was no lease,
24 that the reference is to the page, I assume, where

Page 62

1  Pennzoil got the fee ownership of the oil and gas. And
2  they're trying to explain that we're not conveying these
3  properties to you, we're just going to grant you a lease
4  on those properties.
5  Q. And then there are blanks and other portions of
6  the remarks; is that correct?
7  A. Yes; yes.
8  Q. And do you have any information as to why they're
9  blank?
10 A. No, I don't.
11 Q. Is the Blackshere listed as one of the leases?
12 A. The Blackshere is on here seven times with
13 different lease numbers and I cannot account for that.
14 Q. So I guess to answer my question, it is listed?
15 A. Yes.
16 Q. Not once, but seven times?
17 A. Yes.
18 Q. Okay. As a lease that was conveyed to Cobham
19 from Pennzoil?
20    MS. LYONS: Show my objection to the form.
21 A. It is an assignment of that lease.
22    BY MR. MCMILLAN:
23 Q. Okay. And Exhibit B, what is Exhibit B?
24 A. Exhibit B appears to be a list of the leases.

Page 63

1  I'm sorry. A list of the wells.
2  Q. Okay. Are these the wells on a particular lease
3  or, do you know?
4  A. Well, two of them appear to be on the John
5  Stevens lease and 17 of them to be on the Blackshere
6  Wells and company lease.
7  Q. Now, there's nothing out by the remarks. Do you
8  see that?
9  Is yours blank?
10 A. Yes.
11 Q. Does that mean anything to you other than it's
12 blank?
13 A. No.
14 Q. Okay. And the remarks on the Exhibit A, they're
15 blank after it looks -- appears to be the lessor/grantor
16 B.W. Peterson.
17    Do you see that?
18 A. I do.
19 Q. Do you have any understanding of why those are
20 blank other than they're just blank?
21 A. I don't have any understanding on that.
22 Q. Do you know anything about Cobham?
23 A. I do not.
24 Q. Do you know what it operated on the Blackshere

Page 64

1  lease?
2  A. I do not.
3  Q. And my understanding is you did not look at any
4  records from the DEP in regard to what it was producing
5  on the Blackshere lease?
6  A. That's correct.
7  Q. And we were talking about what the record chain
8  of title shows regarding ownership of the Blackshere
9  lease and we were dealing with -- I think we got up to
10 Cobham; is that correct?
11 A. Yes.
12 Q. And what was your understanding after the Cobham?
13 A. We have an assignment from Cobham Gas Industries,
14 Inc., to Prima Oil Company, Inc.
15 Q. And do you know the date of that?
16 A. It's, apparently, November 5th, 2004.
17 Q. And have you reviewed that --
18 A. Yes.
19 Q. -- document?
20    Okay. And what is after that?
21 A. Confirmatory Assignment and Bill of Sale from
22 Cobham Gas Industries, Inc., and Belmont Energy, Inc.,
23 to Prima Oil Company, Inc.
24 Q. Okay. Is it fair to say that based on just the

Page 65

1 record title, that there is a chain directly from the
2 original lessor to Prima Oil?
3 A. Yes. There's a chain.
4 Q. Based on the record?
5 A. Yes.
6 Q. Now, we talked a little bit about the recording
7 statute, correct?
8 A. Yes.
9 Q. And what it means.
10     And as I lawyer who practices and does
11 title opinions, you're very familiar with the recording
12 statute, are you not?
13 A. Yes.
14 Q. Do you know how long that recording statute has
15 been around?
16 A. I don't.
17 Q. Were you involved with its creation or enactment
18 or anything like that?
19 A. No; no.
20 Q. Now, do you know whether or not, as we sit here
21 today, some of the recorded -- of the unrecorded working
22 agreements and indentures between Hope and South Penn --
23 whether or not they've actually been recorded as we sit
24 here today?

Page 66

1 A. I don't know.
2 Q. Okay. Would --
3     Could those documents be recorded today?
4     MS. LYONS: Which specific documents are you
5 referring to?
6     MR. MCMILLAN: I'm trying to be as -- kind
7 of -- maybe I'll be more specific. I'm trying to kind
8 of shortcut this, but the 1902 indenture that was
9 between Hope Gas and South Penn.
10     MS. LYONS: Well, let's mark it, so we're
11 very clear.
12     THE WITNESS: Would that be Exhibit 4?
13     MR. MCMILLAN: Yeah. It has already been
14 marked. Let me just be clear.
15     Exhibit 4 is the working -- what
16 I've characterized as the working agreement. I
17 believe --
18     MS. LYONS: And I would show my objection to
19 that characterization.
20     MR. MCMILLAN: Okay.
21 A. I believe if an original could be found with --
22 given the fact that it had been notarized, it could be
23 recorded.
24     BY MR. MCMILLAN:

Page 67

1 Q. Do you need the original to record it?
2 A. You would need either that or a certified
3 original, I believe.
4 Q. Are there any other means by which to record an
5 unrecorded deed that you don't have the original for it
6 -- or any written instrument for which you don't have
7 the original?
8     MS. LYONS: To the extent you know.
9 A. No. I don't know.
10     BY MR. MCMILLAN:
11 Q. Okay. In your discussions at CNG Development and
12 you getting wind or hearing about the working agreement,
13 and indeed seeing the modification dated 1922, was there
14 any discussion as to why it was not recorded?
15 A. No.
16 Q. Was there any comments or suggestions made to
17 record it?
18 A. No.
19 Q. Or to make any efforts to try to record it?
20 A. No.
21 Q. And is it fair for me to assume that recording
22 something does put people on notice?
23 A. I understand that's the nature of the recording
24 statute. Yes.

Page 68

1 Q. Okay. Okay. You rendered an opinion in this
2 case, correct?
3 A. Yes.
4 Q. And you have rendered an amended opinion in this
5 case, correct?
6 A. Yes.
7 Q. All right. What is your opinion in this case as
8 to who owns the rights and the type of rights under the
9 subject Blackshere lease?
10 A. Based upon my review of the instruments listed in
11 Exhibit 1 as well as my experience and expertise in the
12 field of real property under West Virginia law, it is my
13 opinion that EQT is the rightful, exclusive and lawful
14 holder of the subject gas leasehold with the exception
15 of formations above the base of the Injun sand and a
16 certain 671-acre tract within the 3,800-acre tract
17 included in the Blackshere lease and a certain 250-acre
18 tract within the 3,800-acre tract included in the
19 Blackshere lease.
20 Q. What's your basis?
21 A. My basis is the review of the documents that I
22 was asked to review and my experience.
23 Q. What particular documents are you referring to
24 that you rely on that provide you with this opinion that

**In the case of:**

*TRANS ENERGY, INC., et al. v.*
*EQT PRODUCTION COMPANY*

*Richard L. Starkey*
*August 24, 2012*



Realtime Reporters
*"Because your time matters"*

118 Capitol Street
Charleston, WV 25301

(304) 344-8463
ScheduleRealtime@gmail.com

Realtimereporters.net

EXHIBIT D

Page 17

1  waived any type of opinion that Mr. Starkey has
2  given him about the conversation. He has merely
3  expressed a fact that the conversation was based
4  on.
5      MS. LYONS: Then I can explore the facts.
6      MR. LEWIS: I am just reminding him as to
7  his opinion. It has not been waived.
8  Q. Do you recall the conversation?
9  A. I don't know that I recall the
10 conversation with Bill, no.
11 Q. Do you recall having that conversation
12 with any representatives of Prima Oil?
13 A. I think I had that conversation with
14 Mark.
15 Q. With Mark, and actually--did I say Bill?
16 It was Mark who testified. You believe you had
17 that conversation with Mark Woodburn.
18 A. Right.
19 Q. When did you first hear about the
20 division of the natural gas estates and certain
21 leases in northern West Virginia?
22 A. Probably the '80's.
23 Q. And tell me exactly what you heard.
24 A. That there was a very inconsistently

Page 18

1  applied agreement which gave gas rights in
2  subleases somewhere to Hope, and oil rights to
3  South Penn, but that--I didn't know exactly--I
4  have never seen the agreement, so I don't know
5  anything about it, really.
6  Q. That was going to be my next
7  question. Have you ever seen any written
8  documents pertaining to that division, the two
9  estates?
10 A. No, it is secret.
11 Q. Do you recall who would have made you
12 aware of this potential division?
13 A. Probably Dave Clovis, would be my
14 guess. He was at Davis, Bailey, Pfalzgraf, Hall
15 and Clovis and we represented Pennzoil in the five
16 or six counties around Wood County.
17 That's--that's probably who would have told me
18 about it because he had represented Pennzoil for
19 many years.
20 Q. Did you work with Mr. Clovis or anyone
21 else on title opinions in which this potential
22 division of the natural gas estates--I'm sorry,
23 the natural gas estate from the oil estate had
24 been divided?

Page 19

1  A. I have been thinking about that and for
2  30 years I have worked for Pennzoil and then East
3  Resources and now HG, and never once has it
4  applied to anything I have worked on. I have
5  worked on the Sistersville field, Wileyville
6  field, Stringtown, these are big fields, you know,
7  hundreds of leases, Mannington field; it doesn't
8  apply to any of them.
9  Q. Did Mr. Clovis indicate that this
10 particular division of the oil from the natural
11 gas estate had applied to any title opinions that
12 he had actually drafted?
13 A. I couldn't tell you. I can't remember
14 that.
15 Q. Can you give me any more context to that
16 conversation with Mr. Clovis?
17 A. No, this has been 30 years ago. I
18 haven't seen Mr. Clovis in probably 25 years.
19 Q. Okay. And have you ever heard of this
20 division between the oil and natural gas estates
21 from any other sources other than Mr. Clovis?
22 A. The complaint, obviously, it has it in
23 it. I was involved in a lawsuit, Saint Lukes,
24 that was, apparently, one of the leases that was

Page 20

1  subject to the agreement, but there was actually
2  an assignment there. At some point, I can't
3  remember who took the original lease, Hope or
4  South Penn. They assigned their rights so that
5  South Penn owned the oil and Hope owned the gas,
6  but there was actually an assignment of record;
7  but I think it probably was because of that
8  treatment. It was in Ritchie County. It was an
9  800-acre lease and Jaybee actually owned the oil
10 rights. They were the successor to South Penn.
11 Q. South Penn.
12 A. And Dominion owned the gas rights; but
13 they actually recorded an assignment. It wasn't
14 just based on the secret agreement.
15 Q. Why do you keep referring to it as a
16 secret agreement?
17 A. Because it was a secret agreement.
18 Q. How do know that? Who told you that?
19 A. It wasn't recorded. It was kept--it
20 was--no one could look at it.
21 Q. Did Mr. Clovis tell you that it was
22 secret?
23 A. A Pennzoil land man told me that they
24 didn't show it to anyone.

Page 25

1  Mr. Kirsch occurred--you said within the last ten
2  years?
3  A.  Right.
4  Q.  Would it have occurred--
5  A.  It may have been as a result of the Saint
6  Lukes case, it could have been what prompted me to
7  ask him about it.
8  Q.  Would it have been before 2004?
9  A.  Maybe, I couldn't tell you for sure.
10 Q.  Can you tell me whether it was the
11 contemplated transaction between Cobham and Prima
12 Oil that prompted you to speak with Mr. Kirsch?
13 A.  No.
14 Q.  No, it was not?
15 A.  No, it was not.
16 Q.  Did your conversation with Mr. Kirsch
17 occur before that transaction--
18     MR. LEWIS: One moment.
19     MS. LYONS: Off the record.
20 (Recess at 11:40 a.m. until 12:05)
21     MS. LYONS: Let's go back on the
22 record. Madam Court Reporter, could you read the
23 last question to the witness.
24 (The following question was read by the court

Page 26

1  reporter: "Can you tell me whether it was the
2  contemplated transaction between Cobham and Prima
3  Oil that prompted you to speak with Mr. Kirsch?")
4  A.  I couldn't tell you for sure. It wasn't
5  related at all.
6  Q.  It is not related. You couldn't tell
7  whether it occurred before or after?
8  A.  No.
9  Q.  We have discussed that with regard
10 to--any time I say "the transaction," if we could
11 just understand that that is the transaction in
12 which Cobham assigned rights to the Blackshere
13 lease to Prima Oil on November 5th, 2004, just for
14 shorthand purposes, okay?
15 A.  Okay.
16 Q.  With regard to the transaction, you had
17 told me that you drafted Exhibit A and that you
18 would have reviewed the assignment and bill of
19 sale on behalf of Prima Oil?
20 A.  Yes.
21 Q.  Did you have any other involvement in
22 this transaction? Did you provide any other legal
23 services?
24 A.  I went to the courthouses at various

Page 27

1  counties to determine whether Cobham had a good
2  assignment from Pennzoil.
3  Q.  Did you actually go into Marion, Wetzel,
4  Doddridge Counties and obtain copies of the
5  recorded documents referenced on Exhibit A?
6  A.  I don't know that I obtained copies.
7  Q.  Did you actually travel to each of those
8  three counties in terms of your work for Prima on
9  this transaction?
10 A.  Yes.
11 Q.  And you reviewed these documents?
12 A.  Yes.
13 Q.  You simply don't know if you made copies
14 of the documents.
15 A.  No, I may have been given copies. I
16 don't know. It is not unusual.
17 Q.  You would have--if you had been given
18 copies, who would have given them to you?
19 A.  Trans Energy.
20 Q.  Some representative of Trans Energy?
21 A.  Right, but I don't recall that. That is
22 not unusual in a transaction like that that they
23 give you copies of older documents. Usually,
24 every time I do a title opinion, I end up with a

Page 28

1  fist full of documents.
2  Q.  Prior to this transaction actually being
3  effectuated, did you prepare a title opinion?
4  A.  I think I did.
5  Q.  So that would have been in 2004 that you
6  prepared a title opinion?
7  A.  Correct.
8  Q.  And was that a title opinion with
9  reference to each of the leases on Exhibit A?
10 A.  Yes.
11 Q.  Including item number 8, Pennzoil to
12 Cobham?
13 A.  Correct.
14 Q.  And that particular lease pertained--or,
15 I'm sorry, that particular assignment into Cobham
16 would have included reference to the Blackshere
17 lease which is at issue in this case?
18 A.  Correct.
19 Q.  And did your title opinion examine both
20 oil and gas rights?
21 A.  Yes.
22 Q.  With regard to the Blackshere lease?
23 A.  Yes.
24 Q.  Would you consider that a full title

Page 29

1  opinion?
2  A.  It was not a full title opinion.
3  Q.  How would you characterize it?
4  A.  At the time we--it was a purchase of
5  existing production and usually checked either the
6  most recent assignment or maybe a few assignments
7  back, but I didn't search it back until day
8  one.  It would have just been the leasehold side.
9  I didn't examine the mineral ownership.
10 Q.  Can you be more specific in terms of what
11 documents you would have reviewed and how far back
12 you would have gone with regard to the leasehold
13 side, to use your terminology, other than what is
14 reflected here?
15 A.  Yes, I couldn't tell you how far I went
16 back.
17 Q.  Did you review that title opinion in
18 preparation for your testimony today?
19 A.  No.
20 Q.  Do you have a copy of it in your file?
21 A.  I probably have one, sure.
22 Q.  And this title opinion--can we refer to
23 it as an abbreviated title opinion?
24 A.  Okay.

Page 30

1  Q.  Fair enough.  I'm sorry, you have to
2  answer.
3  A.  Yes.
4  Q.  This abbreviated title opinion, you would
5  have rendered that in 2004, correct?
6  A.  Correct.
7  Q.  Prior to November 5th of 2004.
8  A.  Correct.
9  Q.  When you were rendering your abbreviated
10 title opinion prior to November 5th of 2004, did
11 you advise anyone with Trans Energy or Prima Oil
12 what you had learned from the Saint Lukes case and
13 Davis Clovis regarding the potential division of
14 the oil and natural gas estates for certain
15 leases?
16 A.  No.
17 Q.  Why not?
18 A.  It was rarely applied.  It didn't seem to
19 apply to this.  There was nothing in the
20 assignments to bring it up.
21 Q.  At some point you did advise
22 representatives of Trans Energy or Prima Oil of
23 this potential division of oil and natural gas
24 estates, correct?

Page 31

1        MR. LEWIS:  Hold on one second.  I think
2  he hasn't been authorized to tell what he advised
3  them of.
4        MS. LYONS:  We have already gone over
5  this.  This is a fact, it is not an opinion.  And
6  Mr.--let me finish.  And Mr. Woodburn has already
7  testified to it and waived any privileges.
8        MR. LEWIS:  Could you please read back
9  her question?
10 (The following question was read by the court
11 reporter:  "At some point you did advise
12 representatives of Trans Energy or Prima Oil of
13 this potential division of oil and natural gas
14 estates, correct?")
15       MR. LEWIS:  That assumes--that assumes a
16 legal conclusion.  What we talked about before was
17 he discussed lore and legend.  Now you are asking
18 him to say what type of opinion he rendered as to
19 whether or not there was a division.
20       MS. LYONS:  I would disagree, but I am
21 happy to rephrase the question.
22       MR. LEWIS:  I appreciate that.
23 Q.  At some point in time you advised--I
24 believe you said it was Bill Woodburn; is that

Page 32

1  correct?
2  A.  Mark, I think.
3  Q.  I'm sorry, I keep getting that
4  confused.
5  At some point in time you advised Mark
6  Woodburn of a lore and legend that you had heard
7  from Mr. Clovis regarding the potential division
8  of the oil from the natural gas estate under
9  certain leases in which South Penn would have kept
10 the oil rights and Hope Natural Gas would have
11 gotten the gas rights; is that correct?
12 A.  We had that discussion at one time, yes.
13 Q.  And what was the context of that
14 discussion?  I don't want to get into any legal
15 opinions.
16       MR. LEWIS:  Could you put in a time
17 frame, too?
18       MS. LYONS:  Yes, I can.
19 Q.  Can you give me a time frame for that
20 discussion?
21 A.  It would have been when they were going
22 to drill a Marcellus well.  I think that is when
23 we discussed it.
24 Q.  On the Blackshere lease or another lease?



# In the case of:
## *TRANS ENERGY, INC., et al. v. EQT PRODUCTION COMPANY*

### REX CECIL RAY
### August 21, 2012



# Realtime Reporters
*"Because your time matters"*

118 Capitol Street
Charleston, WV 25301

(304) 344-8463
ScheduleRealtime@gmail.com

Realtimereporters.net

**EXHIBIT E**

Page 86

1  A.  No.
2  Q.  Did you make any efforts to make that
3  determination?
4  A.  No, sir.
5  Q.  And have you -- have you had any discussions
6  with anybody relating to Pennzoil pertaining to the
7  Blackshere lease at any time?
8  A.  No, sir.
9  Q.  Do you know whether or not at the time of the
10 acquisition by EQT of the Blackshere lease there were
11 any conversations with folks at Pennzoil?
12 A.  No, sir.
13 Q.  Are you able to determine how many wells were
14 operating on the Blackshere lease that were not EQT
15 wells?
16     MR. GOTTLIEB: Do you have a time period?
17     BY MR. McMILLAN:
18 Q.  At the time that you were looking to determine
19 -- you heard -- you realized there were other gas
20 wells?
21 A.  How many?
22 Q.  Yes.
23 A.  Approximately -- approximately 25.
24 Q.  Are you aware of any other abandoned wells on

Page 87

1  the Blackshere lease that are not in production and
2  not owned by other -- or there is no record producer
3  of the wells?
4  A.  Not that I can recall.  Cause when you look at
5  the DEP records, sometimes they'll say "operator
6  unknown."
7  Q.  But nobody went there physically on site and
8  inspected and -- and reported back to you that they
9  saw a bunch of old abandoned wells?
10 A.  No, sir.
11 Q.  All right.  I assume EQT is capable of doing
12 that, correct?
13 A.  Yes, sir.
14 Q.  Would it be difficult to do that?
15 A.  Possibly.  There may be wells that were
16 drilled and not had any records available that you
17 could even find even old maps of where they may be.
18 Q.  Is it fair to say that it may be difficult for
19 anybody to actually know what wells were on the
20 Blackshere lease --
21 A.  A --
22 Q.  -- even if they did a physical inspection or
23 site inspection?
24 A.  A lot of acreage to cover.

Page 88

1  Q.  A lot of acreage to cover.
2  A.  So you have to rely on -- on some records to
3  point you in the right direction.  DEP records.  If
4  there's access to maps, old maps, possibly old
5  Pennzoil maps.  You know, they have possibly the
6  oldest.  The old Columbia maps sometimes have old
7  foreign wells on them.  Would be foreign to Columbia.
8  Q.  And I guess looking at the record room itself
9  could assist?
10 A.  Possibly.
11     (DEPOSITION EXHIBIT NO. 7, MARCH 3, 2008
12 NICHOLAS TO WOODBURN LETTER, MARKED FOR
13 IDENTIFICATION)
14 Q.  We'll mark this as Deposition Exhibit 6 -- 7
15 for identification purposes.  And ask you to identify
16 that document for me if you can.
17 A.  Would be a letter dated March 3rd, 2008, from
18 Mark Woodburn -- or to Mark Woodburn from Patrick
19 Nicholas.
20 Q.  Do you know who Patrick Nicholas is?
21 A.  Patrick Nicholas at this time was staff
22 landman for Dominion.
23 Q.  Did he have any relationship with EQT?
24 A.  At this time, no.

Page 89

1  Q.  What about now?
2  A.  Yes.
3  Q.  What's his position now?
4  A.  Mr. Nicholas is regional land manager for
5  special projects.
6  Q.  Do you know what he provided to Mr. Woodburn?
7  A.  It says in this letter that he provided the
8  1902 working agreement and the 1922 amended thereto.
9  Q.  Do you know that the working agreement he
10 referred to was Deposition Exhibit 1, which is in
11 reference to working agreement to Gilmer County?
12 A.  Okay.
13 Q.  Did you know that?
14 A.  No, did not.
15 Q.  Would you agree with me that Deposition
16 Exhibit 1, which purports to be a working agreement,
17 pertains to just Gilmer County?
18 A.  Yes.
19 Q.  And, again, you've not seen this document
20 before; is that correct?
21 A.  No, sir.
22 Q.  Did you have any discussions with Mr. Nichols
23 in regard to this letter?
24     MR. GOTTLIEB: Outside of discussion with