IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


TRANS ENERGY, INC.,
a Nevada corporation,
REPUBLIC PARTNERS VI, LP,
a Texas limited partnership,
REPUBLIC ENERGY VENTURES, LLC,
a Delaware limited liability company
and PRIMA OIL COMPANY, INC.,
a Delaware corporation,

      Plaintiffs,

v.                                          Civil Action No. 1:11CV75
                                                           (STAMP)

EQT PRODUCTION COMPANY,
a Pennsylvania corporation,

      Defendant.


<u>MEMORANDUM OPINION AND ORDER</u>
<u>GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT,</u>
<u>DENYING DEFENDANT'S MOTION FOR</u>
<u>DECLARATORY JUDGMENT AND FOR SUMMARY JUDGMENT,</u>
<u>DENYING PLAINTIFFS' MOTION TO STRIKE</u>
<u>THE AFFIDAVIT OF MICHAEL G. KIRSCH,</u>
<u>DENYING DEFENDANT'S MOTION FOR LEAVE TO FILE A</u>
<u>SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF ITS</u>
<u>MOTION FOR DECLARATORY JUDGMENT AND SUMMARY JUDGMENT AND IN</u>
<u>OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND</u>
<u>DENYING AS MOOT PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE</u>
<u>ALL UNRECORDED DOCUMENTS PURPORTING TO AFFECT RECORD TITLE,</u>
<u>INCLUDING THE "WORKING AGREEMENT" AND PRECLUDE TESTIMONY</u>
<u>REGARDING "LORE AND LEGEND" OF THE SOUTH PENN OIL COMPANY/</u>
<u>HOPE NATURAL GAS COMPANY WORKING AGREEMENT</u>


I.   <u>Background</u>

This civil action arises from the parties' competing claims of

interest in the gas rights of a 3,800 acre plot of land located in

Wetzel and Doddridge Counties, West Virginia ("Blackshere").  On

February 20, 1892, John Blackshere and South Penn Oil Company

("South Penn"), which would later become Pennzoil Products Company ("Pennzoil"), entered into an oil and gas lease covering Blackshere ("the Blackshere Lease"), and recorded the lease in the office of the Clerk of the County Commission of Wetzel County. In 1901 and 1902, South Penn entered into indentures with Carnegie Natural Gas Company ("Carnegie") and Hope Natural Gas Company ("Hope"), which purported to sever South Penn's natural gas and oil rights in the Blackshere Lease, giving Carnegie the gas rights to 250 acres of Blackshere, and Hope the gas rights to the remaining acres of the leasehold. At the time that the indenture, or working agreement, was entered into with Hope in 1902, Hope and South Penn were both wholly-owned subsidiaries of Standard Oil Company. Neither of these indentures were ever recorded. It is uncontested that defendant EQT Production Company ("EPC") succeeded Hope and Carnegie in whatever interest was conveyed to them by South Penn through those unrecorded 1901 and 1902 indentures. EPC owns and operates two Marcellus Shale gas wells on the Blackshere property, which are registered as operated by EPC with the West Virginia Department of Environmental Protection ("WV DEP").

In 1996, Pennzoil[1] assigned its rights in the Blackshere Lease to Cobham Gas Industries, Inc. ("Cobham").  This assignment was recorded in the office of the Clerk of the County Commission of Wetzel County.  In 2004, Prima Oil ("Prima"), a wholly-owned subsidiary of Trans Energy, Inc. ("Trans Energy"), acquired all of Cobham's interest in the Blackshere Lease through a Confirmatory Assignment and Bill of Sale also recorded with the Clerk of the County Commission of Wetzel County.  On December 1, 2008, by conveyance recorded in the office of the Clerk of the County Commission of Wetzel County, Trans Energy and Prima Oil assigned a portion of their rights to the Blackshere Lease to Republic Energy Ventures, LLC.

In early 2011, Trans Energy was granted a permit by the WV DEP to drill a new Marcellus Shale gas well on the Blackshere property, at which point Prima Oil and Republic Partners engaged counsel to perform a title examination into its interest in the Blackshere Lease.  This title examination yielded EPC's competing interest in the lease resulting from of the unrecorded Hope indenture.  Upon this discovery, the plaintiffs filed this civil action, seeking to quiet title on the Blackshere Lease and requesting declarations

---

[1]As alluded to above, South Penn acquired a controlling stake in Pennzoil Company in 1925.  In 1963, South Penn merged with Zapata Petroleum and Stetco Petroleum to become a new Pennzoil Company.  See Pennzoil Company, Encyclopedia Britannica Online, http://www.britannica.com/EBchecked/topic/450222/Pennzoil-Company (last visited October 18, 2012).

that plaintiffs have rightful title to the Blackshere Lease, that South Penn/Pennzoil's chain of title is unbroken and valid, that Prima Oil was a bona fide purchaser for value ("BFP") of the Blackshere Lease and that Prima Oil had no actual, constructive or record knowledge of any competing interest in the Blackshere property when it acquired Cobham's interest in the same.

EPC answered, and also filed counterclaims seeking a declaration that it has a superior right, title and interest in and to the gas within and underlying the Blackshere property, and also raising tort counterclaims for trespass, conversion and waste, and requesting compensatory, treble and punitive damages.  The plaintiffs later filed an amended complaint which raised the same tort claims and also sought damages.

Following the close of discovery, both the plaintiffs and EPC filed cross motions for summary judgment.  The plaintiffs also filed a motion to strike the affidavit of Michael G. Kirsch, filed as an exhibit to EPC's response to the plaintiffs' motion for summary judgment.  EPC filed a motion to extend discovery and the plaintiffs filed two motions in limine.[2]  All of these motions are now fully briefed.  On October 16, 2012, the parties, by counsel, appeared before this Court for the pretrial conference in this matter.  At this conference, all of the pending motions were

---

[2]This Court has ruled upon the motion to extend discovery and the first motion in limine to exclude reference to punitive damages by separate memorandum opinion and order.

discussed. The plaintiffs also indicated their withdrawal of all claims of adverse possession of the Blackshere property, and the possible withdrawal of their tort claims for damages.  After this conference, this Court asked the parties to clarify their positions on their tort claims for damages.  The plaintiffs indicated that they withdrew all tort claims for damages, and EPC indicated its intent to maintain all of its claims and requests for damages. This Court then contacted the parties by letter, informing them generally of the rulings that it intended to make in this memorandum opinion and order and directing all parties to refrain from filing any further motions in this case.  Following the sending of that letter, EPC filed a motion seeking leave to file a supplemental memorandum of law in support of its motion for declaratory judgment and summary judgment and in opposition to plaintiffs' motion for summary judgment.  All pending motions are now ripe for this Court's consideration.

    For the reasons that follow, as a result of the plaintiffs' withdrawal of its tort claims for damages, the plaintiffs' motion for summary judgment is granted.  EPC's motion for declaratory judgment and for summary judgment is denied.  EPC's motion for leave to file a supplemental memorandum of law in support of its motion for declaratory judgment and summary judgment is denied.  As indicated at the pretrial conference in this case, the plaintiffs' motion to strike the affidavit of Michael G. Kirsch is denied.

Finally, the plaintiffs' remaining motion in limine to exclude certain unrecorded documents and references thereto is denied as moot.

## II.  Applicable Law

Under Rule 56(c) of the Federal Rules of Civil Procedure,

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
    (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials; or
    (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).  However, as the United States Supreme Court noted in Anderson, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine

6

issue for trial." Id. at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250; see also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979) (Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (citing Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir. 1950))).

In Celotex, the Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Summary judgment is not appropriate until after the non-moving party has had sufficient opportunity for discovery. See Oksanen v. Page Mem'l Hosp., 912 F.2d 73, 78 (4th Cir. 1990), cert. denied, 502 U.S. 1074 (1992). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

III.  <u>Discussion</u>

A.  <u>Motions for summary judgment</u>

   i.  <u>The competing claims of interest to the Blackshere Lease</u>

   Both parties' claims to the gas rights under the Blackshere
Lease begin with the original 1892 oil and gas lease between the
John Blackshere and South Penn, which was duly recorded with the
office of the Clerk of the County Commission of Wetzel County.
However, the issues regarding proper title to the lease which have
led to this litigation began shortly thereafter.  In 1901 and 1902,
South Penn entered into indentures with Carnegie and Hope, granting
these companies the gas rights to 250 acres and 3,550 acres of the
Blackshere leasehold respectively, with South Penn retaining the
oil rights to the same.  These indentures were not at the time, nor
have they ever been, recorded.  Decades after these unrecorded
indentures were created, Hope conveyed all of its interests,
rights, and titles held in Wetzel County, West Virginia to
Consolidated Gas Supply Corporation ("Consolidated Gas") on April
1, 1965.  This conveyance was recorded in the office of the Clerk
of the County Court of Wetzel County, but did not refer
specifically to any rights that Hope may have had in the Blackshere
Lease, rather referring generally to the transfer of all of the
rights held by Hope within Wetzel County.  EPC's chain of title to
the gas rights in Blackshere derives from any right that

8

Consolidated Gas may have received from Hope through this 1965 conveyance.

The plaintiffs' claimed interest in the gas rights under the Blackshere Lease comes as a result of an Assignment and Bill of Sale ("Assignment") entered into on October 15, 1996 by Pennzoil (South Penn) and Cobham.  This assignment was recorded through a Memorandum of Assignment and Bill of Sale ("Memorandum") filed the same day with the office of the Clerk of the County Court of Wetzel County.  The Memorandum indicates that Pennzoil, through the Assignment, "did bargain, sell, transfer, assign and convey unto [Cobham], all right, title and interest it may have in and to certain oil and gas leases and 88 wells more particularly described on EXHIBIT 'A' and EXHIBIT 'B', attached [t]hereto and made a part [t]hereof."  The rights transferred by this Assignment, were purchased in 2004 by Prima, which is a wholly-owned subsidiary of Trans Energy.  A portion of the rights of Prima and Trans Energy have been assigned to the Republic plaintiffs.

EPC contends both in its response to the plaintiffs' motion for summary judgment and in its motion for declaratory and summary judgment, that the plaintiffs, while holding record title to the oil rights under the Blackshere Lease, never obtained the gas rights to Blackshere.  It argues that the Memorandum and the Assignment between Pennzoil and Cobham unambiguously assign to Cobham only the oil rights to the Blackshere Lease.  In the

alternative, EPC argues that Pennzoil never had the gas rights to convey to Cobham, by virtue of the 1901 and 1902 Carnegie and Hope indentures which, while unrecorded, can only be superseded under West Virginia law by a BFP, for which status Prima does not qualify.

ii.  Rights transferred to Cobham by Assignment and Bill of Sale and recorded in Memorandum of Assignment and Bill of Sale

As quoted above, the Memorandum recorded by Pennzoil and Cobham to memorialize the Assignment which transferred rights to the Blackshere Lease transferred "all right title and interest [Pennzoil] may have in and to certain oil and gas leases and 88 wells more particularly described in EXHIBIT 'A' and EXHIBIT 'B', attached to and hereto made a part hereof."  Page 2 of Exhibit A lists the Blackshere Lease, the original lessee of the Lease, the original date that the Lease was granted, and the record book and page number where the Lease was recorded.  No notation is made as to the Blackshere Lease in the remarks section of Exhibit A.  Page 1 of Exhibit B lists all wells associated with the Blackshere Lease that are being conveyed to Cobham.  This exhibit notes the lease number associated with the wells, the farm name where the wells are located, the well numbers, the acreage of the leasehold and the "rights" conveyed with the wells.  Under the "rights" section of Exhibit B, all of the Blackshere wells are listed as "oil" only. Other wells are listed as both oil and gas.

10

Both parties agree that the Memorandum is clear and unambiguous on its face, and thus must be interpreted only by the language of the document itself.[3]  See Syl. pt. 4, Zimmerer v. Romano, 679 S.E.2d 601, 604 (W. Va. 2009).  EPC argues that, based upon the notation of simply "oil" in the "rights" column of Exhibit B to the Memorandum summarized above and the fact that other wells are accompanied by a notation indicating both oil and gas, it is clear that the Assignment did not convey gas rights under the Blackshere Lease.  EPC maintains that Exhibit B indicates not only the wells transferred under the Assignment, but also expresses the rights to each of the leases which under which the wells operate.  Because "oil" is the only right listed as to the Blackshere Lease, EPC urges, oil was the only right under the Blackshere Lease conveyed to Cobham.

However, as the plaintiffs argue, and this Court finds, EPC's interpretation of the above language requires a reading of Exhibit B in a vacuum and a blindness of the Memorandum as a whole.  Such

_____

[3]As noted above, the plaintiffs have filed a motion to strike the affidavit of  Michael G. Kirsch, filed as an exhibit to EPC's response to the plaintiffs' motion for summary judgment, as it is parol evidence which cannot be considered in the interpretation of an unambiguous agreement.  See Doganieri v. United States, 520 F. Supp. 1093, 1097 (N.D. W. Va. 1981).  However, as this Court indicated at the pretrial conference in this case, this motion is denied, as this Court believes it appropriate to consider the motion as this Court deems proper under its interpretation of the law and facts of this case.  That being said, this Court has not considered this affidavit in its interpretation of the 1996 Memorandum of Assignment and Bill of Sale nor in its interpretation of the 1996 Assignment and Bill of Sale.

a reading is improper.  See Syl. pt. 1, <u>Maddy v. Maddy</u>, 105 S.E. 803 (W. Va. 1921) ("In construing a deed, will, or other written instrument, it is the duty of the court to construe it as a whole, taking and considering all the parts together, and giving effect to the intention of the parties wherever that is reasonably clear and free from doubt[.]").  When reading the Memorandum in its entirety, it is clear that Pennzoil transferred both oil and gas rights to the oil and gas leases listed, and that Exhibit B simply lists the wells transferred and the rights utilized by those wells.

Initially, the opening paragraph of the Memorandum, which contains the so-called "granting" language of the document, indicates the transfer of interest in two distinct types of Pennzoil property.  First, Pennzoil transferred all of its interest in and to "certain <u>oil and gas</u> leases."  Second, it conveyed all of its interest to 88 wells.  Following the statement of these two distinct conveyances, the Memorandum indicates that the leases and wells transferred are "more particularly described" on the two exhibits which are attached thereto.  This granting language is both telling on its own, and also informs the reading of the language of Exhibits A and B.  The Memorandum indicates, with regard to leases transferred to Cobham, that <u>all</u> of its interests in <u>all</u> of the leases were transferred.  The Memorandum also, importantly, asserts that all of the leases conveyed are "oil <u>and</u> gas leases."  There is no indication that any of the leases are

simply oil leases, or that any are simply gas leases.  On the contrary, this language unambiguously indicates that all leases are both oil and gas leases.  Such an assertion is not made about the wells conveyed.

Having thus determined that the granting language unambiguously indicates that Pennzoil has conveyed <u>all</u> of its interests in two distinct in types of property, (1) "oil and gas leases;" and (2) "wells," the reading of Exhibits A and B is thus informed.  Exhibit A clearly lists all of the <u>leases</u> conveyed as it refers only to information relating to the particular oil and gas leases conveyed to the complete exclusion of information regarding the particular wells conveyed.  In that exhibit, the entire original Blackshere Lease granted to South Penn in 1892 by John Blackshere, and recorded on page 547 of record book 35 in Wetzel County, is listed among those transferred.  There is no indication in this exhibit that anything but the entire Blackshere Lease so recorded in 1892 was conveyed to Cobham through the Assignment.  Accordingly, this exhibit, read in conjunction with the granting language in the memorandum, unambiguously indicates that the entire Blackshere Lease -- an <u>oil and gas</u> lease -- was transferred to Cobham.

Exhibit B on the other hand, clearly only lists all wells transferred to Cobham by the Assignment and Bill of Sale.  This is apparent initially because the first exhibit specifically refers

13

only to the leases conveyed, to the clear exclusion of information regarding wells. As a result, based upon the granting language and by process of elimination, Exhibit B must more particularly describe only the wells transferred, to the exclusion of the leases conveyed. This further becomes clear because, while there is general reference in Exhibit B to the leases with which the wells are associated, this exhibit much more particularly describes wells, while Exhibit A made no reference at all to wells. In Exhibit B, all wells associated with the Blackshere Lease that were transferred to Cobham are specifically listed by number, as well is the acres of the Blackshere leasehold, and the "rights" of those wells. This Court does not find it necessary to determine the reason why the parties to this memorandum chose to list "rights" in this exhibit, because whatever that reason may have been, it cannot be reasonably determined to indicate that the wells designated as oil-only were so designated because Pennzoil only transferred the oil rights to the leases to which they were affiliated. Exhibit A, which clearly describes the leases conveyed, makes no reference to any lease being "oil" only. It is also clear for the reasons above that Exhibit B only refers to the wells conveyed and does not serve to describe the leases which were conveyed separately and distinctly from the wells within the granting language. Accordingly, this Court finds that the Memorandum clearly and

unambiguously indicates that Pennzoil conveyed both oil and gas rights under the Blackshere Lease to Cobham.

 iii. <u>Prima's Status as a BFP</u>

 However, EPC argues that, even if this is true, by virtue of the 1901 and 1902 indentures, Pennzoil did not have the gas rights under the Blackshere Lease to convey to Cobham in 1996. As a result, EPC claims, even if the Memorandum purports to unambiguously convey both oil and gas rights, EPC is the actual holder of the gas rights under the Blackshere Lease. It is true that under West Virginia law, as EPC suggests, unrecorded written contracts conveying rights to land are "as effective as a recorded deed" against purchasers with notice of the unrecorded transfer. <u>Farrar v. Young</u>, 230 S.E.2d 261, 265 (W. Va. 1976). However, there is one limitation to this rule. Such unrecorded transfers can be invalidated by a BFP of the subject property. <u>See</u> W. Va. Code § 40-1-9. The purpose of this limitation is to protect good faith, bona fide purchasers who conduct due diligence prior to purchasing land or an interest therein from "creditors of the grantor, and against other persons to whom the grantor may have undertaken to execute title papers pertaining to the land embraced in the recorded instrument." <u>Bank of Marlinton v. McLaughlin</u>, 1 S.E.2d 251, 253 (1939). EPC argues that Prima does not qualify as a BFP because it had notice of EPC's interest in the gas rights to

Blackshere.  However, the plaintiffs contend, and this Court finds, that Prima was a BFP without notice of EPC's competing claim.

In order to qualify as a BFP without notice, one must purchase an interest in real property for valuable consideration "without notice of another's claim to the property and without actual or constructive notice of any defects in or infirmities, claims, or equities against the seller's title." Black's Law Dictionary, 1271 (9th ed. 2004).  In short, the BFP must purchase in actual good faith.  Wolfe v. Alpizar, 637 S.E.2d 623 (W. Va. 2006).  In order for a party alleging notice to a purchaser to successfully prove the same, it must show that the purchaser was placed on actual, constructive or inquiry notice from the record chain of title, from open and visible use, or by some other means, of a competing interest or defect in title.  Fanti v. Welsh, 161 S.E.2d 501, 505 (1968).  Such knowledge is imputed upon the purchaser if it could have acquired it through "the exercise of ordinary diligence." Id. Accordingly, if "a reasonably careful inspection of the premises" or of the chain of title would have yielded knowledge of the competing interest, "or where the grantee has knowledge of facts sufficient to put a prudent buyer on inquiry," he will be deemed to have had knowledge of the competing interest and cannot be said to be a BFP.  Id.

Here, EPC points to multiple circumstances which, it alleges, should impute upon Prima knowledge of EPC's competing interest in

16

the Blackshere Lease.  First, it asserts that the Memorandum contained language that should have provided notice of "suspicious circumstances sufficient to put [Prima] on inquiry notice of a potential competing interest."  ECF No. 109 *8.  Secondly, it contends that EPC's maintenance of two gas wells on the Blackshere property should have been discovered through reasonable diligence, and thus inquiry notice of EPC's competing interest in Blackshere should be imputed upon Prima.  EPC next says that Prima's title researcher, Richard L. Starkey, was aware of so-called "legend and lore" regarding the severing of South Penn's oil and gas rights under the Blackshere Lease, but failed to take adequate steps to discover whether or not such "legend and lore" was founded. Finally, it is argued that the consideration paid by Prima to Cobham in exchange for the Blackshere Lease was wholly insufficient and such consideration demanded by Cobham should have placed Prima on notice of a likely deficiency in the title transferred thereunder.  For the reasons that follow, this Court finds that Prima was not on notice of the competing interest and could not have obtained such notice through reasonable diligence.

      a.  <u>Alleged constructive notice in record chain of title</u>

EPC contends that an inspection of the record chain of title for the Blackshere Lease yields a number of "suspicious circumstances" which create constructive notice of its interest in the gas rights to Blackshere.  EPC specifically points to two

portions of the Memorandum between Pennzoil and Cobham.  First, it is argued that the "rights" section of Exhibit B in the memorandum, quoted and discussed extensively above, wherein the rights noted for the Blackshere transfer are only listed as "oil" while other listed transfers' rights are listed as both oil and gas, provided notice of a possible unrecorded interest in the gas rights to Blackshere.  As a result, EPC argues, Prima was under a duty to determine, through reasonable diligence, whether such an interest existed.  For the reasons discussed above, this argument is not persuasive.  This Court has already determined that Exhibit B of the Memorandum only presents a schedule of wells transferred to Cobham.  Thus, the reference to "oil" only would not put a later purchaser on notice of a possible competing interest to the gas rights under the lease, which were clearly conveyed along with the oil rights in the granting language and in Exhibit A.

Secondly, EPC asserts that the reference within the first paragraph of the Memorandum to the actual Assignment, which is the complete agreement between the parties to the transfer, represents further "suspicious circumstances" and created a duty for Prima to inspect the Assignment.  West Virginia law requires the recording of only a memorandum noting a transfer, rather than the entire document of transfer.  Certain specific information must be contained in the memorandum in order to qualify as a valid record of the transfer, and "[s]uch memorandum shall constitute notice of

18

only the information contained therein." W. Va. Code § 40-1-8. Accordingly, future purchasers are on constructive notice of anything referenced within the memorandum.

Also, under West Virginia law, if a reference within the memorandum creates "'reasonable grounds to believe that property may have been conveyed in an instrument not of record'" the purchaser "may be charged with searches beyond the record." Mancuso v. Meadowbrook Mall Co. Ltd P'shp, No. 1:06CV53, 2007 U.S. Dist. LEXIS 23308 *15 (N.D. W. Va. Mar. 28, 2007) (quoting Eagle Gas Co. v. Doran & Assocs., Inc., 387 S.E.2d 99, 102 (W. Va. 1989); and see Pocahontas Tanning Co. v. St. Lawrence Boom & Mfg. Co., 60 S.E. 890, 893 (W. Va. 1908) ("That which fairly puts a party on inquiry is regarded as sufficient notice, if the means of knowledge are at hand; and a purchaser, having sufficient knowledge to put him on inquiry, is deemed to be sufficiently notified to deprive him of the character of an innocent purchaser.").

Here, the relevant Memorandum specifically referenced the Assignment as the actual document of transfer thus, pursuant to West Virginia Code § 40-1-8, putting Prima on constructive notice of that document. EPC argues that, as a result, West Virginia law requires that Prima look outside the record to the referenced document in order to complete its reasonable due diligence. In support of this argument, EPC cites Mancuso, 2007 U.S. Dist. LEXIS 23308. In that case, a court in this district found that a

19

purchaser was on notice of a possible unrecorded restrictive covenant through a note in the recorded memorandum referencing "any and all exceptions, reservations, restrictions, easements, rights-of-way and conditions as contained in prior deeds of conveyance in this chain of title." Id. at *11.  However, in making this argument, EPC misconstrues the requirements of West Virginia law, and the holding of Mancuso.  In order to create a duty to further inspect a possible competing interest, a reference within the Memorandum must not only put the later purchaser on notice of an unrecorded document, but also give him "reasonable grounds to believe that" that unrecorded document may contain information relating to a competing interest or deficiency in title. Eagle Gas Co., 387 S.E.2d at 102.  In Mancuso, the language within the memorandum did just that, as it directly referred to possible "exceptions, reservations, restrictions . . ." which may have been in place to limit the title transferred to the purchasers.  2007 U.S. Dist. 23308 LEXIS at *11.  The language of the Memorandum in this case does not so indicate possible information regarding competing interests or impediments, but rather generally refers to the Assignment.  This Court does not believe that this reference would have placed a reasonably prudent purchaser on notice of a possible competing interest, and thus, no duty to look outside the record to further investigate the same was created.

20

Additionally, even assuming for the sake of argument that the reference to the Assignment created a duty to inspect the Assignment document, this would not affect this Court's overall determination that Prima was without notice of EPC's competing interest in the gas rights to Blackshere, because, as with the Memorandum's general reference to the Assignment, an inspection of the Assignment would not yield any information which could constitute "reasonable grounds to believe that property may have been conveyed in an instrument not of record." Eagle Gas Co., 387 S.E.2d at 102. EPC argues that such reasonable grounds exist in the language within the Assignment which notes that "a portion of [the transferred] Land and Wells are subject to certain contractual obligations with either CNG Transmission Corporation or CNG Producing Company."[4] This notation, EPC argues, is sufficient to require a purchaser to inquire further into exactly what contractual obligations the Assignment refers. This Court disagrees.

The notation upon which EPC relies simply generally refers to preexisting contractual obligations applicable to some of the land and wells transferred by the Assignment. There is no indication of the type of "contractual obligations" which may bind some of the subject land and wells, nor does it give any information regarding

---

[4]CNG Transmission Corporation is a predecessor-in-interest of EPC.

which land and wells are bound thereto.  "Contractual obligations" could mean any number of things, and this notation does not provide any inclination that these obligations may include competing interests to the rights under any of the oil and gas leases transferred under the assignment.  Further, a large number of oil and gas leases, and an even larger number of wells were transferred to Cobham via the Assignment, and a subsequent purchaser of a single oil and gas lease contained therein is given no guidance as to which leases and wells may be affected by these amorphous "contractual obligations."  Accordingly, this general notation is insufficient to create a reason to believe that a competing interest may exist, and it is beyond the realm of "common prudence and ordinary diligence" to require later purchasers to proceed into a further investigation into such non-specific references to possible contractual obligations that may bind the land in which the purchaser seeks to gain an interest.  Mancuso, 2007 U.S. Dist. LEXIS 23308 *16 (internal quotation marks omitted).

Finally, EPC asserts generally that Prima's due diligence into the record title was cursory and unreasonably superficial.  As such, it maintains, Prima cannot be deemed a BFP, and must be held to the standards of caveat emptor, or buyer beware.  However, this argument also misconstrues West Virginia law.  As described above, in determining whether a purchaser qualifies as a BFP, courts must impute all knowledge upon that purchaser which could have been

22

obtained through reasonable diligence in researching the title history of the land in which the purchaser is attempting to obtain an interest.  See Fanti, 161 S.E.2d at 505.  This rule is not one which requires a purchaser to engage in due diligence and punishes him for failing to do so by denying him BFP status regardless of whether such diligence would have yielded notice of a competing interest.  Rather, this body of law simply holds that, whether or not a purchaser engages in reasonable diligence, he cannot claim ignorance to any notice which would have resulted from said diligence.  Id.  If the potential for notice does not exist, no notice can be imputed upon the purchaser.  Here, there is nothing within the record chain of title of Blackshere which could have put Prima on notice of the possible existence of EPC's interest.  As stated above, nothing in the 1996 Assignment or Memorandum would indicate that a competing interest in Blackshere existed.  Further, all recorded documents that exist within EPC's chain of title, originating from the unrecorded 1902 indenture, cannot be located in tracing the title of the Blackshere Lease, as the 1902 indenture was not recorded, and the 1965 deed between Hope and Consolidated Gas Supply Corporation fails to note the 1902 indenture, the original Blackshere Lease, or even to specifically reference the

Blackshere property at all.[5]  Accordingly, no such knowledge can be imputed upon Prima.

      b.   <u>Alleged inquiry notice in the existence of EPC wells on Blackshere</u>

EPC further argues that Prima was on inquiry notice of EPC's competing interest in the gas rights under the Blackshere Lease through the existence of EPC wells on the property at the time that Prima purchased its interest in Blackshere. Inquiry notice is defined by West Virginia law as notice resulting from "knowledge or information of facts sufficient to put a prudent man on inquiry as to the existence of some right or title in conflict with that which he is about to purchase." Syl. pt. 4, <u>Pocahontas Tanning</u>, 60 S.E. 890. Like constructive notice, inquiry notice of any competing interest is imputed upon a purchaser when any such facts as above-described could have been recognized through reasonable physical inspection of the premises. See <u>Bailey v. Banther</u>, 314 S.E.2d 176, 181 (W. Va. 1983). However, the inquiry into this type of notice also requires a determination as to whether a "reasonable" physical inspection would have resulted in the discovery of others' possible claim[s] to the property, or whether such discovery would have required an inspection that is beyond the realm of reasonableness.

---

     [5]As indicated above, the 1965 deed, simply noted the transfer of all of Hope's interests in Wetzel County. It made no specific reference to Blackshere, nor to any other lease located therein.

See Pocahontas Tanning, 60 S.E. at 893; and Mancuso, 2007 U.S. Dist. LEXIS 23308 at *16.

The Blackshere leasehold consists of 3,800 acres of property. At the time of the Cobham/Prima transfer, EPC or its predecessors operated two gas wells thereon, and Cobham operated 27 wells.[6] According to unrefuted and unchallenged deposition testimony offered by William Woodburn, Prima's representative, Blackshere contains dozens of access roads leading to different wells, is not developed, and is entirely "wooded [and] steep" with "no access." ECF No. 107 Ex. A *18-19, 47.  It is also described as "about six square miles of dense forest."[7]  ECF No. 91 *15 n.11.  The record shows that, in its title investigation prior to purchasing its interest in Blackshere from Cobham, Prima spent several days conducting a visual inspection of a large portion of the property, and some of the Cobham wells thereon.[8]  This Court believes that, under the circumstances, size and topography described and unchallenged by EPC, the visual inspection undertaken by Prima was

_____

[6]The record in this case indicates conflicting numbers in this regard.  In any event, the record shows that the plaintiffs' predecessors operated between 27 and 29 wells on Blackshere at the time that Prima purchased its interest therein.

[7]According to the plaintiffs, to put the size of Blackshere into perspective, the leasehold property is approximately 1/4 the size of Manhattan. See ECF No. 91 *15 n. 11.

[8]Plaintiffs assert that Prima devoted several days to "visiting wells, reviewing the gathering lines for production, and exploring about five (5) miles of the leasehold." ECF No. 91 * 16.

reasonable, and it would not be reasonable for due diligence to require a purchaser of an interest in the Blackshere Lease to visually inspect the entire leasehold property.  It is clear that Prima took a view of the property prior to purchasing an interest therein.  It toured a large portion of the land and inspected a number of wells.  Without reason to believe that others were operating wells on the property, and on a property the size and character of Blackshere, it is highly likely that a reasonable inspection of the leasehold property would not yield a discovery of EPC's wells.  Further, there has been no allegation nor evidence presented that Prima actually discovered EPC's wells and did nothing to further investigate their existence.  Therefore, EPC's two operating wells on the property are not sufficient to create inquiry notice of their claim of interest.  Further, while EPC argues that the existence of its wells on Blackshere are easily found through a search on the WV DEP website, without inquiry or constructive notice of a competing interest to the gas rights to Blackshere creating a duty to further investigate the same, Prima was under no duty to search the WV DEP website.

c.   Alleged inquiry notice in "legend and lore"

EPC further argues that Richard Starkey, Prima's attorney who conducted the due diligence regarding the acquisition of the Blackshere Lease, was aware through "legend and lore" in the industry of oil and gas leases in northern West Virginia, that

South Penn had at some point severed its oil rights from its gas rights in a number of oil and gas leases in the area.  See ECF No. 107 Ex. 1 *12.  This knowledge, it asserts, is "sufficient to put a prudent man on inquiry as to the existence of some right or title in conflict with that which he is about to purchase."  Syl. pt. 4 Pocahontas Tanning, 60 S.E. 890.  However, this argument neglects to address the entirety of Mr. Starkey's testimony.  While he admitted that he learned of this so-called "legend and lore" sometime in the 1980s, he also stated that he had never seen any agreement which would support this "legend," and that, in his thirty years working in the oil and gas industry in northern West Virginia, he had "never once" seen the alleged severance "applied to anything I have worked on."  ECF No. 107 Ex. 1 *12.  Mr. Starkey testified that he has worked on a number of big fields in the relevant area, including "hundreds of leases [and that the alleged severance] doesn't apply to any of them."  Id.

It appears clear to this Court that, while the knowledge of Mr. Starkey may very well be imputed upon his client, Prima, Mr. Starkey's knowledge of the "legend and lore" relating to South Penn's severance of its oil and gas rights under a number of leases in the northern West Virginia area was insufficient to constitute inquiry notice of a competing interest in the gas rights of Blackshere.  See Morgan-Gardner Elec. Co. v. Beelick Knob Coal Co., 112 S.E. 587, 591 (W. Va. 1922) ("The law imputes to the principal,

and charges him, with all notice or knowledge relating to the subject matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority[.]"); and see Dorr v. Camden, 46 S.E. 1014, 1017 (W. Va. 1904) (explaining that attorneys are the agents of clients and are subject to the same standards of agency law as is any other agent.)

Mr. Starkey's deposition testimony makes clear that, even though he was aware of "legend and lore" regarding a "secret" agreement between South Penn and Hope to bifurcate oil and gas rights under a number of leases, he also asserted that his extensive experience in the industry had shown him that this "legend" was without merit, as he had never seen a document memorializing such an agreement, and had never seen the agreement applied to a single lease, out of the hundreds with which he had worked.  Under Pocahontas Tanning, "vague rumor or mere surmises are insufficient in themselves" to create inquiry notice.  60 S.E. at 893.  Mr. Starkey's knowledge and experience told him that what he had heard about the secret agreement was just that.  Accordingly, his knowledge of the legend and lore was insufficient to create inquiry notice in this case.

d.   Alleged inquiry notice in consideration paid by Prima for the Blackshere Lease

Finally, EPC asserts that the consideration paid to Cobham by Prima for the rights to the Blackshere Lease was so insufficient

28

that it should have placed a prudent purchaser on inquiry notice as to a competing interest or an otherwise defective title.  EPC claims that Prima paid just $250,000.00 to Cobham in 2004 for the Blackshere Lease, but the plaintiffs assert that in addition to the $250,000.00, Cobham also received 250,000 shares of Trans Energy. EPC compares this consideration with the fact that, in 2007, Prima contemplated investing $6,000,000.00 into the property for construction of a Marcellus Shale gas well.  It contends that this evidences the gravity of the deficiency of the consideration paid, and of the value of the property if Prima had acquired the gas rights free of outside claims.

EPC notes that, while consideration is not generally questioned in a BFP inquiry, because the BFP test only requires that "valuable consideration" be given for a property, when consideration is so inconsistent with the value of an interest sought to be purchased, courts often consider the same in the context of notice.  See, e.g., Shacket v. Roger Smith Aircraft Sales, Inc., 651 F. Supp. 675, 692 (N.D. Ill. 1986).

This Court agrees that, as a general rule, when consideration paid is significantly less than the value of a property, notice of a deficiency in title may be imputed upon the purchaser.  However, in this case, EPC's argument disregards the unique circumstances of recent significant developments in the oil and gas industry in northern West Virginia, which greatly changed the value of gas

leases in the area between the years of 2004 and 2007.   As the plaintiffs point out, in 2004, purchasers of oil and gas leases in northern West Virginia could only rely upon the United States Geological Survey ("USGS") estimations that 1.9 trillion cubic feet of recoverable Marcellus Shale gas existed in the area.   See ECF No. 113 * 14.   Therefore, the value of gas leases like Blackshere at that time was hypothetical, at best.   Throughout the years following Prima's acquisition of the Blackshere Lease, as the parties are well aware, that hypothetical value has steadily grown into an actuality, and has done so at a level not foreseen by even the USGS estimations; at present, the estimated recoverable Marcellus Shale gas is at around 141 trillion cubic feet.   Id.

With this unique background in mind, along with the fact that EPC has not entered into the record any evidence of the fair market value for oil and gas leases in Wetzel County, West Virginia in 2004, this Court cannot find that a legitimate issue of material fact exists regarding whether the consideration paid by Prima in 2004 was so low that it should have put it on notice of a deficiency in title to the Blackshere Lease.   As such, this Court must find that Prima was a BFP of the Blackshere Lease and that it is the rightful owner of both the oil and gas rights thereto.   As noted above, the plaintiffs have withdrawn all other common law claims for damages, and thus, the plaintiffs' motion for summary judgment is granted.

B.   <u>Motion for leave to supplement motion for declaratory judgment and for summary judgment</u>

As noted in the background of this case outlined above, this Court contacted the parties to this civil action by letter following the pretrial conference to inform them that the plaintiffs' motion for summary judgment would be granted, and directing the parties to refrain from filing any further motions. <u>See</u> ECF No. 153. The following day, despite this Court's direction in this regard, EPC filed a motion for leave to file a supplemental memorandum of law in support of their motion for declaratory judgment and for summary judgment, and in opposition to the plaintiffs' motion for summary judgment. In support of this motion, EPC asserts that, pursuant to a motion to compel which was granted in their favor by United States Magistrate Judge James E. Seibert following the deadline for the filing of dispositive motions, a second deposition of William F. Woodburn, Prima's corporate representative, was conducted on October 14, 2012. EPC further says that the deposition revealed information which EPC argues affects the above analysis regarding whether Prima qualified as a BFP.

This Court was clear in its letter to the parties dated October 22, 2012 that it had reached all necessary decisions regarding the cross motions for summary judgment, and that no more motions were to be filed by either party. EPC's motion for leave to supplement its motion for summary judgment was filed following that

31

direction, and in contravention thereof. Further, as the motion for leave to supplement indicates, the second deposition of Mr. Woodburn was conducted on October 14, 2012; more than one week prior to this Court's letter directing the parties to file no further motions. As such, EPC was not entirely precluded from presenting to the Court the information that it obtained in this deposition, but could have provided this Court with the deposition transcript at any time during the week following the deposition. In fact, EPC presented argument at the pretrial conference which made use of the deposition testimony now sought to be added to the record. Accordingly, because this motion was untimely and filed in violation of this Court's clear direction against filing further motions, EPC's motion for leave to supplement its motion for summary judgment is denied.

That being said, this Court has nonetheless reviewed and considered EPC's offered supplemental memorandum of law, as well as the plaintiffs' response memorandum. Following this review, this Court concludes that, regardless of its decision regarding EPC's motion for leave to file the supplemental memorandum, the argument and evidence presented therein do not change any of the above opinions and determinations of this Court.

All of the evidence that EPC says was revealed in the second deposition of Mr. Woodburn relates to the extent of the due diligence performed by Prima prior to its purchase of its interest

32

in the Blackshere Lease. As is discussed at length above, this Court has found that Prima was not on sufficient notice of any possible competing interest in Blackshere in order to create a duty to conduct further research. Further, as is also discussed above, this Court has found that, even if such research would have been conducted in the course of Prima's due diligence efforts, it would not have yielded any further information to put Prima on notice of EPC's competing interest. Accordingly, the level of due diligence actually performed by Prima in its purchase of its interest in the Blackshere Lease does not affect this Court's ultimate decision that Prima was without notice of any potential competing interest in the Blackshere gas rights at the time that it purchased its interest in the Blackshere Lease.

## IV. <u>Conclusion</u>

For the reasons stated above, the plaintiffs' motion for summary judgment (ECF No. 90) is GRANTED. The plaintiffs' motion to strike the affidavit of Michael G. Kirsch (ECF No. 114) is DENIED. EPC's motion for declaratory judgment and for summary judgment (ECF No. 92) is DENIED. EPC's motion for leave to file a supplemental memorandum of law in support of its motion for declaratory judgment and summary judgment and in opposition to plaintiffs' motion for summary judgment (ECF No. 154) is denied. The plaintiffs' motion in limine to exclude all unrecorded documents purporting to affect record title, including the "working

33

agreement" and preclude testimony regarding "lore and legend" of the South Penn Oil Company/Hope Natural Gas Company Working Agreement (ECF No. 106) is DENIED AS MOOT.  Accordingly, it is ORDERED that this case be DISMISSED and STRICKEN from the active docket of this Court.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein.  Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:   November 26, 2012


/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE